1    And that item indicates failure to timely reconvene the

2    IEP team and review the IEP document without delving too

3    far into the facts of the case.   The IEP itself is out-

4    dated, and the current is more than 12 months old.

5         And the student currently is attending Savoy

6    Elementary School where he has been for over a month.  And

7    the parent has requested that a meeting be held, and that

8    D.C. Public Schools -- since the student is currently

9    there, that some of these issues do fall under DCPS'

10   responsibility not only as the SEA, but in that sense as

11   the LEA for the past 30 somewhat days.

12        MR.  JONES:   Well --

13        MS.  HARRIS-LINDSEY:  My response would be the

14   student, just as a way of proffer and I have to, if

15   necessary -- Ms. Benny Jones and (inaudible) indicated

16   that the student just -- in the last month, within the

17   last 30 days or so, is just a -- gotten to Savoy.

18        And under our due practice the student has to be

19   there for some period of time for that school to have some

20   kind of understanding and familiarity with the student.

21   And my understanding after communication with the school

22   is that the student has just -- we just (inaudible) 30

1    days as of Friday or 14th.

2          So the hearing request as it was drafted was

3    filed when the child just got to Savoy or had only been

4    there for a few weeks and under IDEA the staff has to be -

5    - have familiarity with the student in order to do any

6    thing with him, and so -- Savoy is not opposing or that --

7    I came to understand that they don't have to service the

8    child.  We are just, I mean, objecting to any allegation

9    of a denial of FAPE, that is being a --

10          MR. JONES:  Well, what I'll do is I'll reserve

11    my opinion on dismissing DCPS -- I'll actually rule on it

12    in the decision.  So if you want to leave you can do that.

13    But I'll reserve the right to move forward on dismissing

14    DCPS as a part of this particular complaint.  So --

15          MS. HARRIS-LINDSEY:  Well, if I leave then I

16    don't really --

17          MR. JONES:  I just said --

18          MS. HARRIS-LINDSEY:  -- for the other issue --

19          MR. JONES:  Right, right.  I'm not suggesting

20    that you have to stay or go.  That's your decision, but

21    I'm not going to rule on your request at this time.

22          MS. HARRIS-LINDSEY:  That thing would be -- it

1    may be -- you may be -- ethically you're responsible for

2    me to leave.

3         MR. JONES:  Oh, okay.

4         MS. HARRIS-LINDSEY:  -- if I am -- if there is

5    going to be allegations made against DCPS, and then I'll

6    leave because three of the four is -- three of the four

7    matters don't involve the use of tests, and the

8    allegations even as drafted -- even as stated in the

9    hearing request don't actually rise on their face to a

10   violation of IDEA.

11        And if there is no violation that's being

12   alleged against DCPS, then I will still ask that we be

13   dismissed just on the allegation -- just as the hearing

14   request is drafted, because then there is nothing to

15   defend.

16        I mean, the whole purpose is violations of IDEA

17   and services to the student, and as is drafted, don't --

18   it doesn't (inaudible).

19        MR. JONES:  Well, I'm not able to make a reason

20   decision on whether or not I would allow DCPS to be

21   dropped from the complaint.  Now, both counsel had no

22   problem with that, I have no problem with dismissing.  But

1    until I hear and read the complaint I'd just have to

2    reserve judgment on the dismissal request, okay?

3            MS. HARRIS-LINDSEY:  That's fine.

4            MR. JONES:  All right, now --

5            MR. DALTON:  Could I just add for the record,

6    however, that section 343 (e)(ii) speaks to the issue of

7    when an IEP is required.  And it states that neither the

8    session meets the requirement concerning the devolvement

9    of an IEP.  It must be conducted within 30 days of a

10   determination that the child needs special education and

11   related services.

12           This section is not directly on point, but this

13   section because it deals with the initial determination of

14   the child in need, but this section has been used in

15   countless cases both here and in other jurisdictions as

16   authority for exactly what counsel for DCPS has proffered

17   that, if there is already an IEP, then the earliest the

18   school district can be put on notice that a child were to

19   be in need of special education services is the receipt of

20   that IEP and introduction of that student into their

21   system.

22           And therefore, that's the point on which they

1    could, under any school of logic --

2              MR. JONES:  Be held accountable?

3              MR. DALTON:   -- be held accountable, for those

4    30 days have just transpired.  Therefore, I don't think it

5    would be a responsible ethic in either way for counsel to

6    be dismissed from this case.  I understand Ms. Bruceville

7    concerns as far as her representation of the client.

8    However, counsel for DCPS has indicated that there is no

9    resistance on the part of Savoy to holding an IEP meeting.

10             Perhaps the best thing to do would be if the

11   individual from Savoy is available by phone, perhaps a

12   date could be set now that we're at the hearing, and

13   perhaps with that date being set, Ms. Bruceville would

14   then withdraw her objection -- I'm not sure.

15             MS. BRUCEVILLE:  I mean, for the hearing officer

16   understand that this is not intended to be a contentious

17   personal attack on the DCPS -- any particular DCPS school.

18   However, given -- and I understand Mr. Dalton's reading of

19   the section that we just discussed.

20             In this case, this was a child, who was expelled

21   from a school with a history of behavioral problems, a

22   volume of IEP documents so they, talking about all the

1    concerns and all the extensive needs of the student for

2    the student's IEP to go through -- past its 12-month

3    lifespan.

4              The parent walked in to the school and at the

5    moment of registering the child asks whether a meeting

6    took place in an emergency kind of a circumstance.  If the

7    circumstances at hand were different, I understand Mr.

8    Dalton's point.  However, these were concerns where it has

9    resulted in its (inaudible).

10             Now, that said, if the DCPS representative were

11   to be contacted and we were to arrange a date, certain I

12   would agree to that.  However, I wouldn't -- that would be

13   in a different sort of a settlement.  Now, I'm not saying

14   that the violation didn't occur.

15             MR. JONES:  Well, Ms. Lindsey, at this point I

16   still reserve the decision on whether or not to dismiss

17   DCPS as a party to the claim.  I just don't have enough

18   information to make that decision.  I understand what he's

19   read with regard to the IEP the fact that Savoy, has

20   recently become responsible for the student.

21             But I don't know any of the particulars of this

22   point; I'm just reading it myself.  I can't make a reason

1    decision.  So I have to reserve judgment.  Now, would you

2    please outline to me what your issue is and what remedy

3    you're seeking?

4            MS. BRUCEVILLE:  The issue, with respect to

5    allegation number two in the complaint, or overall we're

6    talking about for everything.

7            MR. JONES:  Well, you go -- you make your

8    opening statement analysis.

9            MS. BRUCEVILLE:  Okay.

10           MR. JONES:  Briefly and with the remedy you

11   want.

12           MS. BRUCEVILLE:  Absolutely, absolutely.  I'll

13   go out of order, since we were just talking about item

14   number two.  The student did recently enroll at Savoy

15   Elementary School.  This is a 6-year-old student, who has

16   been expelled from Friendship-Edison Public Charter

17   School.  The student's current -- most recent IEP, which

18   I'll note is not current, was developed in April, April

19   the 23 of 2003.

20           You can see reviewing the notes in that team

21   discussion, there were quite a bit of discussions at that

22   point about what the disability of the student was going

1    to be, how the classification would work, how the services

2    would work.

3        Based on the evaluations that I have disclosed,

4    and are noted as documents TD15, 16, 17, 18, all the

5    relevant testing materials that were reviewed by the IEP

6    team, and are noted in the team notes, the team noted the

7    concerns of the evaluators with concern to oppositional

8    defiant disorder, some behavioral instances and

9    observation for clinically could have been diagnosed in an

10   IEP as an emotionally disturbed student.

11       The team reviewing it in conjunction with the

12   parent and the teachers, Friendship-Edison staff

13   especially felt that the student's behaviors did not rise

14   to the level of an emotionally disturbed student, and

15   instead he would be diagnosed as a -- or classified rather

16   as a student with speech and language impairment and other

17   health impairment to ADHD.

18       His services were somewhat limited in his IEP.

19   Since that time, and while the parent raised some

20   objections at the time, the school seemed to indicate that

21   it did not rise to a level of an emotionally disturbed

22   student.  Since that time and in the manifestation meeting

1    notes that are identified as document TD10, dated March

2    18, 2004, where the parent participated with the

3    Friendship-Edison staff, and they discussed a recent -- an

4    event that had resulted in a lengthy suspension for a 6-

5    year-old.

6         The team reviewed all the evaluations again and

7    noticed how the student's behaviors had regressed

8    especially since January.  The teacher felt, and the

9    participants in the meeting felt that they could not

10   control his behavior, that it rose to a level that it was

11   so severe, not that they would develop a behavior plan,

12   not that they would put any other support services for the

13   student in place, but rather that they would expel him

14   from that school.

15        With that background, I'll turn to item number

16   two.  The parent has raised objections with Friendship-

17   Edison and then with Savoy concerns that the IEP did not

18   address the student's needs.  Beyond that, that IDEA does

19   state that the IEP needs to be revised at least once a

20   year or once every 12 months.  The IEP therefore is

21   clearly outdated.

22        Now, the DCPS while it -- while he only became a

1    student at Savoy Elementary School following the expulsion

2    from Friendship-Edison, which is approximately 30 or so

3    days ago, DCPS, did act in the capacity of the SEA, and I

4    would say have the duty to at least monitor its own

5    schools and know when IEPs are outdated.

6         And further, when a parent shows up, with or

7    without an attorney coming to a hearing, a parent has

8    every right -- and I imagine that the hearing officer

9    assumes that the parent has every right to request an IEP

10   at any time. And that's exactly what this parent did.

11        Since enrolling at Savoy, his behaviors have

12   continued to be severe. He's again been suspended, and

13   the parent has had to take off from work, and sit with the

14   child all day in school, because he was not permitted to

15   sit in class without his mother. Again, we're talking

16   about a child, who is 6, and there are plenty of services,

17   and support services that can be available.

18        Other testimony, if necessary, will show that

19   Ms. Suttonrock has visited the school, has spoken with the

20   teacher, and the teacher, his current classroom teacher at

21   Savoy, who has indicated he -- that T██████' needs are far

22   beyond what she can handle, that he is by far the worst

1    performing student in the class, and that she had not even
2    seen his IEP.

3            The first time she saw her -- T██████' IEP --
4    although the IEP was brought to the school, the first time
5    that classroom teacher saw that IEP was when Ms.
6    Suttonrock was there for her visit.  T█████ is not making
7    progress.  He is being suspended again, and yet, nothing
8    is being done.

9            Even by today, had DCPS at this point or prior
10   to walking into this hearing today stated that they were
11   willing to have a meeting that they were willing to
12   cooperate and willing to do something, the parent was told
13   they would have a meeting.  And yet, nobody did anything.
14   That was a month ago, more than a month ago.  And yet, no
15   one is talking with her.  This parent is up at the school
16   constantly.

17           She has certainly more than availed herself of
18   the school staff and of her child's, attention to her
19   child's needs.  No one is --

20           MR. JONES:  So let me ask you this question --
21   so I can get to the heart of this.  How many times has
22   this student been suspended?

1          MS. BRUCEVILLE:  Since being at Savoy or since -

2    -

3          MR. JONES:  No, since at Friendship-Edison --

4          MS. BRUCEVILLE:  If you would provide me with a

5    moment --

6          SPEAKER:  Three times.

7          MR. JONES:  Okay --

8          MS. BRUCEVILLE:  The last --

9          SPEAKER:  That was for 20 days.

10         MR. JONES:  Three times.

11         SPEAKER:  Five and five and then ten.

12         MR. JONES:  Five and five and ten.  Okay.  How

13   many times was he suspended at Savoy?

14         MS. BRUCEVILLE:  Once -- was it two days?

15         SPEAKER:  Once -- it would have been two days.

16         MR. JONES:  In your complaint, you talk about

17   compensatory education services.

18         MS. BRUCEVILLE:  Yes, now that in item number

19   one, the compensatory education services that I'm talking

20   about resulted from an agreement between counsel and

21   previous hearings where Friendship-Edison had failed to

22   provide -- and I'll note how many hours -- 16 hours of

1    missed services during the 2003-2004 school year and 2

2    hours of missed service time during the 2002-2003 school

3    year and that related to --

4          MR. JONES:  So there's a total 16 hours

5    outstanding on his comp ed plan?

6          MS. BRUCEVILLE:  Correct, correct.

7          MR. JONES:  Go on.

8          MS. BRUCEVILLE:  And it was something that had

9    been agreed to prior to his expulsion, but now that he's

10   expelled he is still entitled to those services he's still

11   missed them previously.  And to bring to the hearing

12   officer's attention, there are two letters here identified

13   as TD5 and TD6 that was drafted by myself on March the

14   24th and April the 14th.

15          In both of those letters, I basically laid out

16   all the allegations that I was going to bring in the

17   hearing request and offered Friendship-Edison the

18   opportunity to work with us in advance, to come up with a

19   plan to develop for compensatory education services or to

20   come to some resolution on these matters.

21          The contact that I've had at that -- since then

22   numerous messages that have come from myself and from my

1    other staff members in my office to the school have gotten

2    no response at all.  What I have worked with opposing

3    counsel in this -- in his office the impression, what was

4    stated to me directly we thought the school would, in

5    fact, hold the meeting.

6           And then, despite that and despite sharing that

7    information that with the school, that their counsel had

8    sort of blessed this meeting and said it could move

9    forward.  No meeting has been scheduled and, in fact, this

10   -- the meeting that had been scheduled for the middle of

11   April prior to the suspensions, was then canceled.

12           MR. JONES:  Is there an enrichment plan,

13   behavior enrichment plan?

14           MS. BRUCEVILLE:  No.

15           MR. JONES:  Has there been an FDA?

16           MS. BRUCEVILLE:  No.

17           MR. JONES:  Have you ever requested one?

18           MS. BRUCEVILLE:  The team discussed his -- the

19   parent was present at the manifestation meeting and talked

20   about behavior intervention supports.

21           MR. JONES:  All right.  Counsel for Friendship-

22   Edison.

1         MR. DALTON:  Well, with all due respect to the

2   proffers made by counsel, she has been quite (inaudible)

3   describing the facts of this case to you.  Friendship-

4   Edison should be dismissed on res judicata to the

5   (inaudible) grounds based upon the exhibits of the

6   parent's counsel, not the exhibits of Friendship-Edison.

7         It's res judicata because of TD08 and TD07 --

8   TD08 serves that the current IEP is appropriate for this

9   student, TD07 less the 16 hours of special ed speech and

10  language services.  We were making progress towards making

11  up those hours when the student at the end of the March,

12  voluntarily withdrew himself from our jurisdiction and

13  enrolled at Savoy.

14        There is an ample case law to provide that when

15  there is a voluntary withdrawal by one student from one

16  jurisdiction to the other, any further obligations are

17  null and void.  Also, we cannot hold an IEP meeting for a

18  student, that's not in our jurisdiction.  It's simply

19  impossible.

20        MR. JONES:  Okay, let's go on in the case?

21        MS. HARRIS-LINDSEY:  -- if I might, may DCPS --

22  I know we are going on a --

1      MR. JONES:  Yeah.  Did you want to say

2   something?

3      MS. HARRIS-LINDSEY:  No, I just want to -- I

4   just wanted to be able to call my witness only because we

5   are dealing with -- and I feel like I am kind of -- in the

6   back stream --

7   MR. JONES:  Well, you can come up here.

8      MS. HARRIS-LINDSEY:  No, I'm not -- I am afraid,

9   I moved to a table I may have to stay.

10      Is it -- would anybody oppose DCPS moving

11   forward on -- I am just going to have one witness and just

12   as the clarification D.C. did submit disclosures on May

13   10, 2004.

14      MR. DALTON:  I do think that the hearing officer

15   is the authority to resolve the issues probably would be

16   come into clearer focus, if the D.C. proceeded first.

17      MR. JONES:  All right.  Let me see your

18   disclosure --

19      MS. HARRIS-LINDSEY:  I am sorry --

20      MR. JONES:  -- because I didn't have -- remember

21   we asked about disclosures --

22      MS. HARRIS-LINDSEY:  I did and I moved to

1    dismiss them and stop at that point so I probably want to

2    --

3         MR. JONES:  So do you have any problems with

4    that Ms. Bruceville's disclosure?

5         MR. DALTON:  No, I don't need the --

6         (Discussion off the record)

7         MR. JONES:  Okay.  All right.  DCPS has

8    introduced as a part of this 5-day disclosure, a document

9    dated May 10, 2004.  Both of the counsels have indicated

10   that they have no problems with admissibility.  And

11   additionally, counsels have agreed that DCPS could move

12   forward and introduce it's witness.  And so I'm going to

13   allow that.

14        MS. HARRIS-LINDSEY:  Okay, I'm going to call --

15   DCPS is going to call special education --

16        MR. DALTON:  And the record shall reflect this

17   tremendous cooperation.

18        MS. BRUCEVILLE:  Absolutely.

19        MS. HARRIS-LINDSEY:  DCPS is going to call the

20   special ed coordinator, Ms. Benny Johnson (phonetic) at

21   Savoy Elementary School.

22        (Discussion off the record)

1        MR. JONES:  Would everybody -- in order for me

2   to concentrate, so I can understand what is going on.

3   These individual conferences have to cease little bit,

4   because I am being distracted here and there.

5        MS. HARRIS-LINDSEY:  Ms. Johnson.

6        MS. JOHNSON:  Yes.

7        MS. HARRIS-LINDSEY:  Okay.

8        MR. JONES:  I appreciate it.

9        MS. BRUCEVILLE:  I've got a notepad now.

10       MR. JONES:  All right, thank you.  If you need

11  to talk write it, and then I'll -- there is no problem

12  with that.

13       MS. HARRIS-LINDSEY:  Ms. Johnson --

14       MR. JONES:  Hi, Ms. Johnson.

15       MS. JOHNSON:  Yes.

16       MS. JONES:  How you are doing?

17       MS. JOHNSON:  I am fine.

18       MR. JONES:  This is Mr. Jones; I am the hearing

19  officer in this matter.

20       MS. JOHNSON:  Just repeat the name.

21       MR. JONES:  Mr. Jones.

22       MS. JOHNSON:  Okay.

1          MR. JONES:  Okay.  I am going to swear you in.

2    Would you raise your right hand?

3          MS. JOHNSON:  Yeah.

4    Whereupon,

5                        BENNY JOHNSON

6    was called as a witness and, having been first duly sworn,

7    was examined and testified as follows:

8          MR. JONES:  Please state your name for the

9    record and your position in DCPS.

10         THE WITNESS:  I heard my name; I didn't hear the

11   other thing.

12         MR. JONES:  I know, I said please state your

13   name.

14         THE WITNESS:  Okay.  My name is Benny Williams

15   Johnson.

16         MR. JONES:  And what is your position with DCPS?

17         THE WITNESS:  I am the special ed coordinator in

18   Savoy Elementary School.

19         MR. JONES:  All right.  Go ahead with your

20   examination, Mr. Lindsay.

21         MS. HARRIS-LINDSEY:  Excuse me for talking

22   behind your ears; it is not my goal to be disrespectful.

1          MS. BRUCEVILLE:  Do you want to come up.

2          MS. HARRIS-LINDSEY:  No, I just want to -- I

3    don't want to -- I want to come closer so she can hear me.

4          (Discussion off the record)

5    DIRECT EXAMINATION

6    BY MR. LINDSAY:

7    Q    Hi, Ms. Johnson.

8    A    Yeah.

9    Q    Okay.  I am going to ask you a few questions

10   pertaining -- I am going to get to the point pertaining to

11   T██████ D██████

12   A    Okay.

13   Q    Are you familiar with T██████ D█████?

14   A    Yes, I am.

15   Q    I am sorry -- I am jumping too far ahead in

16   myself, just if you could.  Can you identify what school

17   are you employed?

18   A    I am with DCPS Savoy Elementary School.

19   Q    In what capacity are you employed at Savoy?

20   A    I am currently the special ed coordinator at

21   Savoy.

22   Q    Okay.  And as the special coordinator what are

1    your duties and responsibilities?

2        A    Okay.  My duties are, to make sure that all of

3    my students are served, and I am responsible for here in

4    the building.  Also to work with teachers to make sure

5    that whenever new students come in that we get as much

6    background information as we can, and pass it on, for long

7    you know, such as the IEP.

8            Or whatever, you know, if the child has special

9    needs besides educational needs, such as, for example,

10   medical needs then the teacher needs to know that.

11       Q    Okay.  Are you familiar with the student, T██████

12   D█████?

13       A    Yes, I am.

14       Q    Then how did you become familiar with T██████?

15       A    T██████ enrolled in our school, and when he

16   enrolled in our school I was in the office and the mother

17   presented -- said -- presented the information that she

18   had from the school that he had been to.

19       Q    And when did the parent enroll T██████ at Savoy?

20       A    Oh my goodness, I don't have that in my hand.

21       Q    Okay.  If -- does the date April 14th, sound

22   familiar?

1    A    Yes.  If that falls on a Wednesday, if April the

2    14th was a Wednesday, I would remember the day was a

3    Wednesday that she enrolled him.

4    Q    Okay.  And when she enrolled him what documents

5    did she present, that you recall?

6    A    She presented a psychological evaluation, she

7    presented an incomplete IEP, and -- those were the two

8    that I remember.

9    Q    Okay.  And what is the policy -- or what are the

10    steps you follow when the parent brings this, enrolls the

11    student in the middle of the school year for --

12    A    Well, if a child comes into our school from a

13    different school, we always give what we call a 30-day

14    review, and therefore it gives us 30 days to see where the

15    child is, for you know, if we need to revise the IEP, if

16    we need to write a new IEP, it's always this, a 30-day

17    review.

18    Q    Okay.  And what -- if you are familiar, what

19    have been the observations in T█████ over these 30 days?

20    A    You know, we have noticed that T█████ has some

21    behavior problems, he has had several problems with his

22    current special ed teacher.  Just right now, I have him in

1    my office because of behavior problems from this morning.

2    That is mainly what I have noticed.  T████ can do the

3    work that is presented to him, but he has some behavior

4    issues.

5         Q    Okay.  Then you indicated that the school does a

6    30-day review.

7         A    Yeah.

8         Q    What steps has Savoy taken to convene a meeting

9    for T████?

10        A    Okay.  We've just tested T████ this morning to

11   see exactly where he is, if he is in the right place.  And

12   therefore after we've had tests with him, we are almost

13   ready to come to the table, which means that we will be

14   ready, probably ready to come to the table by this

15   weekend, I mean, I am sorry, by the end of this week or

16   the first of the next week.  And the reason I say the

17   first of next week is because I may not be here everyday

18   this week.

19        Q    Okay.  Tell me was -- were there -- what

20   circumstances prevented, if any, Savoy from convening two

21   weeks ago, or when T████ first came to the school?

22        A    Oh, that was too early for us to really convene,

1   to do any tests that -- what we could -- I mean, that's

2   not right for the child to come right in, and say here, we

3   are going to test you and see if you are in the right

4   place.  We have to let the child become adjusted to the

5   school, let him become adjusted to his surroundings before

6   we can sit there and say, okay we are ready come to the

7   table --it's not fair to the child.

8        Q    Okay.  And what testing needed to be complete

9   for T█████?

10       A    Well, I have -- I had some questions about his

11  psychological evaluations because -- excuse me, the

12  psychological evaluation was done by a psychologist out of

13  the state of Georgia, which was licensed in the state of

14  Georgia.

15            And we really can't accept that school, even

16  though I had done my part, and done an assessment to see

17  where T█████ is and where he should be functioning, we

18  have to give a psychological evaluation, which means that

19  we will need the parent or signature in order to do that.

20       Q    Okay.  In the -- during the 30 days what has

21  Savoy done to accommodate the behaviors that you've seen,

22  or they had manifested by T█████.

1       A    Well, we have had the parents -- we have

2   contacted the parents, the parents have been up here, the

3   father was just up here last week.  That's mainly what we

4   should do in contacting the parent, and letting the parent

5   know I have been involved in with him.

6           The parents would have been involved with him, I

7   mainly been involved with him, because instead of having

8   him sit in the office for disciplinary reasons.  I bring

9   him to my office, I talk with him, and I make him do the

10  works.  I find that he does love to have one-on-one

11  contact.  He does love that one-on-one.  He will finish

12  most of his work.

13          Sometimes he will try to throw a paper away.

14  And say, oh I am finished, and then I make him go back

15  from his classroom and get the paper and come and bring it

16  back to my office.

17          And usually I follow-up on that with the next

18  stage, I try to make myself available to get up to his

19  classrooms, and to make sure that he is doing what he is

20  supposed to do.

21      Q    Okay.  There is one last question.  You said the

22  IEP that T███████ came with, with incomplete -- does T██████

1    receive any services other than -- does he receive any

2    services?

3         A    He is currently receiving services here because

4    on his IEP it was a counselor, a psychological counselor

5    and in speech.

6         Q    Okay.

7         A    And on the psychological evaluations, it was

8    recommended that he also receive academic services.  So we

9    put him in for academic services since it was recommended

10   that he receive academic services.

11        Q    Okay.  Does he receive any counseling in speech

12   also?

13        A    Yes, he is.

14        Q    So he is receiving --

15        A    Special ed --

16        Q    Special education services and --

17        A    In Savoy.

18        Q    -- and related services?

19        A    Yes.

20        Q    Okay.

21             MS. HARRIS-LINDSEY:  I have nothing further.

22             Thank you, I appreciate that.

1           THE WITNESS:  You are welcome.

2           MR. JONES:  All right -- would you like to have

3    some questions --

4           MR. DALTON:  I would.

5           MR. JONES:  Yes.

6           DIRECT EXAMINATION

7           BY MR. DALTON:

8       Q   Hi, Mr. Benny Johnson, my name is Paul Dalton

9    and I represent Edison-Friendship Public Charter Schools.

10      A   Yes.

11      Q   And T██████ was a student of our school before he

12   came to Savoy.

13      A   Yes.

14      Q   And did you have a chance to quantify the

15   results that you are testing now?

16      A   Am I don't understand you?

17      Q   What kind of test did you give T█████ today?

18      A   I just gave him a quick educational assessment

19   test the Kaufman Test.

20      Q   Okay.  And did that show him to be on grade

21   level?

22      A   Yes, well, most of it was on grade level.

1     Q    Okay.  Can you differentiate what was and what

2  wasn't?

3     A    He was on low grade -- I was a little concerned

4  about of his -- with just one area really, but it may not

5  be because of the words, it may have been because of the

6  words.

7     Q    Okay.  But in general, you'd say he is on grade

8  level?

9     A    So far I found him to be on grade level.

10       MR. DALTON:  Well, thank you, I have no further

11  questions.

12       MR. JONES:  Yes, Ms. Bruceville, do you have any

13  --

14       MS. BRUCEVILLE:  Just a few.

15       CROSS-EXAMINATION

16       BY MS. BRUCEVILLE:

17     Q    Ms. Johnson, can you hear all right?

18       (Discussion off the record)

19       BY MS. BRUCEVILLE:

20     Q    Sorry Ms. Johnson, can you hear okay?

21     A    Yeah.

22     Q    This is Christina Bruceville; I am the attorney

1    that's working with T█████ and with his family.  And I

2    just have a few quick questions.  Had --do you know how

3    many children are in T█████' current classroom?

4        A    There are -- I think it's about 11, and -- the

5    current amount in his classroom.

6        Q    Okay.  You were talking about the psychological

7    -- the psychological evaluation was brought to you on the

8    April the 14th, correct, with you said as --

9        A    Correct.

10       Q    -- you said.  And have you indicated to the

11   parent before your testimony just right now, that this

12   psychological assessment was not sufficient and that

13   something else needed to be done.

14       A    I didn't say the psychological was not

15   sufficient, I said it was done by a person, who was

16   licensed in the state of Georgia.  I talked with -- I had

17   to wait until I get clarification on that myself about

18   accepting another state psychological examination.

19           When a psychological examination is done by

20   another state person, it also must be -- unless that

21   person is licensed in D.C., we also have to do a

22   psychological examination ourselves.

1    Q    But had you spoken with Ms. Dixon about --

2    A    No, I have not.

3    Q    Okay.

4    A    I just got clarification on that by myself.

5    Q    Okay.  And were you aware that T██████ has been

6    suspended, not today obviously, but that he had been

7    suspended already two days since having come to your

8    school?

9    A    Suspended for two days?

10    Q    Uh-huh.

11    A    No.

12    Q    I mean, you say you are not familiar with that?

13    A    I didn't know he had been suspended for two

14    days.  I think that is been incident did happen and I was

15    here, or if you are referring to the time he hit the

16    teacher or kicked the teacher.

17    Q    Okay.  And I apologize I just lost my train of

18    thought for a moment.  Oh, when Ms. Dixon came into

19    register, she you were in the office you said.

20    A    Yes.

21    Q    And didn't she ask you for a meeting right then?

22    A    No.  No, no.

1    Q    And are you -- well, are you sure you didn't

2    tell her that certainly a meeting would happen within 30

3    days because that was your policy?

4    A    I did say 30 days, 30 days has just come up with

5    5, it was 30-days that T███████ has been in our school.  And

6    it gives me time to what I need to do, and also to get

7    ready for the meeting for T███████.

8    Q    Okay.  But the 30 days has passed and you just

9    did the testing today, correct?

10    A    Correct.

11    Q    But has Ms. Dixon been up with the -- you've

12    said that you have pretty frequent contact with Mr. and

13    Ms. Dixon, both?

14    A    Yeah.

15    Q    Okay.

16    Q    Not personally me, I've called directly once or

17    twice.  I have spoken with her I'd say one time after

18    T███████ had enrolled here at Savoy, and I mentioned to her

19    that maybe she and her husband could come and let him

20    adjust to our surroundings.  But she had not been here,

21    and that's something I do with all parents when the child

22    comes this late in the school year, but may be you want to

1    come and sit with your child and that your child make the

2    adjustment.

3        Q    Also did Ms. Dixon tell you that the reason that

4    she was registering T██████ at your school?

5        A    No, she didn't give me a reason; she was

6    transferring him from Friendship-Edison.

7        Q    Okay.

8        A    And she may have given the administrator a

9    reason.

10        Q    Okay.   Thank you.   I appreciate your time.

11        A    You are welcome.

12             MR. JONES: Any redirect, Ms. Lindsay?

13             MS. HARRIS-LINDSEY:  No, not at this time.

14             MR. JONES:  Mr. Dalton?

15             MR. DALTON:  Oh, no thank you.

16             MR. JONES:  All right, thank you very much, Ms.

17    Johnson.

18             MS. HARRIS-LINDSEY:  Thank you Ms. Johnson.

19             THE WITNESS:  You are welcome.

20             MS. HARRIS-LINDSEY:  Okay.

21             (Witness excused.)

1        MR. JONES:  Okay.  One of the things that
2   counsel for Friendship-Edison has indicated is that this
3   case was res judicata.  And reading the HOD issued June
4   30, 2003 it seems as if those issues were brought up.
5   Let's say --

6        MS. Bruceville:  The issues have changed
7   somewhat.  Some of the issues were the same at that point
8   however there are two things.  First, the parent did
9   disagree with the IEP at the time that it was developed
10   and as a result of that disagreement we took it to hearing
11   and resulted in the HOD.

12        The hearing officer did find that he believed it
13   to be reasonable enough then that if there were further
14   clarifications that should happen to the school.  Since
15   that time however, what we are talking about is the
16   different set of circumstances.  The notes from the
17   meeting held in March indicate that the student's
18   behaviors and aggression, the very things that the hearing
19   officer was ruling on at that point, we were saying that
20   the IEP was inappropriate from its moment of inception.

21        At this point what I am saying is different and
22   saying that the IEP, whether I think, it was the best

1    thing for him at that moment come January when the teacher

2    reported she started seeing a change in regression, in his

3    behavior as well as in his academic performance, that was

4    where the school should have started to be on notice that

5    this IEP no longer could have appropriate for him.

6              And there is specific statement supporting that

7    in the MDT meeting notes from April 18, -- oh from excuse

8    me March 18, 2004.  That specifically contradict the

9    statements that the CMT members were making back in April

10    at the IEP meeting then back in April 2003.

11              MR. JONES:  All right, what about the HOD in

12    2004?  What the issue with that?

13              MS. BRUCEVILLE:  Well, the HOD at that point was

14    with respect to additional compensatory education time.

15              MR. JONES:  Have you agreed on a comp ed plan

16    for the student?

17              MR. DALTON:  We did.

18              MR. JONES:  And have you --

19              MR. DALTON:  We have implemented the plan and

20    then he left.  You cannot --

21              MR. JONES:  Wait just a minute Mr. Dalton.

22    Where is -- what evidence do you have to suggest that the

1    comp ed plan was being implemented, do you have any --

2            MR. DALTON:  We have testimony and we have a

3    table or a chart that indicates when the services were

4    given.

5            MR. JONES:  All right, so the comp ed plan for

6    Friendship-Edison is being implemented, and was being

7    implemented?

8            MR. DALTON:  Was being implemented.

9            MR. JONES:  So you had agreed in accordance with

10   the HOD --

11           MR. DALTON:  Correct.

12           MR. JONES:  As the HOD ordered you to go forward

13   with the comp ed plan.

14           MR. DALTON:  Right.

15           MR. JONES:  You sat down with counsel, you

16   negotiated came with a plan and you were implementing it?

17           MR. DALTON:  Correct.

18           MR. JONES:  How long was the implementation

19   going on?

20           MR. DALTON:  Not very long, because he left at

21   the end of March.

22           MR. JONES:  Okay.

1        MR. DALTON:  And I --

2        MR. JONES:  You -- wait just a minute.  Do you

3    dispute that Ms. Bruceville?

4        MS. BRUCEVILLE:  I don't.

5        MR. JONES:  Just a simple yes or no.

6        MS. BRUCEVILLE:  I don't dispute that it was

7    implemented until the student was expelled from the

8    school.

9        MR. DALTON:  He was not expelled, sir.  I really

10   object to the way Ms. Bruceville is characterizing it.

11       MR. JONES:  Okay.  Well, let me ask the

12   question.  How was he expelled and when, what date?

13       MS. BRUCEVILLE:  I have -- and let me gather

14   everything for you first.

15       MR. DALTON:  Can I offer just a second.

16       MS. BRUCEVILLE:  Yes.

17       MR. DALTON:  Just to sort of to help you.  My

18   documentation shows that Exhibit 3 and it is titled wrong.

19   It should be not "for Dr. Brunell" (phonetic) but "from

20   Dr. Brunell," dated 3/29, and that document clearly states

21   in a letter that there is a recommendation that has to be

22   approved by the board the student removed himself from the

1    school prior to the board having acted on that

2    recommendation.

3         MS. BRUCEVILLE:  And actually I have to disagree

4    with you there.  Whether or not the board took the

5    necessary actions, according to my documents 13, which is

6    what was sent to me from Ms. Whitehead, progressive

7    discipline policy.  Procedures for expulsion and basically

8    --

9         MR. JONES:  I believe ma'am -- let me just

10   interrupt.  Let me just get testimony on this, since there

11   is some disagreement, why don't you call your witness.

12   I'll hear and I'll make a decision.

13        MR. DALTON:  Sure.

14        MR. JONES:  Call your first witness?

15        MR. DALTON:  All right, I am going to call my

16   witness because I don't think it will take very long, and

17   we will be able to succinctly deal with all the issues.

18        MR. JONES:  Okay.

19        MR. DALTON:  But for the record I still believe,

20   without this evidence that we are entitled to a directed

21   finding based on prior HODs that were listed.

22        MS. HARRIS-LINDSEY:  (Off mike) is the hearing

1    officer still -- withhold ruling on issues with respect to

2    DCPS --

3         MR. JONES:  Well, one of the things I did notice

4    on the HOD rendered in 6/30/03 by Mr. Duvall (phonetic) is

5    a similar request for dismissal which he denied.

6         MS. HARRIS-LINDSEY:  You know what it really --

7    it's got the one -- it's also the one prior to it that we

8    were dismissed from.  Mr. Duvall, Mr. Smith just --

9         MR. JONES:  Now, Mr. Smith, you are --

10        MS. HARRIS-LINDSEY:  This is under -- TD7.

11        MR. DALTON:  Which is our later hearing.

12        MS. HARRIS-LINDSEY:  A later one --

13        MR. JONES:  Okay.

14        MS. HARRIS-LINDSEY:  I am sorry.

15        MR. DALTON:  That's the one in January this year

16    they were dismissed.

17        MR. JONES:  Okay.

18        MS. BRUCEVILLE However the fact --

19        MR. JONES:  Wait just a minute -- I'll let you

20    say whatever you have to say.  But it has to be --

21        MS. BRUCEVILLE:  Absolutely.

22        MR. JONES:  Thank you.  Now you are looking at 7

1    --

2         MS. HARRIS-LINDSEY:  TD7 page 3, under summary,

3    fourth paragraph.

4         MR. JONES:  All right, now what do you have to

5    say, Ms. Bruceville?

6         MS. BRUCEVILLE:  Oh I just wanted to point out

7    that the issues were a bit different as Mr. Dalton

8    explained that we were talking about the delivery in that

9    TD7.  The issue before the hearing officer was the

10   delivery of services that were in the student's IEP.

11        The student was only attending the charter

12   school at that point and Friendship-Edison acting as its

13   own LEA was the only who would be responsible for that.  I

14   think with the other issue, it was a little bit broader

15   because it related to the IEP, and DCPS' supervision at

16   that point.

17        The distinction I'd also make is that the

18   student is actually currently attending a DCPS school, and

19   the issue that I am saying is that this school has been

20   unresponsive to the parent's request for this meeting to

21   go forward.  And that --

22        MR. JONES:  That's not what the -- I just heard

1    testimony on.  Ms. Johnson did not say that she was being

2    unresponsive.

3         MS. BRUCEVILLE:  Well, the testimony of the

4    parent would be that she has never heard any of this

5    before Ms. Johnson was called on the phone before you.  It

6    just seems awfully convenient that the student was tested

7    this morning.

8         MS. HARRIS-LINDSEY:  If I might just -- and I am

9    not going to believe this until Mr. Dalton, (inaudible)

10   just for completion of the record that the student began,

11   was enrolled at Savoy on April 14th, due process was filed

12   on April 26th.

13        The one thing regardless of what -- the

14   allegations of who said what when, the reality is the due

15   process hearing was filed at a point where the allegations

16   simply aren't right.  Ms. Johnson said it's unfair --

17   unfair to the student to convene a meeting--

18        (Tape ends abruptly.)

19

20   XXX BEGIN S2

21

22        SPEAKER:  -- to review -- to observe the child

1   where the child has not become familiar with the

2   surroundings, and has indicated that it was simply too

3   early to do anything, to convene.

4          And as -- if I might add, there are hearings

5   where DCPS comes where they convened a meeting without

6   persons who are familiar with the student.  And so the

7   request that DCPS -- they have a child because he had

8   problems in prior school, he comes into this, convene a

9   meeting is contrary to the law, and is the very thing that

10  we've come to hear about.

11         MR. JONES:  I agree with you totally, Ms.

12  Bruceville on the issue that the school just has received

13  the student, and therefore the timeline in this 30-day

14  policy is not rightly executed.  So you could have

15  anticipated this at the time you filed your complaint.  So

16  that actually is something that you probably have in

17  actuality stated in your complaint.  So -- but I'm still

18  going to reserve my ruling right.

19         SPEAKER:  That's --

20         MR. JONES:  I'm still going to reserve my ruling

21  rights.  So let's go forward with the case.

22         MR. DALTON:  I'd like to call Matthew Carothers,

1    please.

2    Whereupon,

3                    MATHEW CAROTHERS

4    was called as a witness and, having been first duly sworn,

5    was examined and testified as follows:

6            MR. JONES:  Please state your full name and your

7    position with Friendship-Edison.

8            THE WITNESS:  Matthew Carothers, Jr and I'm

9    currently here as school-based mental health clinician --

10           MR. JONES:  Say a -- speak a little louder.

11           THE WITNESS:  School-based mental health

12   clinician that's placed at Friendship-Edison Public

13   Charter School, Chamberlain Campus through the Center for

14   Students Support Services.

15           MR. JONES:  Okay.  Go forward with your

16   examination.

17           MR. DALTON:  Thank you.

18           DIRECT EXAMINATION

19           BY MR. DALTON:

20       Q    Mr. Carothers, how are you familiar with T██████

21   D█████?

22       A    I have been providing counseling for T█████ for

1    30 minutes per week.

2         Q    Okay.  Were you present at a meeting held on

3    March the 18th of this year?

4         A    Yes.

5         Q    What was the purpose of that meeting?

6         A    The purpose of the meeting was to see if the

7    behavior that he exhibits -- exhibited my T█████ was based

8    on his disability.

9         Q    And what was the behavior that T█████ had

10   exhibited?

11        A    There was a series of different behaviors, one

12   including where he had hit the teacher, another where he

13   had taken things that didn't belong to him, others where -

14   - just overall disruptive behavior.

15        Q    And were T█████' parents at this meeting?

16        A    Yes, they were.

17        Q    And did they participate with the decision that

18   was made at this meeting?

19        A    Yes.

20        Q    And were they in agreement with the decision

21   that was made at the meeting?

22        A    Yes.

1      Q      And what was the decision that was made at the

2    meeting?

3      A      At the end of the meeting it was concluded that

4    the behaviors that T█████ had demonstrated were

5    premeditated.  And Ms. Dixon herself has stated that

6    T█████' behavior was premeditated.  That particular

7    incident was premeditated, because he wanted to go to a

8    daycare or something that she was working with, at another

9    school or daycare of some sort.

10          But it was also concluded that T█████ is very

11    cognizant of right and wrong.  He is very able to make

12    decisions, and he knows what is correct, and what isn't

13    correct, and inappropriate versus appropriate behavior.

14      Q      Does he always display inappropriate behavior

15    with all people and position of authority, or is he

16    selective?

17      A      I would tell that he is selective.  He -- the

18    behavior that was described that Ms. Worsley has

19    experience, as well as the new school I have never had

20    those encounters with T█████.  It appeared that perhaps --

21    and even the two outside clinicians from the center for

22    mental health, the two gentlemen that came had even --

1    also stated that, you know, T████ would do -- exhibit

2    certain behavior with some staff members, but they again -

3    - that he may only go to certain limits with them.  So it

4    could possibly be that he was -- that it was demonstrated

5    more with female staff, female authority.  But I never

6    experienced any of those --

7        Q    What did Mr. Dixon say with regard to discipline

8    issues between him and T████?

9        A    Mr. Dixon was generally quite.  But he did let

10   it be known that he didn't have those -- that he as the

11   father didn't have those types of occurrences with T████

12   either.

13       Q    All right.  So based on the fact that the

14   actions were felt by the team and the parents not to be a

15   manifestation of his disability what was the

16   recommendation?

17       A    The recommendation was then, at that time, for

18   suspension.

19       Q    Okay.  All right.  I have no further questions.

20            MR. JONES:  Any cross examination?

21            MS. BRUCEVILLE:  Please, just a few questions.

22            CROSS-EXAMINATION

1          BY MS. BRUCEVILLE:

2     Q    And Mr. Carothers, I do appreciate you coming in

3   out of school to participate in this and get to the

4   bottom.

5     A    Thank you.

6     Q    I will refer -- and if -- do you recall your

7   report to the team during that meeting?

8     A    Yes, for the most part.

9     Q    And could you -- would be able to describe --

10   according to this you stated that that you felt --

11          SPEAKER:  What --

12          MS. BRUCEVILLE:  I'm sorry.  I'm looking at page

13   4 of 6 of the notes.  I'm looking at Mr. Dalton's number -

14   - the meeting notes from March the 18th, I apologize.

15          MR. DALTON:  Oh, number 2.

16          MS. BRUCEVILLE:  Number 2.

17          MR. DALTON:  Page 4 --

18          MS. BRUCEVILLE:  And its page 4 of 6 of the MDT

19   notes.

20          MR. DALTON:  Where is that?  We're over to the

21   right with Mr. Carothers?  Okay.

22          MS. BRUCEVILLE:  Mr. Carothers reported -- the

 1    third line down then.  He feels that recently T██████'

 2    behavior has regressed.  He finds T██████ is able to -- and

 3    --

 4          MR. DALTON:  Particularly what he has done

 5    wrong, able to express how he should have appropriately

 6    responded.

 7          BY MS. BRUCEVILLE:

 8      Q    So do you feel that his behavior, at that point

 9    when you reported this to the team his behavior had been

10    regressing is what you had noted.

11      A    Yes.

12      Q    You also said later on Ms. Dixon feels that if

13    Mr. Carothers is not available someone else whether good

14    or poor should be available, and you said that a process

15    would be introduced to T██████ so that he would have

16    realized other people were available to him.

17      A    Correct.

18      Q    Had that process ever -- any steps been taken?

19      A    He left, so the process did not occur.

20      Q    Now, you talk about his leaving, and what the

21    conclusion of the team was.  I'm going to look at page 6

22    of 6, and I'm looking towards the middle of that

1    paragraph.  Ms. Whitehead stated that miss -- that

2    Chamberlain is seeking expulsion at this time.  So -- I

3    mean, the conclusion was not only suspension, but to take

4    further steps.

5         A    Correct.

6         Q    Okay.  Now, in your position -- I'm sorry, did

7    you say you were a social worker?

8         A    Correct.

9         Q    Okay.  So are you familiar with the way

10   manifestation meeting -- that the determination of the

11   team is not simply whether the student's decision, he

12   understands right and wrong, but also the consequences and

13   the impact of that.

14        A    Uh-huh.

15        Q    In the earlier part of the report, on page 2 of

16   6, Dr. Corel's psychological report had been reviewed.  Do

17   you remember, either from this meeting or from your

18   familiarity with the student what some of Dr. Corel's

19   recommendations, and what some of Dr. Corel's diagnoses

20   had been?

21        A    I remember them talking about the ADHD, which I

22   don't know if that was done by Dr. Corel, if that was the

1   previous.

2       Q    Or just in -- okay.

3       A    But again he also recommended counseling and the
4   continuance of individual counseling --

5       Q    Okay.

6       A    -- counseling to address the current concerns
7   that T█████ --

8       Q    And do you recall, also Dr. Corel's report
9   included a note about oppositional defiant disorder?

10      A    I think I recall.  I can't say --

11      Q    That's fine.  Are you familiar with oppositional
12  defiant disorder?  Is it fair a characteristic to say that
13  that's often characterized by impulsivity --

14      A    You may oftentimes find CADHD and ODD.  It may
15  be comorbid, in terms of -- that a student may demonstrate
16  both disorders, or may have -- or they may go hand in
17  hand.

18      Q    Okay.  And from your familiarity with Travis was
19  there ever a behavior plan either as a result of this
20  meeting, or any other meeting, or any other -- the events
21  that you discussed?  Was there a behavior plan ever
22  developed that you know of?

1       A     Developed, no.  But working -- getting

2    developed, yes.

3       Q     What do you mean?

4       A     I will say developed, you know, meaning that

5    there was nothing actually put down in place, but that it

6    was being worked toward.  And -- with that meaning that

7    the parts you had talked earlier about Ms. Dorwell

8    (phonetic) who was also a school counselor, letting him

9    know that -- because of my agency I'm not there on

10   Fridays.

11          So on those days, that was, you know, to be a

12   part of the plan that if -- and had been part of the plan,

13   if something happened that he would either see the school

14   nurse, or he could also, if she was not available, could

15   also see Ms. Dorwell who was -- who is the counselor of

16   the school.

17      Q     A behavior plan sometimes includes -- not all

18   the time, certain times would include like positive

19   reinforcement, point systems, things like that.  So there

20   was no plan that was put in place and developed by the IEP

21   team with the parent so that she could implement it also

22   at home --