1      A     We talked about -- we discussed at length

2    positive reinforcements.  And if you go to one of your

3    pages you -- talk about -- you --it's recorded that I do

4    talk about things that have worked to assist T██████ in

5    calming down, and things that work to, kind of reinforce

6    appropriate behaviors.  We did talk.  I even mentioned

7    that he liked (inaudible) and, you know, so we did talk --

8      Q     Sure.

9      A     -- about positive reinforcers for him.

10     Q     And if I remember correctly, also Ms. Dixon in

11   that meeting had also talked about things, strategies

12   where she felt were both good and bad for her son, things

13   that he didn't respond well to.  If he was come upon from

14   behind or surprised in any way, do you recall having --

15   being familiar with that information from Ms. Dixon?

16     A     The specifics I can't remember.  But I remember

17   her because she agreed with some of the things that I was

18   saying -- things that worked well for him.

19     Q     Okay.  And ultimately no other documentation

20   followed this meeting?

21     A     No.

22     Q     Okay.

1           MS. BRUCEVILLE:  I don't have any further right

2    now.

3           MR. JONES:  Any redirect?

4           MR. DALTON:  Yes.

5           REDIRECT EXAMINATION

6           BY MR. DALTON:

7      Q    The reason nothing followed was because the

8    student removed himself from our jurisdiction, correct?

9      A    The student did leave.

10     Q    Okay.  And it's true, isn't it, that not every

11   action of every student who's got a label of ODD would be

12   a manifestation of the resistibility, isn't it?

13     A    Correct.

14     Q    Some actions could be, some actions couldn't be.

15     A    Correct.

16     Q    And you need to evaluate those actions in light

17   of the evidence that you have and the parent's input.

18     A    I would agree.

19     Q    And that is exactly what was done in this case -

20   -

21     A    I would agree.

22     Q    Okay.

1           MR. DALTON:  I have nothing further.

2           MR. JONES:  I have a couple of questions.  Do

3      you have any?

4           MS. BRUCEVILLE:  No.  Thank you.

5           MR. JONES:  How long had the student been at

6      Friendship-Edison?

7           THE WITNESS:  I started working with --

8           MR. JONES:  No, I'm saying the student.  Do you

9      know when the student was enrolled in Friendship-Edison?

10          THE WITNESS:  From my understanding

11     kindergarten.  He was in kindergarten with (inaudible) if

12     I'm not --

13          MR. JONES:  And what grade is he in now?

14          THE WITNESS:  He is currently in the first

15     grade.

16          MR. JONES:  So he's been there approximately a

17     year, year-and-a-half?

18          THE WITNESS:  Yeah.  If he started in the fall

19     then last fall (inaudible) again, then March would have

20     been over a year.

21          MR. JONES:  At the manifestation hearing when

22     the parent was told that there must be a recommendation

```
1   for expulsion who provided that information to her?
2              THE WITNESS:  I think --
3              MR. JONES:  Or did that recommendation come
4   after the hearing -- at that --
5              THE WITNESS:  The -- it was stated at that
6   meeting.  And present at that meeting was also the academy
7   director which would be in a DCPS school like an assistant
8   principal of the elementary academy which is from
9   kindergarten through second grade which is the academy
10  that T------ was (inaudible).  She spoke to that
11  recommendation.  But then at the ending, as it states on
12  page 6 of 6 when it was concluded, the meeting was
13  concluded and a recap was done, it was again as it states
14  stated by Ms. Whitehead.
15             MR. JONES:  So that recommendation was never
16  carried out?
17             THE WITNESS:  To my knowledge there was never
18  anything that transpires saying that the student was
19  expelled, and I'm speaking from my knowledge.
20             MR. JONES:  Okay.
21             SPEAKER:  (off mike)
22             MR. JONES:  Your next witness.
```

1          MR. DALTON:  Ms. Worsley.

2     Whereupon,

3                         REGINA WORSLEY

4     was called as a witness and, having been first duly sworn,

5     was examined and testified as follows:

6          MR. JONES:  Speak up and then tell me your full

7     name and your position with Friendship-Edison.

8          THE WITNESS:  My name is Regina Worsley, and I'm

9     a general education teacher.

10         MR. JONES:  Spell Worsley.

11         THE WITNESS:  W-o-r-s-l-e-y.

12         MR. JONES:  Okay, go with your examination.

13         DIRECT EXAMINATION

14         BY MR. DALTON:

15    Q    Ms. Worsley, are you T█████ D████'s teacher?

16    A    I was his teacher, yes.

17    Q    And academically, has T█████ been performing on

18    grade level?

19    A    He started out the year (off mike) and as the

20    year progressed on not so good.

21    Q    Okay.  Where -- how was he doing grade wise?

22    A    Beginning he used to learn well, his grades were

1  pretty much on level for first grade testing that I've

2  done, it was grade level.  So he was on grade level

3      Q    And did you attend the 3/18 manifestation

4  determination?

5      A    I did.

6      Q    And from your viewpoint as his teacher, what

7  transpired during that meeting, and what happened as a

8  result of that meeting?

9      A    We spoke about his behavior in class.  We spoke

10  about when he act out that I did.  For example, when he

11  acted out I would call Mr. Carothers, or I would call the

12  nurse, and Mr. Carothers would come and get him, and keep

13  him for maybe 10 minutes and bring him back to class.  The

14  rest of the day he was fine.  And with -- the same thing

15  with Nurse Croyne (phonetic), when I couldn't get Mr.

16  Carothers I would call her.  But the times were very

17  infrequent.

18          I believe I called her maybe once in September,

19  maybe twice or so in October.  And on the meeting we spoke

20  on those issues.  And we spoke about as the year was

21  progressing how his behavior was changing, and how it's

22  getting worse from the time that he just defiantly says

1    no.  You know, I know that, you don't tell me what to do,

2    to the time that he spat on me, to the time that he hit

3    me, the time that he called me names.  And after that we

4    spoke about ways in which we could have controlled his

5    behavior.  For example, let him have some timeout with Mr.

6    Carothers or the nurse, and --

7        Q    What decision did the team reach?

8        A    We reached a decision to put a brace when Mr.

9    Carothers wasn't available or the nurse, the very person

10   that he could go to when he acted out.

11       Q    Okay.  What about the decision as to -- what was

12   going to happen as a result of his hitting you and other

13   behaviors, what was going to be the recommendation to the

14   board?

15       A    The recommendation to the board was going to be

16   expulsion as stated by Ms. Sheppard (phonetic) the academy

17   director.

18       Q    And were the parents in agreement with that

19   recommendation?

20       A    I believe so.

21           MR. DALTON:  I have no further questions.

22           MR. JONES:  Any cross examination, Ms.

1    Bruceville?

2              MS. BRUCEVILLE:  Just few questions.

3              CROSS-EXAMINATION

4              BY MS. BRUCEVILLE:

5        Q    Ms. Worsley, again thank you for taking time

6    from your classes to address these issues.  I'm looking at

7    the team notes pages 3 of 6 from that March 18th meeting.

8    There is a number of incidents that were reported,

9    incidents that involved T███████ with you in that classroom.

10   And I just want to be sure, do these accurately reflect

11   instances that you were seeing, does this accurately state

12   what was going on?  There is a date of -- specific

13   incidents you noticed, January 21st, 22nd, February 25th,

14   March 10th.  March 10th, I guess twice.  Do these

15   accurately --

16       A    These -- yes.

17       Q    Okay.  And you noted that he was having

18   increasing problems, and -- like his behaviors were

19   increasingly distractible and having increasing problems

20   in your classroom.

21       A    (Off mike)

22       Q    Okay.  But his services didn't -- his IEP didn't

1    change, his services didn't increase, and he had no

2    behavior plan developed with the IEP team, correct?

3        A    No, his services didn't change, although Mr.

4    Carothers and the nurse were called when he acted out, and

5    his mom too.

6        Q    Okay.  Thank you.

7            MR. JONES:  Any redirect?

8            MR. DALTON:  No redirect.  I'd like to call Ms.

9    Whitehead now.

10           MR. JONES:  Let me ask one question.  You were a

11   little fast there.

12           MR. DALTON:  I'm sorry.

13           MR. JONES:  When did you -- you talked about the

14   fact that he was doing well, and then all of a sudden he

15   changed, you know, was it -- when did that change occur?

16           THE WITNESS:  I would say the second half of the

17   year.

18           MR. JONES:  Which is --

19           THE WITNESS:  Particularly almost the end

20   January, February, and I had spoken with his mom, and she

21   had told me that his medication was being changed, and I -

22   -

1          MR. JONES:  Oh, he was on some type of

2     medication?

3          THE WITNESS:  Right, yes.

4          SPEAKER:  What kind of medication was he on, do

5     you know?

6          THE WITNESS:  His mom will have to tell you

7     that.

8          SPEAKER:  Okay.  And so --

9          SPEAKER:  I think the notes reflect that he was

10    --

11         MR. JONES:  So did all this -- okay, 1/21, 22,

12    25, 3/10, so all this occurred after the -- as the

13    medication was taken off.  Did you ask the parent why she

14    took them off?

15         THE WITNESS:  No -- I mean, she didn't take them

16    off.  She -- the medication had changed, because of some

17    eating problems that he was having --

18         MR. JONES:  So he was a pretty good kid, first

19    half.  Second half he was hard to handle.

20         THE WITNESS:  Yes.

21         MR. JONES:  Okay.  Your next witness.

22         MR. DALTON:  Ms. Whitehead.

1          SPEAKER:  Ms. Whitehead.

2     Whereupon,

3                    TERESA WHITEHEAD

4     was called as a witness and, having been first duly sworn,

5     was examined and testified as follows:

6          MR. JONES:  Please state your full name and your

7     position at Friendship.

8          THE WITNESS:  My name is Teresa Whitehead, and

9     I'm the special education coordinator for Chamberlain

10    Campus, and I monitor the implementation of IEPs for

11    special ed students.

12         MR. JONES:  All right, go ahead with

13    examination.

14         DIRECT EXAMINATION

15         BY MR. DALTON:

16    Q    Ms. Whitehead, are you familiar with the student

17    T██████ D█████?

18    A    Yes, I am.

19    Q    Were you present at the meeting that was held on

20    March 18th, this year?

21    A    Yes, I was.

22    Q    What was the purpose of that meeting?

1          A      T███████s had been suspended, and it was a

2    manifestation meeting to determine if his behaviors that

3    led to the suspension was directly related to his

4    disability classification.

5          Q      And were his parents at the meeting?

6          A      Yes, they was --

7          Q      And did you document in your meeting notes their

8    input into the meeting?

9          A      Yes, we did.

10         Q      If you can recall, could you give me a general

11   gist of what the parent's comments were with regard to

12   their son's behavior?

13         A      Yes.  Ms. Dixon stated that the first time --

14   T██████ was suspended three times.  The first time was for

15   5 days.  The second time was for 10 days.  And the last

16   time was for 5 days.  During his first suspension, I

17   believe it was -- he spent that time with Ms. Dixon when

18   she went to work, and she worked at a daycare center.

19              As the manifestation meeting took place, and Ms.

20   Dixon shared some information with us she did explain to

21   the team that T██████ had told her that he was going to get

22   suspended again, because he wanted to go to work with her,

1    because he enjoyed being at the daycare center with her.

2          She also said that he had premeditated the

3    incident that led up to his suspension, and those were her

4    exact words.

5      Q    Was there any discussion by Ms. Dixon about

6    private schools?

7      A    Yes.  As the manifestation meeting was winding

8    down she said that her attorney was already looking for an

9    alternative placement other than Chamberlain.

10     Q    And were particular schools mentioned?

11     A    Yes.  Okay, here it is, on page 5 of the notes

12   from the manifestation meeting Ms. Dixon said -- states

13   that her attorney is seeking placement for T█████, and has

14   applied for Rock Creek Academy and High Roads Academy.

15            MR. JONES:  Where are you reading?

16            MR. DALTON:  Bottom of --

17            THE WITNESS:  The bottom of page five of six.

18            MR. DALTON:  Five of six -- Ms. Dixon underlined

19   twice --

20            MR. JONES:  (Inaudible)

21            MR. DALTON:  I think it's the first time

22            BY MR. DALTON:

1    Q    And what is the second, the comment next to the

2    second time you underlined Ms. Dixon's name?

3    A    Ms. Dixon states that this particular incident

4    was premeditated, because he likes to go with her to her

5    job.

6    Q    And what is -- if you look at page 6 of 6, is

7    there another statement made my Ms. Dixon?

8    A    Yes, Ms. Dixon states that T██████ needs to be in

9    another setting.

10   Q    Even though this child is a child with a

11   diagnosis of ADHD and a child with a diagnosis of

12   oppositional defiance disorder why do you believe this

13   team -- the team nevertheless felt that this particular

14   incident was not a manifestation of these disabilities?

15   Q    Because everyone testified, including Ms. Dixon,

16   and his outside therapist, that T██████ has the ability, he

17   knows right from wrong, he does feel badly when he engages

18   in negative behavior, and he is sorry.

19        The team also agreed that T██████ is very

20   selective as to what type of behavior he will exhibit with

21   certain individuals.  So he does understand, he did

22   understand his behaviors.

1    Q    And because he is selective, that implies that

2    he has the ability to control that behavior in some

3    instances with some individuals?

4    A    Yes, that was the consensus at the time.

5    Q    All right.  Nevertheless even given the

6    recommendation, was this recommendation carried out by the

7    board of Edison School?

8    A    To my knowledge, I know Dr. Brunell wrote a

9    letter recommending expulsion for T██████, and at that time

10   when he was suspended the last five-day suspension that he

11   received that was during the time in which Ms. Dixon was

12   waiting for the expulsion hearings to determine if the

13   board was going to --

14   Q    And what happened prior to the board acting?

15   A    Ms. Dixon enrolled him in Savoy.

16   Q    All right, then at the time that Ms. Dixon

17   enrolled him at Savoy that ended the jurisdiction of

18   Friendship-Edison.

19   A    That's my understanding, yes.

20        MR. DALTON:  All right.  I have no further

21   questions for this witness.

1          MR. JONES:  All right, Ms. Bruceville, do want

2     to cross examine?

3          MS. BRUCEVILLE:  Please.

4          CROSS-EXAMINATION

5          BY MS. BRUCEVILLE:

6     Q     In the middle of was -- Ms. Whitehead -- sorry -

7     - again thank you for coming down, and I appreciate your

8     time today.  Was there an IEP meeting that was scheduled

9     to take place for T█████ D████ on or about April 15th,

10    April 14th?

11    A     Yes, that's correct.

12    Q     Okay, and what happened with that meeting?

13    Isn't it true that you informed Ms. Suttonrock from my

14    office that that meeting was cancelled in advance of that

15    meeting taking place?

16    A     Well, that -- we did have a meeting for -- I

17    believe it was April 14th, to review his IEP.

18    Q     You mean you had a meeting scheduled for that

19    date.

20    A     Had a meeting schedule -- excuse me I am sorry -

21    -

22    Q     That's okay.

1       A       -- had a meeting scheduled to review his IEP,

2    but in the meantime that -- all that took place during the

3    time when we were waiting for the hearing -- expulsion

4    hearing.  And as I stated before, Ms. Dixon enrolled him

5    in Savoy, which then took it out of Friendship-Edison

6    Public Charter School's jurisdiction.

7       Q    Okay.  I'm looking at the prior notice that was

8    issued as part of the MDT team notes on that March 18th

9    document.  And it says on here --

10              MR. JONES:  (Off mike)

11              MS. BRUCEVILLE:  The middle of the page, it's

12   actually the --

13              MR. JONES:  No, no, what exhibit?

14              MS. BRUCEVILLE:  I apologize, it's my exhibit

15   number 10, Mr. Dalton's exhibit 3, I think.  The prior

16   notice form.

17              MR. DALTON:  I don't know if we --

18              SPEAKER:  I don't have --

19              MS. BRUCEVILLE:  Was it in included in yours?

20              MR. DALTON:  -- show us a copy.

21              MS. BRUCEVILLE:  Sure.

22              MR. DALTON:  It wasn't --

1          MS. BRUCEVILLE:  Okay.  Perhaps it was not.

2          MR. JONES:  (Inaudible).

3          MS. BRUCEVILLE:  No, actually the -- perhaps I

4    was referring to the wrong document.  I don't think it is

5    in yours.  Then I'll refer to my number 10, one of the

6    very last pages.

7          MR. DALTON:  Mine isn't tabbed so could I look

8    at yours --

9          MS. BRUCEVILLE:  Sure absolutely.

10         MR. DALTON:  This is what she is talking about.

11   So this is prior notice.

12         MS. BRUCEVILLE:  Right there.

13         MR. DALTON:  -- program, okay.

14         THE WITNESS:  Okay.

15         BY MS. BRUCEVILLE:

16    Q    That form -- you filled out that form, correct?

17    A    Yes, I did.

18    Q    Okay, and it notes on it that other -- under the

19   middle category there it says other in expulsion.  And it

20   also states further below that the consequence in the

21   school -- I don't have it in front of me -- but it's a

1    mandatory expulsion in the circumstances that involve the

2    student's behavior.

3         A    Right, that's correct.

4         Q    Okay.  So when you were informing this parent

5    that her child under school policy at least it was a

6    mandatory expulsion, she should be under no pretense that

7    this was anything other than an expulsion.

8         A    Okay, if you refer to the end of the

9    manifestation notes, on page 6 of 6.  It says -- Ms.

10   Whitehead states that Chamberlain School is seeking

11   expulsion at this time, Ms. Sheppard which she is the

12   academy director and she operates as a vice principal, Ms.

13   Sheppard states that all the relevant information will be

14   provided to them, the parents, immediately following this

15   meeting to setup a hearing for the expulsion, or to appeal

16   the expulsion.

17        Q    Okay.  You also stated that during that meeting

18   Ms. Dixon shared with you her thought that since the child

19   was attending work with her at the daycare facility

20   probably with other young children it seemed to function -

21   - I don't know if these words were used -- but almost like

22   a reward to him, you know, it was more favorable for him

1    to go not to school than it was to go to school.  I mean,

2    am I using the right characterization here?

3         A    Well, Ms. Dixon stated that T▉▉▉▉ had told her

4    that he was going to get suspended so that he can stay

5    home and go to work with her, which she worked at a

6    daycare center, and she said that he enjoyed going to work

7    with her.

8         Q    So -- then how come the team -- this was with

9    respect to the 10-day suspension, I mean that's when this

10   meeting was held following that second 10-day suspension.

11        A    Yes, correct.

12        Q    So there was still a 5-day suspension that

13   followed this.

14        A    Yes.

15        Q    Weren't there other types of consequences that

16   could have been used for this child since -- if he thinks

17   it is more enjoyable to go to work than it is to come to

18   school weren't there other things we could done besides

19   reward him with the very thing that it seems like he

20   wanted more than to have to come to school and work in Ms.

21   Worsley's class.

1    A    And I understand your question, Dr. Brunell and

2    our academy director, Ms. Sheppard, those are the two

3    people who administer suspensions.  I'm not one of the

4    people who have authority to do that.  So that would

5    probably be a question for Ms. Sheppard or Dr. Brunell.

6        Q    Okay.  Also you were present during the

7    development of that April 2003, IEP, you were a team

8    member.

9        A    Yes, I was.

10       Q    Okay.  And you've also been a participant in the

11   other hearings and due process days that we've been here.

12       A    That's correct.

13       Q    And it is fair to say that you are familiar with

14   the parent's concern that the IEP didn't necessarily

15   reflect what she saw in T██████' behaviors.

16       A    I disagree with that.  When we had his initial

17   IEP --

18       Q    No, I don't mean to disagree.  It appears that

19   you disagreed, but did you -- you were familiar with what

20   her concerns were?

21       A    I disagree.

22            MR. DALTON:  Well --

1        MS. BRUCEVILLE:  Okay, I'm sorry, please go

2    ahead.

3        MR. DALTON:  I mean, the witness says that she

4    disagrees.

5        MS. BRUCEVILLE:  No, I don't know, I thought she

6    disagreed with the parent's concerns not --

7        MR. DALTON:  No, she disagrees with --

8        MS. BRUCEVILLE:  Then please, I don't mean to

9    interrupt.

10        MR. JONES:  Well, are you going to put in your

11    objection --

12        MR. DALTON:  Yes, because the hearing -- even

13    though counsel raised this issue the hearing officer

14    disagreed with her.  Now, this agrees with a prior

15    determination of the hearing officer that the IEP was

16    appropriate.  Therefore I think we're done with this.

17    This is not relevant to this hearing.

18        BY MS. BRUCEVILLE:

19    Q    Okay.  So at this March 18th meeting were you

20    familiar with the parent's concern after reviewing in the

21    notes, the documents, and seeing that the teacher reported

22    and Mr. Carothers reported some periods of regression,

1    concerns that more support services could be useful for

2    this student.

3        A    I agree that I was aware of her concerns

4        Q    Okay.

5             MS. BRUCEVILLE:  That's all my questions right

6    now.

7             REDIRECT EXAMINATION

8             BY MR. DALTON:

9        Q    Ms. Whitehead, the fact that there might have

10   been regression, if it does not interfere with the child's

11   academic process, would that rise to a level of a

12   necessity to modify the IEP?

13       A    Since it -- ask me the question again.

14       Q    Okay.  Isn't there a connection between

15   regression and academic performance?

16       A    Yes, it is --

17       Q    And doesn't the regression have to interfere

18   with the academic performance before the regression

19   becomes important enough to act on?

20       A    Yes, that's correct.

21       Q    And was the regression important enough to act

22   on with regard to --

1      A      We had determined at that time since T██████ knew

2    rightful -- right from wrong that he could control his

3    behaviors when he to.

4      Q      Okay.  Well, that goes to the issue of the

5    expulsion hearing.  What I'm trying to get to is the need

6    and the suggestion by counsel that somehow between when

7    the hearing officer made his determination about the IEP

8    and this meeting that you all should have figured out that

9    his IEP needed to be changed, because he was failing in

10   academic performance, but in fact he was not falling in

11   academic performances, isn't that correct?

12     A      Yes, that's correct.  I did understand your

13   question.  That is correct.

14     Q      All right.  So even though there was some

15   mention of his -- it has to be coupled with academic

16   failure, and that certainly wasn't the case with this

17   student.

18     A      That's correct.

19            MR. DALTON:  I have no further questions.

20            MR. JONES:  Any --

21            MS. BRUCEVILLE:  No thank you.

```
1              MR. JONES:  Just a -- just one or two questions
2    with timelines.  When was the -- okay, the (inaudible)
3    hearing, when did that take place?
4              THE WITNESS:  March 18, '04.
5              MR. JONES:  March 18, '04.
6              THE WITNESS:  Yes.
7              MR. JONES:  When was the expulsion take place --
8    or did it take place?
9              THE WITNESS:  I don't know if the expulsion
10   hearing took place.
11             MR. JONES:  When was it scheduled, do you know?
12             THE WITNESS:  No, I do not know.
13             MR. JONES:  Okay.  When did the parent take the
14   student out of Friendship-Edison?
15             THE WITNESS:  We were notified on -- I believe
16   it was April 13th, that he was enrolled in Savoy.
17             MR. JONES:  All right, no further questions.
18             MR. DALTON:  Can I just clarify that point?
19             BY MR. DALTON:
20    Q    When was spring break?
21    A    Spring break was from April 5th through April
22   12th, and we --
```

1    Q    Okay, so in practicality he was effectively gone

2    at the end of March.

3    A    That's correct.

4    Q    Because no one was in school.

5    A    That's correct.

6    Q    Okay.

7         MR. JONES:  All right, do you rest now, Mr.

8    Dalton?

9         MR. DALTON:  Yes, I do.

10        MR. JONES:  All right, do you --

11        MS. BRUCEVILLE:  I have Ms.

12   Suttonrock.

13   Whereupon,

14                    SHARON SUTTONROCK

15   was called as a witness and, having been first duly sworn,

16   was examined and testified as follows:

17        MR. JONES:  Please state your full name and your

18   position?

19        THE WITNESS:  Sharon Suttonrock, educational

20   advocate for T█████ D█████ working with James E. Brown and

21   Associates.

22        MR. JONES:  All right, Ms. Bruceville, go

1    forward.

2           DIRECT EXAMINATION

3           BY MS. BRUCEVILLE:

4        Q    Could you state your name and your -- well, you

5    stated your position, but your name for the record,

6    please.

7        A    Sharon Suttonrock.

8        Q    And are you familiar with T███████ D█████?

9        A    Yes.

10       Q    And in what way are you familiar?

11       A    I'm his advocate, educational advocate.

12       Q    And do you recall how long roughly you've worked

13   with him?

14       A    I would believe for the better part of a year,

15   over a year.

16       Q    Okay.  And are you familiar with his IEP

17   documentation, his evaluation materials, are you familiar

18   with his educational cumulative records?

19       A    Yes.

20       Q    Have you reviewed the student's manifestation

21   determination meeting notes from March the 18th, 2004?

22       A    Yes.

1      Q    Okay.  Now, are you familiar with the
2    determination that was reached by the team?
3      A    Yes.
4      Q    What is the standard that's typically used in
5    making a manifestation determination?  In other words,
6    what do you need to say to show whether or not it is --
7    the student's behavior has been a result of his disability
8    or not?
9           MR. DALTON:  Objection, lack of foundation.
10          BY MS. BRUCEVILLE:
11     Q    Okay.  How long have you been an educational
12   advocate?
13     A    For almost three years.
14     Q    And prior to that, what was your --
15          MR. JONES:  Sustained, I'm sorry.
16          MR. DALTON:  Okay.
17          MR. JONES:  Sustained, you're not going to -- do
18   the foundation.
19          MS. BRUCEVILLE:  Okay.
20          BY MS. BRUCEVILLE:
21     Q    Okay.  And what was your educational -- or what
22   was your professional background prior to becoming an

1    educational advocate?

2        A    I was a school teacher.

3        Q    Okay, and in what jurisdictions?

4        A    Prince William County in Virginia.

5        Q    And what --

6        A    I'm sorry.  I was a special education teacher in

7    the areas of emotional disability and learning

8    disabilities.

9        Q    Okay.  And what was your training, prior to

10   becoming a teacher, what was your -- what are your

11   professional credentials?

12       A    A bachelor in psychology, and masters degree in

13   community and clinical psychology, and I have a -- you

14   know, teaching certifications as well as being certified

15   in the District as a mental retardation professional.

16       Q    And have you participated in any IEP meetings

17   and in manifestation determination meetings for students?

18       A    Yes, I have.

19       Q    In the District of Columbia?

20       A    Yes, I have.

21       Q    Do you have any idea how many IEP meetings you

22   have attended?

1        MR. DALTON:  I want to help speed this up.  I

2   don't have my voir dire, if I had voir dire on this, would

3   be not my concern with her general credentials, but the

4   lack of familiarity she had with the manifestation

5   determination review in this case since he was not at this

6   case.

7        MS. BRUCEVILLE:  Sure.  No, no, actually the

8   question -- maybe that wasn't phrased correctly then.

9        MR. JONES:  You asked her about the standards.

10       MR. DALTON:  Right.

11       MS. BRUCEVILLE:  Yeah, what standards would a

12   team use in order to make a manifestation determination?

13       MR. DALTON:  Well --

14       MR. JONES:  And he is suggesting that she

15   doesn't have the subject matter expertise to make that

16   kind of determination or opinion to provide me with

17   answers, is that --

18       MS. BRUCEVILLE:  I thought you were saying that

19   --

20       MR. DALTON:  The point is that regardless of any

21   general standards every child's case is individual, and

22   that we have to apply the individual situation, and that

```
1    she was not a participant, that there were two --

2              MR. JONES:  That's enough.

3              MR. DALTON:  Okay.

4              MS. BRUCEVILLE:  Is that sustained, or am I --

5              MR. JONES:  I'm overruling -- I'm not -- I

6    haven't heard what you're saying --

7              MS. BRUCEVILLE:  Okay.  I'm stating that the --

8    idea is clear that the manifestation -- what the role of

9    the manifestation team is, which is to determine -- to

10   assess what was the child's action.

11             MR. JONES:  Was she present?

12             MS. BRUCEVILLE:  She was not present for the

13   meeting.  And -- however --

14             MR. JONES:  I'm going to sustain his objection.

15   You can proffer into the record what you consider to be

16   appropriate.

17             MS. BRUCEVILLE:  Okay.  Then for the record,

18   could you explain what the standard it would be that you

19   would use -- do you want me to proffer, or --

20             SPEAKER:  (Off mike).

21             MS. BRUCEVILLE:  Okay.  The proffer would be

22   that a manifestation team would review the action and
```

1    weight it against the student's disability.  And the

2    critical question is not whether the student thought about

3    it before, and not whether the child knows right from

4    wrong, but rather was the child able to control that

5    action with respect to the circumstances at hand.

6         In this case, the psychiatric and the

7    psychological evaluations that Friendship-Edison relied on

8    in developing its IEP.  I mean, stuff that was done by

9    their own evaluators talks about oppositional defiant

10   disorder, which injured the DSM codes, and under the

11   actual description in his evaluation says oppositional

12   defiant disorder, and characterize impulse control

13   problems.

14        So what the team didn't actually address was,

15   was this an -- did he have control over his impulse.

16   Weighing right and wrong is different than stating was he

17   controlling an impulse.

18        MR. JONES:  Okay.  All right.

19        MS. BRUCEVILLE:  So that would be my proffer.

20        MR. JONES:  Go ahead.

21        MR. DALTON:  And I would object to that only

22   because Ms. Suttonrock wasn't at the meeting, and there

```
1    was testimony that --
2              MR. JONES:  And I have sustained your objection,
3    Mr. Dalton.
4              MR. DALTON:  Okay.  All right.
5              MR. JONES:  Go forward.
6              BY MS. BRUCEVILLE:
7        Q    With respect to the issues (inaudible) between,
8    for example late February, March and into the present,
9    have you had communication with Friendship-Edison about
10   these events and these circumstances?
11       A    Yes.
12       Q    And what kind of communication have you had?
13       A    Some telephone calls or faxes just generally
14   have a meeting.
15       Q    Could you be more specific?  Who were they
16   directed to, and what was the substance of your
17   communication?
18       A    I spoke with Ms. Whitehead, I think, maybe one
19   or twice on the phone.  I left few messages.  I went to
20   the school.  Actually, we met at the school.  And the
21   substance of it was, once you schedule and IEP T█████ and
22   also in -- after the -- after I went to the school and we
```

1    met on another meeting we scheduled the IEP meeting

2    between then and now.

3         You know, we've been trying to -- well, always I

4    made attempt to try to get back to the school to have that

5    meeting.

6    Q    And -- I mean, at the point when you were

7    informed that he was expelled, did you continue to try to

8    work with the school to get a meeting convened?

9    A    Yes, I mean, it was my understanding that we

10   could still go forward, you know, with having a meeting

11   although he might not be there.  So that's what I was

12   attempting to do.

13   Q    And what gave you that understanding?

14   A    Speaking with the attorneys I understood that --

15   Friendship-Edison's counsel said that it was okay to

16   convene a meeting, and so that's the information that I

17   had presented to Friendship-Edison.

18   Q    Since the student enrolled at Savoy, have you

19   had an opportunity to observe him at the Savoy?

20   A    Yes.

21   Q    What was your observation like?

22   A    Briefly, I observed him in the special education

1    classroom.  There were approximately nine to ten students

2    in the classroom with one teacher.  I spoke with the

3    teacher, and she stated that -- she said she -- said she's

4    not -- she had not seen an IEP.  She really didn't know

5    what his disability was.  However, she could see that he

6    had some problems, and needed some kind of attention, and

7    that's why he was going to the classroom --

8         Q    Just to interrupt for a second.  At what point -

9    - how long had T█████ been at the school at the point

10   where you conducted your observation?

11        A    It's been -- it had been basically a month --

12        Q    Do you remember the date of your observation, or

13   if you kept a log of your notes, would you remember?

14        A    I believe it was Thursday last week which would

15   have been like the 13th.

16        Q    Okay.  What did the teacher report T█████'

17   status or progress in the class to be?

18        A    She -- well, she said that, you know, he was --

19   you know, the worst student that she's had in terms of his

20   behavior, that -- you know, he's torn up the room, that,

21   you know, she doesn't know what to do.  She hasn't seen,

22   you know, his IEP, so she really doesn't know what she is

1    dealing with.

2         But she could me tell that -- she -- it's

3    basically that he was -- I'm trying to paraphrase.  She

4    said -- well, basically she was saying that he was the

5    worst student in her classroom, and that since he's been

6    there he's ruined her classroom.

7       Q    Do you believe from your experience only, and

8    not as a DCPS representative, clearly, in the time that

9    T██████ has been at the school, is that enough time for the

10   school to have -- and based on your background as a

11   teacher, did the school have enough time to hold a meeting

12   without -- and gather necessary information without it

13   being a negative impact on the student?

14        MR. DALTON:  I'm going to object to that

15   question.

16        MR. JONES:  Your response to her objection.

17        MR. DALTON:  You want to hear my basis?

18        MR. JONES:  I'm sorry, go ahead, basis.

19        MR. DALTON:  Ms. Rock (phonetic) has indicated

20   that she observed the student once since he's been at

21   Savoy, one observation.  There is no testimony she's in

22   (inaudible) communication with the school about the

1    student, based on that, to make a quick answer to -- for

2    her to answer whether Savoy has had sufficient time to

3    observe, that's not a question.

4              MR. JONES:  And we have that -- okay, go ahead.

5              MR. DALTON:  And that's not the issue that we

6    are -- that we put on the table (off mike).

7              MR. JONES:  We heard from the school, and the

8    school has indicated that they had not -- had the time

9    enough to complete evaluations.

10             MS. BRUCEVILLE:  Okay.

11             MR. JONES:  So your question really has been

12   answered.  Okay.

13             MS. BRUCEVILLE:  Okay.

14             MR. JONES:  Can you move on?

15             MS. BRUCEVILLE:  Yes.  Actually, I don't have

16   any further questions right now.

17             MR. JONES:  Do you have any cross?

18             MR. DALTON:  Yes.

19             CROSS-EXAMINATION

20             BY MR. DALTON:

21        Q    Ms. Rock isn't it true that the willingness of

22   Friendship-Edison to hold an IEP meeting was predicated on

1    their jurisdiction over the student.

2         A    I would say not, because the last communication

3    that I had with Ms. Whitehead was --

4         Q    Well, let me back up.  Are you telling me that

5    it's your opinion as someone who is qualified as an

6    advocate with years of experience that a school system can

7    have an IEP with a student that they have no jurisdiction

8    over?

9         A    No, I'm sorry, I misunderstood your question.

10   What I'm saying is, at the time that I last communicated

11   with Ms. Whitehead, T████ had not -- he wasn't enrolled

12   at another school.

13        Q    Oh, well, then we can assume that the

14   understanding was of Ms. Whitehead that she did have

15   jurisdiction over that student --

16             (Tape ends abruptly)

17                      *    *    *    *    *