1          MS. GAMBALE:  My question was there -- was there

2    a concern about who setout the information for the test?

3          MR. ST. CLAIR:  Just a minute -- just wait a

4    minute.

5          THE WITNESS:  Yes.

6          MR. ST. CLAIR:  Help me.  I'm not sure I

7    understand the question.

8        MS. GAMBALE:  Well, when they administered the test,

9    they conduct the tests using either the parent or teacher,

10   and in this case neither occurred.

11         MR. ST. CLAIR:  To what, what's the objection?

12         MR. DALTON:  My objection is that this is not a

13   (inaudible).  You can't know whether or not there was a

14   teacher or the parent, or anything with regard to how the

15   test was administered.

16         MR. ST. CLAIR:  Right.  The problem, Ms.

17   Gambale, is that Ms. Munford is not familiar with this.

18   So -- with this scale.

19         THE WITNESS:  No, what I --

20         MR. ST. CLAIR:  Just a minute, Ms. Munford.

21         And so it brings into question the validity or

22   the materiality or the confidence of any testimony that

1  she would give on this particular scale.  What -- I mean,

2  the record is clear that Ms. Munford asked for the

3  Vineland.  That wasn't administered.  This was

4  administered, this being a AAMR adaptive behavior scale,

5  which your advocate is unfamiliar with.  So I don't see

6  how you can explore this any further.

7          MS. GAMBALE:  okay.  I'll move on then.

8          MR. ST. CLAIR:  Okay.

9          BY MS. GAMBALE:

10     Q    Was there a reason why the Vineland was

11  requested at the meeting?

12     A    Yes.  The Vineland was requested because it was

13  the adaptive scale that was used before.  It would give us

14  a more complete picture on where G███████ is functioning

15  now.  We could compare her old scores with her new scores.

16  So that was specifically why we requested a Vineland for

17  G███████.

18          MS. GAMBALE :  I have no further questions.

19          MR. ST. CLAIR:  Mr. Dalton, recross.

20          MR. DALTON:  No.  I'm unable to recross because

21  this witness, while giving testimony with regard to the

1    Vineland, I cannot cross-examine her because she's

2    unfamiliar with it to show that---

3              MR. ST. CLAIR:  Unfamiliar with what?

4              MR. DALTON:  With the American Association on

5    Mental Retardation's adaptive behavior, and it is a

6    functional equivalent of --

7              MR. ST. CLAIR:  You're arguing here.  Don't

8    argue.  You got a chance, first and last word.

9              MR. DALTON:  No.

10              MR. ST. CLAIR:  I guess that means, no, you

11    don't have any recross.

12              MR. DALTON:  I have no further questions.

13              MR. ST. CLAIR:  Thank you, Ms. Munford.

14              (Witness excused)

15              Next witness Ms. Gambale.

16              MS. GAMBALE:  Okay I will call Ms. Moody.

17    Whereupon,

18                        MICHELLE MOODY

19    was called as a witness and, having been first duly sworn,

20    was examined and testified as follows:

21              MR. ST. CLAIR:  All right.

22              DIRECT EXAMINATION

1          BY MS. GAMBALE:

2     Q    Could you please state your name for the record?

3     A    Michelle Moody

4     Q    And what's your educational background?

5     A    I have a bachelors degree in English literature,

6    a masters degree in special education, regular ed

7    credential, a special ed teaching credential, a resource

8    specialist teaching credential, and I taught special

9    education for 10 years, and I served as a special

10   education coordinator for two years, and assistant

11   director of special education for Danville Public Schools

12   in Danville, Virginia.

13    Q    And where are you employed?

14    A    At Brown and Associates.

15    Q    And do you know G███████████?

16    A    Yes, I do.

17    Q    And how do you know G██████ W████████?

18    A    I'm her educational advocate.

19    Q    And how long have you worked with G██████?

20    A    About -- I'd say about five months.

21    Q    And what documents have you reviewed in

22   connection to G███████?

1       A     I've reviewed the psycho education evaluation

2    dated February 27, 2004, Stanford 9 from 2002-2004, report

3    cards from 2002, 2003, and 2004, sent to social history

4    evaluation from January '04, and education evaluation from

5    November '03.

6       Q     Okay.  And what communication have you had with

7    this school?

8       A     Actually, I have gone to the schools several

9    times to observe G▮▮▮▮, so I've had a lot of

10   communication with the school actually.  I just -- I

11   called there yesterday as a matter of fact to try to go

12   down there.

13      Q     And have you been able to observe G▮▮▮▮?

14      A     I observed G▮▮▮▮ in a counseling class.  I've

15   been there on four separate occasions.  Two times I went,

16   and G▮▮▮▮ was not at school those days.  Another time I

17   went to the school, and G▮▮▮▮ was in counseling, so I

18   left.  And then this last time -- last we go into the

19   school to observe G▮▮▮▮, she was in a counseling class,

20   and the counselor was kind enough to let me sit in on

21   counseling.  And G▮▮▮▮ did not know I was there for her.

1  So I was able to hear her discussing some of her problems

2  with one of her teachers she was having.

3      Q    And what is her current classification?

4      A    LD, right now.

5      Q    And what was her former classification?

6      A    MR.

7      Q    With regards to -- are you familiar with the

8  adaptive scales?

9      A    Yes.

10      Q    And have -- how many IEP meetings have you

11  participated in?

12      A    Okay, gosh.  Let's see.  Maybe two a day for --

13  every week, 10.  So I'd say on average I attend about 40 a

14  month, because I have about two a day, about 10 a week.

15  So between 40 and 50 a month, and so that multiplied by

16  three years of being an advocate.  And then when I was a

17  special ed teacher for 10 years, then a special ed

18  coordinator.  So many hundreds, hundreds, if not a

19  thousand.

20      Q    So have you ever been involved in a decision to

21  classify a student as mentally retarding?

22      A    Yes.

1    Q    And what's generally required for that

2    classification?

3    A    Usually we use a Vineland expanded edition as

4    opposed to AAMR, because an AAMR only assesses personal

5    self-sufficiency community and social responsibility.

6    Whereas the expanded edition of the Vineland, which is

7    what was asked for at the meeting, the previous meeting,

8    they assess individual educational goals, and they are

9    essential in developing a treatment plan.

10        So the AAMR does not involve the educational

11   piece, but the expanded edition of the Vineland does

12   involve the educational piece.  And so it's comprehensive.

13   It's more comprehensive when determining what goals and

14   objectives derived for a student.  And in addition to

15   that, in 2001, a Vineland -- an expanded edition Vineland

16   was completed before on G████.  So that's why it's

17   essential that we have something for comparison -- you do

18   the same measure, assess the same ability.

19   Q    And who -- how would the -- either the Vineland

20   or the AAMR be administered?

21   A    Usually it's with -- well not usually, it's

22   always, if -- it's going to be accurate with a person that

1    is familiar with the student.  They question the parent,
2    and they question a teacher who works closely with the
3    students.

4        Q    Okay.  And did you have a chance to review the
5    most recent psychological -- psychoeducational evaluation?
6        A    Yes.

7        Q    Okay.  And when they did the AAMR, who did they
8    -- did they do that?

9        A    It appears that a staff member did it.  So it's
10   not clear if they interviewed a teacher and the parent.
11   And it's essential that they interviewed the parent so
12   they can get a true and reliable assessment of the
13   student's social ability, since they are going to
14   determine whether the student is LD or MR with this --
15   with this evaluation.

16       Q    And in terms of the difference between a
17   classification of LD and MR, what difference does that
18   make in programming?

19       A    Makes a lot of difference in programming.  For
20   an MR student, you are going to focus on community-based
21   instruction skills.  And with an MR student, a student
22   plateaus at a certain grade level, so you are not going to

1    force -- try to force-feed a student with information that

2    is too complex for them, and you want them to learn their

3    way around the community, learn how to be socially

4    appropriate.

5         It's a completely different treatment plan and

6    educational plan for a student that is mentally retarded

7    as opposed to LD, because with LD, you're going to teach

8    them compensatory strategies, ways to compensate for their

9    specific learning disability.  But with MR, you

10   acknowledge that their educational and intellectual

11   profile is completely flat, and that they are going have

12   to be adjustments made in their living and community-based

13   skills.

14   Q    And then what kind of -- there was an issue that

15   was raised at the last hearing regarding the March 31st

16   meeting?  What communication did you have with the school

17   regarding that meeting?

18   A    If I remember correctly -- not if I remember

19   correctly, I do remember -- I called Ms. Opalack and told

20   her don't have the meeting without us present.

21   Q    Okay.  And did you propose alternate dates for

22   her?

1    A    Yes, yes.  You say the March 30th meeting?

2    Q    Yes.

3         MR. ST. CLAIR:  This year.

4         THE WITNESS:  Okay.  Yeah, I faxed the letter to

5    them on March 23rd.  I have a fax confirmation here, and

6    it says, "It has come to my attention, we are trying to

7    schedule a meeting for G████ W███████, please be on March

8    30th.  The parent and I are unable to attend, and I

9    propose the following dates, April 4, April 6 or April 8."

10        MR. ST. CLAIR:  Is that --

11        MR. DALTON:  What exhibit?

12        MR. ST. CLAIR:  Let the hearing officer see it.

13        MS. GAMBALE :  It's our exhibit number 30.  Is

14   this a copy of the letter that you sent?

15        THE WITNESS:  Yeah.

16        MR. ST. CLAIR:  Exhibit number what?

17        MS. GAMBALE:  Thirty -- GW-30.  It's in our

18   supplemental exhibits.

19        MR. ST. CLAIR:  Wait a minute -- Ms. Williams --

20   I've got 1 through 16.  Oh here it is, 31.  I got it.  Oh,

21   just let me look at it.

1          Just a minute.  I'm going to hear you, Mr.

2   Dalton.  Let me get -- let me -- all right.  You got it,

3   sir?

4          MR. DALTON:  Uh-huh.

5          MR. ST. CLAIR:  All right, go ahead, Ms.

6   Gambale.

7          BY MS. GAMBALE:

8      Q   Did you ever agreed to meet on March 31st?

9      A   No.  Not that I remember, no.

10     Q   Okay.  I have no further -- did you ever hear

11  back regarding these dates that you had proposed?

12     A   No, no.  But I'll tell you -- but Mr. Henry did

13  something recently for an invitation.  So I have got, you

14  know, something in June, invites in June.

15     Q   Okay.

16         MS. GAMBALE:  I have no further questions.

17         MR. ST. CLAIR:  Mr. Dalton?

18         CROSS-EXAMINATION

19         BY MR. DALTON:

20     Q   Are you familiar with the disclosures that have

21  been offered in this case by Friendship-Edison?

1      A     I think -- I believe that I am.  But in

2  reviewing them, I may have mixed up some pages.  So I'm

3  pretty sure I have them.

4      Q     I would like to have you look at exhibit 15,

5  which is a memo from --

6             MR. ST. CLAIR:  Whose exhibit?

7             MR. DALTON:  Mine.

8             THE WITNESS:  You know what, I don't think -- I

9  don't think I'm going to have to --

10             MR. ST. CLAIR:  Is that the memo dated March

11  31st?

12             MR. DALTON:  Ms. Gambale, could you share that

13  with her.

14             MS. GAMBALE:  This is what I ever received -- my

15  pages were with these numbers.

16             MR. DALTON:  Let me show you this memo, and then

17  I'll show Ms. Moody.

18             MS. GAMBALE:  Okay.  I am familiar with this.  I

19  have (inaudible).

20             MR. DALTON:  Thanks.

21             MS. GAMBALE:  Okay, thank you.

22             BY MR. DALTON:

1    Q    Parent's exhibit number 30 is dated the 24th,

2    correct?  I mean, I'm sorry, the 23rd.  I want to make

3    sure that we have those dates, these two dates in the

4    right order.  Your letter to Mr. Henry is on the 23rd,

5    correct?

6    A    Yes.

7    Q    All right.  This memo, which is my exhibit 15

8    talks about a conversation between you and Ms. Opelack the

9    day after you wrote the letter.  And what Ms. Opelack

10   reports is consistent, is it not with your letter of the

11   23rd?

12   A    Yes, that's true.  I talked to her.  That letter

13   is true.

14   Q    Okay.  So you had in mind based on your letter

15   to Mr. Henry that this was actually going to be held on

16   the 30th.

17   A    Yes.

18   Q    And then when she told you, no, it's not, it's

19   on the 31st, you indicated to her, did you not, that that

20   was okay?

1     A    I did, and I called her back. You're right. I

2   did. And I called her back and said, please don't have

3   the meeting. And she said, we're going forward anyway.

4          MR. ST. CLAIR:  How soon did you --

5          THE WITNESS:  I called her that same day.

6          MR. ST. CLAIR:  Okay.

7          THE WITNESS:  And it's true I did say okay at

8   first, and then I called her back and said, yeah, let's

9   change the date, we cannot make it on the 31st.

10         MR. ST. CLAIR:  All right.

11         BY MR. DALTON:

12    Q    Now with regard to the AAMR, what does that

13  stand for?

14    A    American Association of Mental Retardation, I

15  believe.  I forget these acronyms.

16    Q    Then what is that -- what is that organization?

17    A    It's a federal organization where they help

18  determine and set the standards for students with mental

19  retardation.  And they deliver information to the public,

20  and they --

21         MR. ST. CLAIR:  Let her finish, let her finish.

1    THE WITNESS:  -- they deliver information to the

2  public as well as help determine what assessments are most

3  up-to-date.

4    BY MR. DALTON:

5    Q    Okay.  So this is an organization that sets up

6  the standards for how we define mental retardation,

7  correct?

8    A    Yeah, they help, they give input.

9    Q    Okay.  And it also determines what assessments

10  should be used?

11    A    In determining mental retardation.

12    Q    Right.  And are you familiar with the DSM-IV?

13    A    Yes.

14    Q    All right.  And are there not two conditions

15  that are required for mental retardation?

16    A    Uh-huh.

17    Q    And those two broad conditions are a certain

18  level of cognitive functioning --

19    MS. GAMBALE:  Objection.  Objection, he's not

20  asking a question.  He's testifying.

21    MR. ST. CLAIR:  No, no, I'm going to overrule

22  your objection.

1        Go ahead.

2        BY MR. DALTON:

3    Q    Is -- the two items are a certain level of

4    cognitive functioning and a, for lack of a better generic

5    term, a negative store on a adaptive measurement.  Is that

6    not correct?

7    A    The --

8    Q    Yes or no.

9        MR. ST. CLAIR:  Just a minute, just a minute.

10       THE WITNESS:  The determination is two levels

11   below the mean, two levels below the mean.

12       MR. ST. CLAIR:  The hearing officer is speaking.

13   Ask the question.  Let her answer.

14       MR. DALTON:  Well, she -- she was not responsive

15   to my question.

16       MR. ST. CLAIR:  Well, I had -- you didn't let

17   her get enough out for me to determine whether or not she

18   was.

19       MR. DALTON:  The answer -- the question is to be

20   answered yes or no.

21       MR. ST. CLAIR:  Who decided that?

22       MR. DALTON:  I did when I asked the question.

1          MR. ST. CLAIR:  No, I decide that.  I'm going to

2    let her answer.

3          MR. DALTON:  This is cross-examination.  I can

4    ask a question --

5          MR. ST. CLAIR:  No, but you don't tell people to

6    answer yes or no, Mr. Dalton.

7          MR. DALTON:  Well, with all due respect, Mr. St.

8    Clair, I believe I am absolutely entitled to ask a

9    question that can be answered yes or no.

10         MR. ST. CLAIR:  You certainly are.  But that

11   doesn't mean you are going to get a yes or no answer.

12         MR. DALTON:  Okay.

13         MR. ST. CLAIR:  You ask the question, and let

14   her answer.

15         MR. DALTON:  Okay.

16         MR. ST. CLAIR:  If her answer is flawed, then

17   you'd bring that out on further questioning.

18         MR. DALTON:  Okay.

19         BY MR. DALTON:

20    Q    Well, my question is, there are two basic

21   requirements in order for a child to be found mentally

22   retarded.  One is that they have a certain level of

1  cognitive functions, and the other is that they have a

2  function of adaptive behavior that is consistent with

3  finding mental retardation.  Is that correct?

4      A    Yes.

5      Q    Okay.  So your testimony is that the AAMR is not

6  in a position to determine that their adaptive test is one

7  that can make -- help a psychologist make that

8  determination?

9      A    It is not the --

10          MR. ST. CLAIR:  Wait a minute.  He asked you a

11  question about the society, not the test.

12          THE WITNESS:  Uh-huh.

13          MR. DALTON:  Right.

14          MR. ST. CLAIR:  Go ahead.

15          THE WITNESS:  Say that again.  Now -- okay, I

16  don't remember the question now.  State that question

17  again.

18          BY MR. DALTON:

19      Q    The question is -- by your testimony, I'm under

20  the impression that you feel that the AAMR --

21          MR. ST. CLAIR:  That's the American mental

22  association.  He's talking about the association.

1           THE WITNESS:  Uh-huh.

2           MR. DALTON:  -- is not in a position to

3    establish an adaptive behavior test to help psychologist

4    measure whether a student is mentally retarded or not.

5           THE WITNESS:  They assess social and personal.

6           BY MR. DALTON:

7    Q    Ma'am, just answer my question.

8    A    They don't assess educational.

9    Q    Please answer my question.

10   A    That particular assessment does not do

11   educational.  And it's helpful.

12          MR. ST. CLAIR:  Ms. Moody?

13          THE WITNESS:  Yes.

14          MR. ST. CLAIR:  Keep in mind about what he is

15   asking you a question.  He is not asking you a question

16   about the test.

17          THE WITNESS:  Uh-huh.

18          MR. ST. CLAIR:  He's asking you a question about

19   the association that created the test.

20          THE WITNESS:  Uh-huh.

21          MR. ST. CLAIR:  Ask the question again.  Go

22   ahead.

1          BY MR. DALTON:

2      Q    Is it your opinion that the American association

3   for mental retardation is not an appropriate association

4   to publish an adaptive behavior test, which is one of the

5   two criteria needed to establish mental retardation?

6      A    Oh yes, it is, it is.

7      Q    Oh it is?

8      A    Of course, it's acceptable.

9      Q    Okay.  All right.  Now, your testimony that you

10  gave on direct is also based on a lack of knowledge as to

11  who the individual was, from which Dr. Sparrow got the

12  information with regard to G███████.  Isn't that correct?

13     A    Would you restate that question?

14     Q    Your testimony on direct was that you didn't

15  know who Dr. Sparrow spoke with, isn't that correct?

16     A    It's my understanding -- the staff member, yes.

17     Q    So you --

18     A    And I don't know who.  That's right.

19          MR. ST. CLAIR:  That's great.

20          BY MR. DALTON:

21     Q    So you don't know whether that person was

22  familiar with the student or not?

1     A    That's true.

2     Q    Okay.  Now if the person was very familiar with

3   the student, it's my understanding that your testimony

4   nevertheless is that Dr. Sparrow's examination is flawed.

5   Is that correct?

6          MS. GAMBALE:  Restate that question, Mr. Dalton?

7          BY MR. DALTON:

8     Q    Well, on direct, you indicated that even though

9   you didn't know who she spoke with, that it's flawed.

10    A    Oh, no, I didn't say flawed, incomplete, because

11   it does not assess educational.

12    Q    No, no, no, no, I'm not talking about -- I'm not

13   talking about that test.  We still are continuing to have

14   this problem.

15    A    What are we talking about then?  Be clear.

16    Q    I'm talking about Dr. Sparrow's analysis.  This

17   Ph.D. in psychology --

18          MR. ST. CLAIR:  All right now Mr. Dalton, now I

19   think she's the one that administered the test, right?

20          MR. DALTON:  Right.

21          MR. ST. CLAIR:  Now aren't you talking about the

22   test?

1          MR. DALTON:  No, I'm talking about Dr. Sparrow's

2    procedures that she followed.

3          MR. ST. CLAIR:  Okay.  While administering the

4    test?

5          MR. DALTON:  That's correct.

6          BY MR. DALTON:

7      Q    You are saying that they are flawed even though

8    this opinion is based on not knowing who she talked to.

9      A    Would you tell me who she'd talked to.  I mean,

10   you tell me who she talked to, and then maybe --

11     Q    No, I get to ask the questions.

12         MR. ST. CLAIR:  Now Ms. Moody, I want you to

13   just answer the questions.  Now this is cross-examination.

14   Let Mr. Dalton ask the questions, you answer the

15   questions.  Sometimes you just may not know the answer.

16   I'm sorry Mr. Dalton.

17         MR. DALTON:  That's all right.

18         BY MR. DALTON:

19     Q    Do you want me to repeat the question again?

20     A    No, the answer is that I don't know who

21   administered the test.

22     Q    No, that wasn't the question.

1    MR. ST. CLAIR:  No, to whom --

2    THE WITNESS:  Well, be clear, and stop --

3    MR. ST. CLAIR:  No, just don't -- do you want a

4  brief recess.

5    THE WITNESS:  No, I just want him to be clear.

6    MR. ST. CLAIR:  All right.  Well, okay.  He's

7  concerned about the -- you know that the doctor -- what's

8  her name?

9    MR. DALTON:  Sparrow.

10    MR. ST. CLAIR:  She gave the test.  Now we are

11  talking about the person -- you said that the test was

12  incomplete or would've been better if they had discussed

13  it with the parent, right?

14    THE WITNESS:  Yes.

15    MR. ST. CLAIR:  All right.  Now he trying --

16  pointing out that you can't -- just because you don't know

17  who the person is that Dr. Sparrow did talk to doesn't

18  mean that the test is -- the result is necessarily flawed.

19  Did I catch it?

20    MR. DALTON:  Uh-huh.

21    THE WITNESS:  That's true.

22    MR. ST. CLAIR:  Thank you.

1          BY MR. DALTON:

2      Q    Now let's assume that we disregard all of these

3  letters and all of these attempts that were made for them

4  to get a meeting.  Now let's say that you were there at

5  the meeting.

6          MR. ST. CLAIR:  This is the 31st?

7          MR. DALTON:  On the 31st.

8          BY MR. DALTON:

9      Q    Are you with me so far?

10     A    Yeah

11     Q    Am I clear?

12     A    Yeah.

13     Q    Okay.  And let's assume that things went exactly

14  the way they did.  And when it came time to discuss

15  compensatory ed and the offering that was on the table was

16  the one that was made, what would you have done?

17     A    Let's -- you're asking me to determine what I

18  would have done in a situation where I was not actually

19  there.  So I can't make a determination.  I don't know

20  what I would have done.  I don't know.

21     Q    Okay.  So what you're saying to me is a person

22  that was a special ed teacher for a decade --

1    A    Uh-huh.

2    Q    A person for the last three years who has gone

3    two IEPs a day, doesn't have a clue as to what she would

4    have done in response to the offer that was made to

5    compensate this child.

6    A    That's right.  That's what I'm saying.  I'm not

7    perfect.  So no, I don't know what I would have done.

8    Q    Okay.  Is there any help that you can give to

9    the hearing officer or myself in giving us some reasons

10    why you have that answer.

11    A    No.

12    Q    No help at all?

13    A    No

14        MR. DALTON:  I have no further questions for

15    this witness.

16        MR. ST. CLAIR:  Redirect.

17        MS. GAMBALE:  Yes.

18        REDIRECT EXAMINATION

19        BY MS. GAMBALE:

20    Q    Do you know whether or not the AAMR was

21    administered to the parent?

22    A    It's my understanding that it was not.

1          MR. DALTON:  Objection, she does not know by the

2    answer she gave.

3          MR. ST. CLAIR:  All right.  Just answer the

4    question as "I don't know".  Next question.

5          BY MS. GAMBALE:

6      Q    Okay.  Have you reviewed the report?

7      A    Yes.

8      Q    Does the reports state that it was given to the

9    parent?

10          MR. DALTON:  Objection.

11          THE WITNESS:  No, it doesn't.  So that's why I'm

12    assuming --

13          MR. ST. CLAIR:  Just a minute, just a minute.

14    The question was, does the report state that the

15    evaluation was given to the parent.  Is that the question?

16          MS. GAMBALE:  Yes.

17          MR. ST. CLAIR:  And she has reviewed the

18    evaluation.

19          MS. GAMBALE:  Yes.

20          MR. ST. CLAIR:  I'm going to let her answer

21    that.

22          THE WITNESS:  No.

1          MS. GAMBALE:  Okay.

2          BY MS. GAMBALE:

3     Q    And is it your opinion that it was necessary for

4  the parent to be administered the adaptive scale?

5     A    Certainly, certainly.

6     Q    Okay.  And why -- why is that?

7     A    To have a fair assessment of the student's

8  social and personal functioning at home, and then

9  interview the teacher, so you can have a clear and fair

10  accurate assessment of what the student is able to do at

11  school.

12     Q    And have you had an opportunity to review the

13  student's records?

14     A    Yes.

15     Q    And was a Ms. K. Johnson a teacher of the

16  student on any of her report cards?

17     A    Not to my knowledge.

18     Q    And was a Ms. K. Johnson a teacher when you went

19  to do the observation?

20     A    Not to my knowledge.

21     Q    Okay.  Did you have a chance to review the IEP

22  for the student?

1    A    Yes.

2         MR. DALTON:  Which one?

3         MS. GAMBALE:  The IEP that was drafted on March

4    --

5         MR. ST. CLAIR:  -- this year, 31st?

6         MS. GAMBALE:  March 31st -

7         THE WITNESS:  Yes.

8         BY MS. GAMBALE:

9    Q    Were you of the opinion that this was an

10   appropriate document for the student?

11   A    No.

12   Q    And why did you feel like it was inappropriate?

13   A    Well, for one thing the goals are immeasurable.

14   You need to have a baseline in order to determine where a

15   student is functioning, so you know where you're going

16   from there.  For instance, we have -- C██████ will

17   demonstrate a basic understanding of the rules of English

18   language, but we're saying what -- at what grade level

19   with 80 percent accuracy?  It says 80 percent accuracy.

20   But what?  At a third grade level with 80 percent

21   accuracy, at a fourth grade level with 80 percent

22   accuracy?

1          So we don't have any -- we don't have baseline

2    criteria to go front, to know that we're going to make a

3    year's progress or 6 months progress.

4         Q    And how much psychological counseling is the

5    student supposed to receive under this IEP?

6         A    It has zero here, I don't have any counseling.

7         Q    And was psychological counseling recommended in

8    the evaluations?

9         A    Yes.

10              MR. ST. CLAIR:  Where?

11              MS. GAMBALE:  In the -- in the --

12              MR. ST. CLAIR:  The psychological means Dr.

13   Sparrows (phonetic)?

14              MS. GAMBALE:  No.  There was a clinical that was

15   also done that recommends counseling.

16              MR. ST. CLAIR:  When?  When was it?  And what

17   clinic?  What -- just reference it.

18              MS. GAMBALE:  Again, the clinical -- well, there

19   was a social history that talked about it --

20              MR. ST. CLAIR:  What's the date on it?

21              MS. GAMBALE:  -- and that's an IGW-17 --

22              MR. ST. CLAIR:  What's the date on it?

1      MS. GAMBALE:  -- and that's in '94.  And the

2  clinical -- there was a psychological evaluation in IGW-24

3  that was dated in 2002.  And then there was an additional

4  clinical that was done by the charter school that was done

5  recently.

6      MR. ST. CLAIR:  What's the date on that?

7      MS. GAMBALE:  It's in their evaluations.

8      MR. ST. CLAIR:  Just show me the current

9  evaluation, where it says the child should be counseled.

10      MS. GAMBALE:  Yeah, that would -- it's in the

11  evaluations, and that will take me some time.  By the time

12  I'm ready for my closing I will have identified the

13  document for you.

14      ST. CLAIR:  Yes, go ahead.

15      BY MS. GAMBALE:

16      Q    As far as the IEP is concerned, were there any

17  other issues that you noticed with the IEP?

18      A    Well, I didn't see a transition plan in the IEP,

19  and every student over the age of 14 should have a

20  transition plan.  Now -- maybe it was -- yeah, there's no

21  transition plan.

22      MR. ST. CLAIR:  Just a minute.  I think on this

1   IEP, Ms. Gambale, it did not relegate the issue to whether

2   or not the parent did not cooperate with the meeting, and

3   that the IEP was not an issue, because there wasn't enough

4   time, and if you thought that was inappropriate you could

5   come back.

6           MS. GAMBALE:  What -- my understanding of what

7   transpired is at the first hearing we were presented a

8   copy of the IEP --

9           MR. ST. CLAIR:  That's correct.

10          MS. GAMBALE:  -- and you gave a continuance, and

11  allowed us --

12          MR. ST. CLAIR:  Right.  Did I give permission to

13  --

14          MS. GAMBALE:  -- to amend -- you --

15          MR. ST. CLAIR:  Did I give you permission --

16          MS. GAMBALE:  -- you specifically ordered us --

17          MR. ST. CLAIR:  Let me see.

18          MS. GAMBALE:  -- allowed us to amend, to address

19  any issues we had with this IEP --

20          MR. ST. CLAIR:  All right.  Did you raise --

21          MS. GAMBALE:  -- and I did file an amended --

22          MR. ST. CLAIR:  -- raising the IEP?

1            MS. GAMBALE:  What?

2            MR. ST. CLAIR:  Raising the appropriateness of

3    the IEP.

4            MS. GAMBALE:  You had given us leave to --

5            MR. ST. CLAIR:  I know.

6            MS. GAMBALE:  -- amend, and I did --

7            MR. ST. CLAIR:  Did you?

8            MS. GAMBALE:  I did.

9            MR. ST. CLAIR:  Where is it?

10           MS. GAMBALE:  That is in our supplemental

11   exhibits, that is our exhibit number 27.

12           MR. ST. CLAIR:  Did -- Mr. Dalton, you got that

13   right?

14           MR. DALTON:  Yes, I would like a minute to

15   review that.

16           MR. ST. CLAIR:  Okay.

17           MR. DALTON:  It's mine (inaudible) and so -- is

18   there a particular page, Ms. Gambale --

19           MR. ST. CLAIR:  Yeah, right.

20           MS. GAMBALE:  For -- in terms of --

21           MR. DALTON:  Number 1, 2, 3, what?

22           MS. GAMBALE:  It's our exhibit number 27.

1              MR. ST. CLAIR:  I understand that --

2              MS. GAMBALE:  And then if you look at the -- if

3    you look at the "describe the nature of the problem" I

4    list --

5              MR. ST. CLAIR:  Yeah, there it is, number 5.

6              MR. DALTON:  Number 5?

7              MR. ST. CLAIR:  Yes.

8              MR. DALTON:  Okay.  Go ahead.

9              BY MS. GAMBALE:

10       Q     And these are the 30 hours of math tutoring on

11   Saturday, it is acceptable compensatory education plan?

12             MR. DALTON:  Objection.

13             THE WITNESS:  Oh, that's like --

14             MR. DALTON:  Objection.

15             MR. ST. CLAIR:  I'll tell you what, now Ms. --

16   when some one says objection, I want everyone to pause.

17   Yes, Mr. Dalton.

18             MR. DALTON:  This witness, on cross-examination

19   indicated in her response that she is unable to tell us

20   what her response would be to that plan.  That includes a

21   response that the plan was inadequate, because if she had

22   some way of saying what she was going to do in response,

1  that certainly would've included an opinion as to whether

2  or not the level of services was sufficient to overcome

3  the lack of services presented.

4          MR. ST. CLAIR:  I do -- did -- I think Ms. Moody

5  said she wouldn't be able to comment on an IEP meeting

6  because she wasn't there.

7          MR. DALTON:  Right.

8          MR. ST. CLAIR:  She can just --

9          MS. GAMBALE:  But I'm not asking her to tell me

10  what she would have done at the meeting like he had asked.

11  I'm asking her whether in her opinion, the 30 hours of

12  math tutoring was sufficient to make up for what this

13  child lost.

14          MR. ST. CLAIR:  And --

15          MS. GAMBALE:  And that's not asking her to -- in

16  terms of what she would've done or -- but it's just asking

17  her opinion on that specific question.

18          MR. ST. CLAIR:  All right.  Let me ask you

19  something.  In this amended -- was it 27?  Was it 27, Ms.

20  --

21          MR. DALTON:  Uh-huh.

22          MS. GAMBALE:  Yes.

1          MR. ST. CLAIR:  Did you raise the issue of the

2   appropriateness of the award of --

3          MS. GAMBALE:  Yes, I did.

4          MR. ST. CLAIR:  Which one is that?

5          MS. GAMBALE:  That is our number 3.  If you look

6   at --

7          MR. ST. CLAIR:  Three?

8          MS. GAMBALE:  If you look at the second

9   paragraph.

10         MR. ST. CLAIR:  The second paragraph?

11         MS. GAMBALE:  Uh-huh.

12         MR. ST. CLAIR:  All right.  "Failure to

13  development," okay.

14         MR. DALTON:  It's just a statement that is

15  insufficient.  And my cross-examination was designed

16  specifically to get to globally whether she had any

17  comments -- any comments at all, any kind of response.

18  And she said no, and she is bound by that answer.

19         MR. ST. CLAIR:  Tell you what, I'm not -- I am

20  not clear on the specificity of your question.  I do know

21  that you questioned her about --

22         MR. DALTON:  More than once.

1          MR. ST. CLAIR:  Yeah, I know.  But I don't

2    recall the specifics of the question.  What I'm going to

3    do is let her answer it and I'm -- going to take your

4    objection under advisement, and I may strike Ms. Moody's

5    question from the -- answer from the record.  But I'm

6    going to let her get in the record.  And I'll take your

7    objection under advisement.  And I may sustain it and

8    strike Ms. Moody's testimony.  Restate the question, just

9    to the compensatory education.

10          BY MS. GAMBALE:

11     Q    Do you feel that 30 hours of math tutoring was

12    sufficient compensation for what the student wasn't

13    provided?

14     A    No, I don't.

15     Q    And why not?

16          MR. ST. CLAIR:  Now first of all, can you

17    specify what the student was denied?

18          THE WITNESS:  I cannot specifically speak to

19    what the student was denied, because we don't have an

20    appropriate IEP at this point.  If we had all of the

21    services with all of the counseling time and all of the

22    educational services and are appropriate --

1          MR. ST. CLAIR:  No, no, the compensatory
2   education was for what was denied up until March 31st,
3   right?
4          THE WITNESS:  Uh-huh.
5          MR. ST. CLAIR:  So you have to have a pretty --
6   I would think that you would have a grasp of what was
7   denied in order for you to say that the award was
8   insufficient.
9          BY MS. GAMBALE:
10     Q    Do you know how many hours of instructional
11  service she was supposed to be provided with under her
12  June 2002 IEP?
13     A    21.5 hours.
14         MR. DALTON:  You know, that's still --
15         MS. GAMBALE:  And do you know how many --
16         MR. ST. CLAIR:  Ms. Gambale?
17         MS. GAMBALE:  Uh-huh.
18         MR. ST. CLAIR:  The fact that it was indicated
19  doesn't mean that it wasn't delivered.  See, I pretty well
20  --
21         MS. GAMBALE:  We've already had testimony that
22  said that she didn't receive any of her services for the

1  entirety of -- until December.

2      MR. ST. CLAIR:  I understand that.  But Ms.
3  Moody said she did not know what was not delivered, which
4  pretty much, I think, stops you.

5      MS. GAMBALE:  What she just -- she just
6  testified --

7      MR. ST. CLAIR:  No, she's really -- no, what
8  she's doing is testifying as to what was on the IEP.  And
9  then I'm supposed to infer if -- that it wasn't delivered.
10 I can't do that.

11     MS. GAMBALE:  I'm not asking you to make that
12 inference.  What I'm asking for is in the event the
13 student -- I'm asking for Ms. Moody's opinion in terms of
14 if she had missed over 200 hours of instructional services
15 -- I'm not asking you to take that --

16     MR. ST. CLAIR:  You just -- you're making a
17 hypothetical --

18     MS. GAMBALE:  -- I'm asking her whether --
19 exactly.

20     MR. ST. CLAIR:  Okay.  Mr. Dalton?

21     MR. DALTON:  No, no, no, no way.  I mean, just -
22 -

1       MR. ST. CLAIR:  I take that as an objection.

2       MR. DALTON:  Yes, please.

3       MR. ST. CLAIR:  I'll sustain that.

4       MS. GAMBALE:  Okay.

5       MR. ST. CLAIR:  I think pretty much, Ms. Moody

6  stopped you when she said she wasn't aware of how much the

7  child was deprived -- denied.

8       MS. GAMBALE:  But that's not -- I'm not asking

9  her to establish that.  What I'm asking her is to give

10  testimony with regards to taking that as a given --

11      MR. ST. CLAIR:  Okay, what is it?

12      MS. GAMBALE:  -- if, in fact, the child had

13  missed over 200 hours of services --

14      MR. ST. CLAIR:  Yeah, I understand --

15      MS. GAMBALE:  -- services.

16      MR. ST. CLAIR:  That's a --

17      MS. GAMBALE:  Would that be sufficient to make

18  that story -- in most situations.

19      MR. ST. CLAIR:  Yeah, that's a hypothetical.

20  You've stopped, move to the next issue.

21      BY MS. GAMBALE:

22      Q    Who diagnosed G█████ as mentally retarded

1  previously?

2      A    It's going to take me a second.

3      Q    Was she -- no, not the doctor -- where was she

4  attending school?

5      A    I'm not able to answer that right now.

6      Q    I have no further questions.

7           MR. ST. CLAIR:  Recross, Mr. Dalton.

8           MR. DALTON:  Thank you, sir.

9           RECROSS EXAMINATION

10          BY MR. DALTON:

11     Q    Ms. Moody?

12     A    Yes.

13     Q    Had you attended the March 31st meeting, would

14  you have been in a position to raise an objection to the

15  number of hours in the plan?

16     A    Yes.

17     Q    Okay.  Had you been at the meeting, would we now

18  be in a far better position to make a determination as to

19  the parents' feelings as to whether that plan was adequate

20  or not?

21     A    Restate that question, please.

22     Q    If you'd been at the meeting, we would have

1  notes wouldn't we, as to the specific objections that

2  parent would have had, as to why it was inadequate, if in

3  fact that was the opinion?

4      A    Yes, which is why I proposed meeting dates in

5  April.

6      Q    Strike that as non-responsive.

7          MR. ST. CLAIR:  Just a minute.  Now, I'm going

8  to let her answer the question, that's her answer.

9          MR. DALTON:  Then I withdraw --

10         MR. ST. CLAIR:  Next question.

11         BY MR. DALTON:

12     Q    Okay.  The nest question is, are you familiar

13  with the manual for the AAMR adaptive test?

14     A    No.

15     Q    Okay.  And if that manual states that the test

16  can be given to either a teacher or a parent, then

17  compliance with those instructions is in conformity with

18  the testing procedures, is it not?

19     A    I can't answer that.

20     Q    No.  Yes, you can.

21     A    I don't know.

22     Q    No, ma'am.

1      A    My answer is I don't know.

2            MR. ST. CLAIR:  Just a minute.

3            MS. GAMBALE:  Objection.

4            ST. CLAIR:  Just a minute.  The hearing officer

5    is speaking.  First, is the manual in the record?

6            MS. GAMBALE:  No.

7            MR. DALTON:  I can supplement the manual, but I

8    do believe I'm entitled to ask a question assuming facts.

9            MR. ST. CLAIR:  Just a minute.  All right.  I'm

10   going to let her answer, pending submission of the manual

11   --

12           MS. GAMBALE:  I would object --

13           MR. ST. CLAIR:  -- just a minute -- that says

14   what you're pointing?  Otherwise, I'm going to strike all

15   that.

16           MR. DALTON:  Absolutely.

17           ST. CLAIR:  All right.  Go ahead.

18           MS. GAMBALE:  Again, I would -- just for the

19   record I would like to note my objection, not only to the

20   questions, but also to the submission of documents that

21   haven't been disclosed.

22           MR. ST. CLAIR:  Well, let me just say this.

1   Ordinarily, I would've sustained your objection, but Ms.

2   Moody is here in somewhat of the capacity of an expert,

3   and she did venture her opinion that the AAMR test was not

4   as reliable or as complete as the comprehensive Vineland?

5           MS. GAMBALE:  Yes.

6           MR. ST. CLAIR:  So I'm going to let him, Mr.

7   Dalton, ask her questions about that evaluation, subject

8   to him submitting -- underscore it -- I'm not going to

9   read the whole manual.

10          MS. GAMBALE:  No, I understand.

11          MR. ST. CLAIR:  Right.  All right.  Okay, go

12  ahead Miss -- please answer Ms. Moody.

13          THE WITNESS:  Restate the question please.

14          BY MR. DALTON:

15      Q   The question assumes that the manual states that

16  the adaptive behavior test could be administered either to

17  a parent or a teacher, if the manual so states, and that

18  procedure was followed, then the test is in conformity

19  with the standards, is it not?

20      A   If what you're saying is true.

21      Q   Right.  So your answer is yes?

22          MR. ST. CLAIR:  Yes, it's yes.

1          THE WITNESS:  Depending on if it's really true;

2    I want to see the manual myself.

3          MR. ST. CLAIR:  Yes, the answer is yes, the

4    answer is yes.  Next question.

5          BY MR. DALTON:

6      Q    All right.  Now, are you familiar with the

7    manual for the administration of the Vineland?

8      A    Yes.

9      Q    All right.  And is it not true that the manual

10   for the Vineland has exact same provision that the test

11   can be administered either to the parent or a teacher?

12     A    I don't know.

13     Q    Well, you just said you were familiar with it.

14   Now, are you --

15     A    I'm familiar with it, but I'll tell you what.

16   I'm able --

17         MR. ST. CLAIR:  Just a minute -- just a --

18   hearing officer -- correct answer is she doesn't know.

19   Next question.  She can be familiar with it but not know

20   that specific.

21         MR. DALTON:  All right.

22         MR. ST. CLAIR:  Next question.

1          THE WITNESS:  When I need it I go to the

2     document.

3          BY MR. DALTON:

4     Q    Next question is, assuming the manual does

5     provide for the test to be administered either to a

6     teacher or a parent and if that was done, and that's what

7     the manual states, then giving a test to either the

8     teacher or the parent would be in conformity with the

9     manual, would it not?

10    A    If that's true.

11    Q    All right.

12         MR. DALTON:  My -- I'm going to request that I

13    be able to supplement through Dr. Sparrow, both the manual

14    for the Vineland, and for the AARP as rebuttal to the

15    testimony of Ms. Moody, who says that it must be given to

16    both.

17         MR. ST. CLAIR:  Yeah, fine.  Just make sure it's

18    underscored.  I don't want to read any type of manual.

19         MR. DALTON:  All right.

20         MR. ST. CLAIR:  And that Ms. Gambale gets a

21    copy.

22         MR. DALTON:  Sure, absolutely.

1          MR. ST. CLAIR:  All right.

2          MS. GAMBALE:  And I would just request that I

3  have a chance to respond --

4          MR. DALTON:  The manual is the manual.

5          MS. GAMBALE:  True -- if he is going to be

6  submitting additional documents, because sometimes when it

7  comes to --

8          MR. ST. CLAIR:  Ms. Gambale, this is not -- this

9  is just, whether or not something is in the manual.  It

10  either is or it isn't, either he's going to submit it and

11  it's there, or he's not going to submit it.  It's nothing

12  to reply to -- he's not arguing.

13          MR. DALTON:  Right.

14          MR. ST. CLAIR:  I'm going to make certain

15  inferences from it about the -- Ms. Moody's testimony.

16  That's what this is about.

17          MR. DALTON:  Absolutely.

18          MR. ST. CLAIR:  He's trying to impeach Ms.

19  Moody.

20          MS. GAMBALE:  I understand what you're saying.

21  It's just that when it comes to testing measures sometimes

22  there is debate in the medical community about the

1  appropriateness of -- and the --

2         MR. ST. CLAIR:  This is just about whether or

3  not something is in the manual, not the appropriateness of

4  it, not the value of it, just whether or not it's in the

5  manual.  Right?

6         MR. DALTON:  Correct, sir.

7         MR. ST. CLAIR:  Yeah, I'm going to overrule your

8  objection.

9         MS. GAMBALE:  Okay.

10        MR. ST. CLAIR:  Go ahead, Mr. Dalton.

11        BY MR. DALTON:

12    Q    Now what are Present Level of Performances?

13    A    It's known as the PLOP, that's the acronym, and

14  it's the academic level for a student, their present

15  academic level, in an IEP.

16    Q    And so if the IEP has those then you know where

17  the student is academically, do you not?

18    A    If the psycho-educational is up to date.

19    Q    No, ma'am.  I asked you, if the IEP contains a

20  reference to the Present Level of Performances, do you not

21  know where the student is academically?

22    A    If the educational testing is up to date, yes.

1    Q    All right, assuming that.

2         MR. ST. CLAIR:   I know that.  Just go ahead.

3         BY MR. DALTON:

4    Q    Assuming that then can you not measure the goals

5    from the Present Level of Performances?

6    A    You must state whether or not the student's

7    going to make 6 months progress, one year's progress, and

8    the goals for them to be objective.

9    Q    And why do you think that's the standard?

10   A    Because that's what IDEA states, that they have

11   to have a baseline and they have to be measurable.

12   Q    Okay.  And in -- and have you not already

13   testified that the Present Level of Performances provides

14   that baseline?

15   A    Yes, it does.

16   Q    Okay.

17   A    Now, G████'s -- I'm saying that if the testing

18   is up to date it should provide the baseline.

19   Q    All right.  So your assertion that a specific

20   level of progress must be made is inaccurate.  Is it not?

21   A    Restate that question, please.

22   Q    Your assertion that a specific level of progress

1  has to be made according to IDEA is inaccurate.  Is it

2  not?

3      A    Measurable.  IDEA states that goals need to be

4  measurable.

5      Q    Haven't you already stated that the preceding

6  condition to measurability is the baseline?

7      A    How much progress a student will make.  You take

8  the baseline; you'd say the student will progress 6 months

9  with 80 percent accuracy, one year with 80 percent

10  accuracy --

11      Q    Show me where in IDEA that it states --

12      A    -- it says "measurable" in IDEA, measurable.

13      Q    Okay, so -- and then --

14          MR. ST. CLAIR:  I'll tell you what, move to the

15  next point.  I see this point, move to the next point.

16          MR. DALTON:  Okay.  I may be done.  So let me

17  just think for a second.  Yeah, I'm done.

18          MR. ST. CLAIR:  Ms. Moody, you see this letter

19  that -- this memorandum that Ms. Opalac (phonetic) sent to

20  Mr. Dalton?

21          THE WITNESS:  Yes.

22          MR. ST. CLAIR:  What was that reference to Mr.

1   Dalton again, in your disclosure?

2       MR. DALTON:  Fifteen or sixteen -- fifteen.

3       MR. ST. CLAIR:  See where she says -- I know she

4   speak -- she's -- Ms. Opalac is speaking to Mr. Dalton.

5   She says, "As you're aware I tried to schedule this

6   meeting three times with Ms. Williams' attorneys, who were

7   non-responsive."  Do you know anything about that?

8       THE WITNESS:  That was previous attorneys, that

9   was not when we had the case.  I think Rubinstein

10  (phonetic) had it before we had it.  She did not try to

11  schedule a meeting with us.

12      MR. ST. CLAIR:  Can I -- just a minute.  How

13  many times are you saying you spoke with Ms. Opalac about

14  scheduling this meeting?

15      THE WITNESS:  One time.  And that was the time

16  that we had for the 30th and then she cleared it up and

17  said the 31st. and I said, no, we can't make it.  And I

18  gave her dates in April.

19      MR. ST. CLAIR:  That was the first time.  When

20  you --

21      THE WITNESS:  Yes.

22      MR. ST. CLAIR:  Wait a minute, when you say