1  another attorney, are you talking about other than James

2  Brown or another attorney in James Brown?

3          THE WITNESS:  Another attorney in James Brown.

4          MR. ST. CLAIR:  All right.  Okay, I understand.

5  All right.  So there's a possibility that -- and

6  educational advocates are assigned to attorneys.

7          THE WITNESS:  Yes.

8          MR. ST. CLAIR:  So it's possible that they had

9  tried to -- arrange another meeting with another attorney

10  and another educational advocate that you don't know

11  about.

12          THE WITNESS:  Yes.

13          MR. ST. CLAIR:  Okay.  Redirect?

14          MS. GAMBALE:  I have nothing further, though I

15  would like to call Ms. Munford (phonetic) back.

16          MR. ST. CLAIR:  All right.  Tell you what I'm

17  going to do is let Mr. Dalton cross-examine Ms. Moody and

18  then I'm going to let you --

19          MR. DALTON:  I'm done.

20          MR. ST. CLAIR:  Okay, all right.  Ms. Moody --

21  Ms. Munford, please remember that you remain under oath.

22          MS. MUNFORD:  Yes, sir.

1          MR. ST. CLAIR:  Thank you, Ms. Moody.

2          THE WITNESS:  Thanks.

3          (Witness excused.)

```
 1

 2    Whereupon,
 3                        Carolyn Munford
 4    was recalled as a witness and, having been previously duly
 5    sworn, was examined and testified further as follows:
 6              DIRECT EXAMINATION
 7              BY MS. GAMBALE:
 8      Q    Did you have any communications with the school
 9    with regards to scheduling a meeting for G▇▇▇▇?
10      A    To the best of my recollection, I'm sure that I
11    did, although I do not have records of any communications
12    with the school regarding scheduling a meeting.
13      Q    Did you receive any proposed meeting dates from
14    the school in between December and March?
15              MR. ST. CLAIR:  December '03 and March '04?
16              THE WITNESS:  No.
17              MR. ST. CLAIR:  '04.
18              THE WITNESS:  No, no.
19              MR. ST. CLAIR:  '03 and '04?
20              THE WITNESS:  No.
21              BY MS. GAMBALE:
22      Q    Did you ever refuse to attend a meeting that was
```

1   scheduled?

2        A    Absolutely not.

3             MR. DALTON:  Objection.

4             MR. ST. CLAIR:  Well, I'm going to let her

5   answer the question.  Go ahead.

6             THE WITNESS: No.

7             BY MS. GAMBALE:

8        Q    And how does the office work in terms of

9   meetings?  How are you notified if a meeting invitation

10  was received by the office?

11       A    Usually, the letter of invitation will come to

12  me with three proposed dates from the school, and I would

13  respond.

14       Q    And what is --

15            MR. ST. CLAIR:  That's in the case of DCPS,

16  right?  Now does she -- well, you know, that's -- well,

17  first, do you know what the procedure is for Friendship-

18  Edison, because I always get Edison-Friendship.

19            MR. DALTON:  I know, I do too.

20            ST. CLAIR:  Yeah.

21            THE WITNESS:  I think it is the same procedure.

22            ST. CLAIR:  So the answer of the question is,

1   you don't know, right?

2              THE WITNESS:  I'm not a 100 percent certain.  If

3   you give me a moment, I'll look through --

4              ST. CLAIR:  All right.  But you're going to find

5   Friendship-Edison's --

6              THE WITNESS:  My correspondence --

7              ST. CLAIR:  -- policies in your file?

8              THE WITNESS:  No, but I'm -- what -- I'm -- was

9   doing was looking for perhaps a letter of invitation.

10             MR. ST. CLAIR:  All right, okay.  Just a minute.

11  She's looking for her letter of invitation.  You go ahead

12  and cross-examine, she's just --

13             MR. DALTON:  Well, but --

14             MR. ST. CLAIR:  Let her look.

15             MR. DALTON:  No, I have an -- since we have a

16  pause --

17             MR. ST. CLAIR:  Okay.

18             MR. DALTON:  -- while she's looking, I would

19  like to proffer the record here because the hearing

20  officer interrupted me on my objection, and I didn't --

21  not have an opportunity to proffer.

22             MR. ST. CLAIR:  Excuse me.

1          MR. DALTON:  This whole line of questioning is

2    not relevant.  The reason it's not relevant is because

3    unless Ms. Gambale is prepared to correct me --

4          MR. ST. CLAIR:  Uh-huh.

5          MR. DALTON:  -- but it is my understanding that

6    the policies that Brown and Associates are that meetings

7    are to be scheduled through the attorney.  And that we

8    already got introduced into evidence three such

9    correspondence.

10          MR. ST. CLAIR:  You mean disclosure?

11          MR. DALTON:  Yes.

12          MR. ST. CLAIR:  What are they?  Just give me

13    their numbers.

14          MR. DALTON:  Number 12, 13, and 14.

15          MR. ST. CLAIR:  All right, okay.

16          MR. DALTON:  Now, the only reason that this

17    would be -- this testimony of this witness would be

18    relevant, this letter of February 24th to Ms. Rubinstein,

19    a letter of March 5th, which is 13 to Ms. Rubinstein, the

20    letter of March 14th to Ms. Rubinstein.  The only reason

21    this witness's testimony would be relevant is if

22    corresponding with the attorney to schedule the meeting

1   was outside the directions and policies that we have been

2   given by Brown and associates for scheduling these

3   meetings.

4              MR. ST. CLAIR:  Okay.

5              MS. GAMBALE:  Again, I would object, because I -

6   -

7              MR. ST. CLAIR:  Object to what?

8              MS. GAMBALE:  To his statements in terms of the

9   firm policy.

10             MR. ST. CLAIR:  Well, not -- aside from that --

11  what I'm just saying is that he'd referenced the letters

12  to me 13, 14, and 15.  That's what I was looking for.

13             MR. DALTON:  12, 13 --

14             MR. ST. CLAIR:  12, 13, 14.  I guess what I'm

15  asking is did you know anything about -- any responses to

16  these letters?

17             MS. GAMBALE:  Did -- well, that's what I'm

18  calling her to --

19             THE WITNESS:  I was no longer working with the

20  case as I testified earlier.

21             MR. DALTON:  Forgot about that.  She can't

22  testify to any of this.  She says she left --

1              THE WITNESS:  I was off the case by January.

2              MR. DALTON:  -- left by January --

3              MR. ST. CLAIR:  So who picked up in January?

4              MR. DALTON:  Ms. Moody.

5              MR. ST. CLAIR:  Just a minute, Mr. Dalton.  Ms.

6    Gambale, who picked up in January?

7              MS. GAMBALE:  Ms. Moody at that point.

8              MR. ST. CLAIR:  Okay.  I don't have any further

9    questions.

10             MS. GAMBALE:  Judge, I have no further

11   questions.

12             MR. ST. CLAIR:  No questions?  Next witness, Ms.

13   Gambale.

14             (Witness excused.)

```
1
2              MS. GAMBALE:  I would call Ms. Rabino.
3    Whereupon,
4                    GLORIA WARD RABINO
5    was called as a witness and, having been first duly sworn,
6    was examined and testified as follows:
7              MR. ST. CLAIR:  I'm going to ask you to place
8    that microphone between yourself and me.  So when you look
9    at me, you will be speaking directly into the microphone.
10   No, no, right -- you see, right where your right elbow,
11   right on top of that.  There you go.  Now, so there you
12   go.
13             THE WITNESS:  Oh, okay.
14             ST. CLAIR:  There you go, see, okay.
15             DIRECT EXAMINATION
16             BY MS. GAMBALE:
17   Q    Can you please state your name for the record?
18   A    Gloria Ward Rabino (phonetic).
19   Q    And what is your relationship to G███████?
20   A    She's my granddaughter.
21   Q    And why are you here today?
22   A    I'm here to represent G███████.  Her mother gave
```

1    me permission through Ms. Opalac to be here on her behalf.

2        Q    And how have you been involved in her

3    educational process?

4        A    I have been involved in G██████'s educational

5    process since 1st grade -- since kindergarten, all of her

6    life, I've been involved with her education.  From first

7    grade through fourth, I had enrolled G██████ in a catholic

8    school, and it was at the fourth grade level that they

9    indicated that G██████ was struggling in school, and that

10   she should be tested to see if she had any problems --

11   educational deficiencies.  And they weren't in the

12   position to help her.

13       Q    Okay.  And did they find any educational --

14       A    Nothing was ever done.  The schools never

15   intervened -- her mother never had her tested.  I visited

16   each of her schools in elementary and junior high, because

17   G██████ was failing in all of her subjects in both

18   elementary and junior high.  No principal in either school

19   would intervene to help G██████.

20           MR. ST. CLAIR:  Another clarification as to

21   whether these are DCPS schools or --

22           THE WITNESS:  DCPS schools.  Yes, she has always

```
1   been -- expect for 2 months.

2            BY MS. GAMBALE:

3       Q    Okay, and then when did she start attending

4   Friendship-Edison?

5       A    I guess in the ninth grade, maybe.

6       Q    And when was --

7            MR. DALTON:  Could I -- I'm sorry -- could I --

8   clarification as to the year?

9            ST. CLAIR:  Yeah, do you remember -- just a

10  minute.

11           THE WITNESS:  Okay, this is 2004.  She's in the

12  eleventh.  Maybe 2001 or 2002, let me see.

13           MR. ST. CLAIR:  All right, but you know -- do

14  know that she started in the seventh grade -- ninth grade?

15           THE WITNESS:  Ninth grade, right.  So that must

16  have been 2001.

17           MR. ST. CLAIR:  That comport with your

18  understanding Mr. Wallace?

19           MR. WALLACE:  Yes, that's right.

20           THE WITNESS:  2001, right.

21           BY MS. GAMBALE:

22       Q    And where was she -- well, when was she
```

1    classified as a mentally retarded student?

2        A    Where?

3        Q    When?

4        A    I guess, when she was tested here at Friendship-

5    Edison; it might have been 2002, 2003 -- 2002, I believe.

6        Q    And what grade was she in?

7        A    I think it was not until the tenth grade that

8    they actually tested her, or the latter part of the ninth

9    grade.

10       Q    Okay.  And was an IEP developed for her at that

11   time?

12       A    Yes.

13       Q    Now, have you attended meetings on behalf of Ms.

14   Williams?

15       A    I've attended all meetings on behalf of Ms.

16   Williams.

17       Q    With her authorization?

18       A    With her authorization, right.

19       Q    Okay.

20       A    Ms. Williams has on file at the school that I

21   can -- given me authorization to intervene on her behalf.

22       Q    So have you participated in any meetings for

1    G⬛⬛⬛?

2        A    Yes.   You mean other than the IEP meetings?

3        Q    Well, have you participated in the IEP meetings?

4        A    I've participated in the IEP meeting.   The

5    initial one meeting after she was initially tested and

6    then another meeting of the year after an IEP meeting.

7    And then I've met with all of her teachers throughout the

8    year, and the special education advocates.

9        Q    Okay.

10       A    -- in the school.

11       Q    And does she currently have a teacher -- well,

12   has she had a teacher this year named Ms. K. Johnson?

13       A    Ms. Kelly Johnson is her case manager.   She has

14   had her for about maybe 3, 4 months.   She is new there and

15   I think she came on board, January, February, so she does

16   work with her.

17       Q    Okay.   Has she ever taught her in the class?

18       A    She doesn't exactly teach her.   What Ms. Kelly

19   does -- I mean, Ms. Johnson does is assist her.   She

20   visits the classroom.   And is -- she -- when I talked with

21   the teachers, what Ms. Johnson will do for testing, she

22   will sort of critique the original tests and try to rework

1    them at a level that G███ would be able to perform.

2        Q    Okay.  And let me see -- what communication did

3    you have with the school regarding meetings?

4        A    Regarding the March 31st meeting?

5        Q    Uh-huh.

6        A    I received a call from Ms. Opalac informing me

7    that she had talked to Ms. Williams, G███'s mother, and

8    she had given me permission to attend the meeting.

9            MR. ST. CLAIR:  She, the mother --

10           THE WITNESS:  The mother had given Ms. Opalac --

11           MR. ST. CLAIR:  -- permission that you could

12   attend --

13           THE WITNESS:  That -- right -- I could attend

14   the meeting, because she was working.  I was not able to

15   attend the meeting.  I did not attend the meeting.

16           MR. ST. CLAIR:  What meeting is this?

17           THE WITNESS:  The 31st -- are you talking about

18   March 31st -- which meeting are we talking about?

19           BY MS. GAMBALE:

20       Q    March 31st.

21       A    March 31st, because I did not want to attend the

22   meeting without representation from the firm that was

1    representing G█████.

2        Q    And were there meetings that were proposed

3    before the 30th?

4        A    There were meetings proposed before, I think, I

5    did receive a call from Ms. Opalac.

6        Q    At the time that those meetings were proposed

7    had the evaluations been conducted?

8        A    I'm not sure.  I can't answer.  I'm not sure if

9    they had been -- I can't say specifically that they were.

10       Q    When did you receive copies of evaluations for

11   G█████?

12       A    I haven't received copies.  Oh.  Okay, I did

13   receive copies of evaluations, and I think that was before

14   the meeting.

15       Q    Before which meeting?

16       A    Before the March 31st meeting.

17       Q    Okay.  Did you receive -- where did you receive

18   them from?

19       A    From Ms. Opalac.

20       Q    And do you remember the date that she gave you

21   the evaluations?

22       A    No, I don't.  It was before the meeting.  The

1    meeting was in March, so it must have been the early part

2    of March.

3        Q    And did you give you any indication to Ms.

4    Opalac that you were willing to participate in the

5    meeting?

6        A    Yes.

7        Q    And what did you tell her about your willingness

8    to participate?

9        A    I told her I was available to meet whenever the

10   -- a meeting was scheduled based on the availability of

11   G██████'s attorney and education advocate.

12       Q    And did they indicate that they would schedule

13   through us?

14       A    They indicated that they had attempted to

15   schedule through the firm.

16       Q    And I have -- oh, in terms of service, do you

17   know whether or not G█████ received any of her services

18   during the time she started at Friendship-Edison the

19   school year in December?

20       A    G█████ didn't receive any services.

21       Q    And how do you know this?

22       A    Because I'm in daily -- well, often contact with

1   the schools and I talked to her.  I had been in contact
2   with Mr. Wallace.  She was assigned a new special
3   education Ms. Glim (phonetic) and nothing was done.  Mr.
4   Carter, (phonetic) the education advocate that was there
5   met with him.  He informed me that he was stretched thin
6   and he couldn't spend the time with G███████.

7        So he left -- and from the time he left until
8   Ms. Johnson came on board, no help was given to G███████.
9   And regarding the Saturday school math, the 30-hours
10  G█████ has not receiving -- has not received any math on
11  Saturdays.

12     Q    And is it a problem for her to attend school on
13  Saturdays?

14     A    I don't see why it would be.

15     Q    Okay.  And are you in agreement that that's
16  sufficient to make up for what was lost?

17     A    Well, I'm not in the position to -- I really
18  don't know if the 30 hours -- I guess so.  My
19  understanding is that G██████ is functioning in math at
20  maybe the fourth or fifth grade level.  And I don't know
21  what 30 hours is -- if it's going to bring her up to what
22  level, I don't understand what that 30 hours would do for

1  her.

2       Q    And is she currently in a reading class?

3       A    She is in a reading class and my understanding

4  is that she has performed sufficiently to move from her

5  reading class.  I don't understand how she can move from a

6  reading class if she's reading on a fifth grade level and

7  she is in eleventh grade then why she would be out of her

8  reading class.

9       Q    So is she currently in a special education

10  reading class?

11      A    Yes, she's in the special education reading

12  class.

13      Q    Okay.  And you said -- do you know when she is

14  going to be moved out of that class?

15      A    Do I know when she is going to be moved?

16      Q    Has she been moved out of the class yet, or is -

17  - are they proposing that they move her out of the class?

18      A    She is still in the class.  I think they're

19  proposing to move her out of the class.

20      Q    And why is that a concern to you?

21      A    Well, if she's performing reading on a fifth

22  grade level, she's in the eleventh grade.  How can you

1    move her out of a reading class?  Also, if she's in a

2    reading class, performing on a fifth grade level, and now

3    she's taken German, I don't understand how she can

4    possibly pass a German class reading on a fifth grade

5    level or any foreign language class.

6        Q    What are your concerns about her current

7    schedule?

8        A    Well, I understand that she has -- her new

9    schedule is now foreign language, which is the German

10   class.  I'm concerned about that.  I don't see how G██████

11   could possibly pass that course reading on a fifth grade

12   level.  I mean it's just not humanly possible.

13       Q    And what other courses are -- is she taking?

14       A    She's taking history with Mr. -- I think his

15   name is Mr. Roberts -- Robinson.  But they have moved her

16   out of that class and she takes that directly under Ms.

17   Johnson, the English lit -- she took another foreign

18   language, world language, I think it was.  Then her

19   English, yeah, classes.

20            MS. GAMBALE:  Okay.  I have no further

21   questions.

22            MR. ST. CLAIR:  Mr. Dalton?

1           CROSS-EXAMINATION

2           BY MR. DALTON:

3      Q   Hi, Ms. Renelle -- Rabino.  I'm a little

4   confused, so maybe you could helped me.

5           MR. ST. CLAIR:  Mr. Dalton, put that microphone

6   in front of you sir.

7           MR. DALTON:  Okay.

8           BY MR. DALTON:

9      Q   I thought I heard you say that Ms. Johnson

10  wasn't a teacher and just a minute ago, you said she was.

11     A   Ms. Johnson has just been assigned to G▇▇▇▇

12  this week.  So I don't know -- all I know her to be was

13  the case manager, and she has worked with G▇▇▇▇ as the

14  special -- she is a special education case manager, that's

15  my --

16     Q   Okay.  Do you know what an inclusion teacher is?

17     A   I think that's what Ms. Johnson is.

18     Q   Okay.  She --

19     A   I mean -- so she can't be a teacher.  Okay.

20     Q   Well, she can be that too.

21     A   I stand to be corrected.

22     Q   Okay.  Now, with regard to the fact that your

1    attorney said -- asked you a question about her getting

2    this math tutoring.  Did you know that we have to have

3    your permission before we start that?

4         A    No.

5         Q    Okay.

6         A    Or her mother's?  No, I've never -- or her

7    mother?

8         Q    Okay.  Do you know that we were going to ask for

9    that permission at this March 31st meeting?

10        A    I have no idea.

11        Q    Okay.  Well, do you know -- do you remember Ms.

12   Opalac and Ms. Johnson testifying that they talked to you

13   about coming to that meeting?

14        A    Last -- at the last -- our last meeting.

15        Q    Do you remember what they said?  What's the

16   reason you gave them for not coming?

17        A    The reason that I gave them was that I did not

18   want -- but what they said was incorrect.

19        Q    Okay, so --

20        A    I know what they said, but what I said to them

21   on the phone when I talked with both, that I did not want

22   to attend the meeting without G██████ having

1  representation.

2      Q    Okay.  So you do admit that you didn't want to

3  go unless your attorneys went?

4      A    Unless my attorneys were there; that's what I

5  said.

6      Q    So it's really not inconsistent with what they

7  said, and what you're saying, is it?

8      A    I think it's inconsistent, because they said I

9  did not -- what I said was that I did not want to be there

10 without representation.

11     Q    Right.

12     A    And what I heard them say was that I didn't want

13 to come to the meeting.

14     Q    No, I don't think they said that.  Let me tell

15 you what --

16         MR. ST. CLAIR:  Yeah, to you -- just -- I think

17 you've -- explored the topic.

18         MR. DALTON:  Okay.  All right.

19         BY MR. DALTON:

20     Q    Do you remember the testimony given by Ms.

21 Opalac that if G████ did not make enough progress after

22 30 hours that they were going to propose additional

1   compensatory ed for her?

2       A    I heard her.

3       Q    Okay.  Do you think it's important that we

4   measure her progress?

5       A    I think it's important.

6       Q    Okay.  Do you think it's a good thing that she's

7   made progress in reading?

8       A    She appears to have made progress in reading

9   based on the reports.  But I'm not all that -- I just

10  don't feel comfortable that she has made the progress that

11  they are -- the school is implying that she made.

12      Q    Okay.  Would you have been comfortable if Ms.

13  Moody had a chance to review that with you at the IEP

14  meeting?

15      A    Well, I guess, I would have.

16          MR. DALTON:  Okay.  All right.  I don't have any

17  further questions.

18          MR. ST. CLAIR:  Redirect, Ms. Gambale.

19          REDIRECT EXAMINATION

20          BY MS. GAMBALE:

21      Q    Is G███████ currently performing on grade level in

22  reading?

1      A      I would not think so.

2      Q      And have you been provided with a compensatory

3   education plan from the school?

4      A      No.

5      Q      And what did you feel like was inaccurate about

6   the former testimony?

7      A      Whose testimony?

8      Q      Well, at the last hearing you said that you --

9   that there were things that you felt were inaccurate?

10     A      Oh that was just the statement about my

11   attending the meeting from Ms. -- statement from Ms.

12   Opalac and Ms. Johnson about my attending the meeting.  My

13   position is that I did not want to attend the meeting

14   without representation.  And they informed me -- Ms.

15   Opalac, that whether I was there or not they were going

16   ahead with the meeting, because she had so many people

17   involved, and she didn't want to cancel.

18     Q      Okay.  So the reason she gave you to go forward

19   with the meeting was because she didn't want to

20   reschedule?

21     A      Right.

22     Q      Okay.

1          MR. ST. CLAIR:  Which meeting is this?

2          THE WITNESS:  The 31st.  Right.  But I asked if

3    she would reschedule, and she said, no.

4          MS. GAMBALE:  Okay.  I have no further

5    questions.

6          MR. ST. CLAIR:  Recross, Mr. Dalton?

7          MR. DALTON:  None.

8          MR. ST. CLAIR:  Okay.  Counsel, this brings us

9    to argument.  Friendship-Edison will go first and then

10   last they have the burden of proof.  Would you like a

11   break, a 5-minute break or --

12         MR. DALTON:  Yes, I would.

13         MR. ST. CLAIR:  All right, 5-minute break.

14         (Recess)

15         MR. ST. CLAIR:  All right.  We're back on the

16   record.  Please begin your argument, sir.

17         MR. DALTON:  I renew my motion for directed

18   finding on all issues previously presented.  In addition

19   to that, I believe, the testimony given both by the school

20   and the parent indicates only support for those motions,

21   and I'll be specific as to what I believe that support is.

22         It is uncontroverted, which means in my mind

1    that the hearing officer should accept as valid, and

2    authentic that on the February 24th, the law firm of Brown

3    and associates was contacted for meeting dates of March

4    16th, 17th, and 18th.  I turn to exhibit 13; the same law

5    firm which represented the student was contacted for new

6    dates of March 23rd, 24th, or 25th.

7         March 14th; they were consulted for -- again,

8    for the two sets of dates that they had previously given,

9    and again there was no response that, subsequent to that

10   discussions were held with Ms. Moody, who previous to

11   exhibit 15 -- exhibit 30 had indicated that March 30th was

12   not convenient.

13        Was told that the real date was the 31st,

14   consented to that date, and subsequently remained on that

15   consent.  I believe, that was done solely for the purposes

16   of frustrating the -- convening of the IEP meeting prior

17   to the convening of the hearing.  The original requests

18   were begun in February.  We are now talking about May and

19   had we not held the --

20        MR. DALTON:  Even though the student has made

21   academic progress in both written expression and reading

22   we are fighting about what is the appropriate level of

1    compensatory education to be given to this child yet after
2    four attempts the parent's representatives refused to sit
3    down and speak with the school as to what would be
4    appropriate.

5           It is inconceivable to me that the advocate can
6    testify before this hearing officer, given her experience,
7    that she would not have objected to the 30 hours being
8    given and proposed an alternative.  That alternative could
9    have been either accepted or rejected.  And then if it was
10   rejected, a proper hearing would be before this hearing
11   officer.  On the facts that we have now, we do not have a
12   proper set of facts before this hearing officer.  That's
13   why this case should be dismissed.

14          Ms. Opalac testified that as the cluster
15   supervisor, who is the person in charge of determining
16   what will be the policy and what would be offered by our
17   school system, that we are going to do post-testing if we
18   ever get permission to give this child the services that
19   were -- we've suggested and that if we find that she has
20   not made sufficient progress, we're going to offer
21   additional compensatory ed.

22          So it's really irrelevant as to what were the

1  number of hours missed.  I understand Ms. Rabino's concern

2  with regard to the issue of changing the location, of how

3  she's going to get help with reading.  But that was the

4  purpose of the IEP meeting, to explain that, to address

5  those concerns.

6          Now, we're not saying that everything is in

7  concrete, that we won't revisit issues.  What we're saying

8  is there was no denial of FAPE.  We will have another

9  meeting, a fifth attempt now, to schedule it whenever

10  we're put on notice that the parent or the parent's

11  representative wants one.  But we're not going to do it

12  having a gun held to our head.

13          MR. ST. CLAIR:  That's a bit overstated --

14          MR. DALTON:  Well, I think it's an abuse of this

15  process, sir.

16          MR. ST. CLAIR:  Well, that may be true but not

17  that abusive.

18          MR. DALTON:  No.

19          MR. ST. CLAIR:  All right now, is that your

20  first argument?

21          MR. DALTON:  That's my first argument.  My

22  second is that IDEA contemplates full, I believe, the

1  Harris (phonetic) decision in this jurisdiction that

2  hearing officers have the authority to award equitable

3  remedies of compensatory ed.  It is not a mandatory one

4  for one hour.

5         It is a -- and I think the considerations that

6  this hearing officer should look to are the progress that

7  this student's made, the proposals made by the school, the

8  lack of cooperation of the previous counsel, and the fact

9  that we acted in good faith, and that had we been met in

10  any way, not halfway, in any way, we would not be here

11  today.

12         With regard to the classification of the

13  student, I personally believe that the record is quite

14  sufficient to establish that we did the correct thing.

15  Again, had there been any question about whether or not

16  the appropriate adaptive behavior test had been done,

17  whether the appropriate person was interviewed, those

18  again could have been -- could have been addressed at the

19  IEP meeting.  We didn't have their participation, so those

20  issues could not be addressed.

21         But with the supplementation of the record, I

22  believe that it will become quite clear that Ms. Moody's

1    testimony is inaccurate, that it is perhaps her preference

2    that both the parent and a teacher be interviewed.  But

3    certainly, the people who designed the tests have

4    indicated, and it's my personal experience also having

5    done a thousand of these, that in fact it can be either a

6    teacher or a parent.

7              So we will supplement the record or actually,

8    Dr. Sparrow, who is the proper person to do, will

9    supplement the record.  I would ask, because I do not --

10   because Dr. Sparrow is not an employee of Edison-

11   Friendship, that I have to the close of business Tuesday,

12   given the holiday, I don't know if even Dr. Sparrow is in

13   town, to supplement the record.

14             MR. ST. CLAIR:  Okay.  When are we going to

15   count the 10 days, my 10 days?

16             MR. DALTON:  From my perspective, it's after the

17   record's been supplemented because the record is not

18   closed until it is supplemented.  So that may include any

19   -- I don't know what -- I am unclear as to your position.

20   I thought that I wanted to make this record -- make this

21   statement on the record so that Ms. Gambale will have a

22   chance on her side to make sure.  But it is my

1   understanding that there won't be any additional

2   supplements to the record that -- the manual either states

3   that you can --

4           MR. ST. CLAIR:  Yeah.

5           MR. DALTON:  -- do that or it doesn't.  So my

6   feeling is that the 10 days counts after the close of

7   business on Tuesday.

8           MR. ST. CLAIR:  All right, now, Ms. Gambale, I'm

9   going to just interrupt at this point to state that all I

10  expect is a copy of the manual, no argument.  It may be a

11  note saying that this is from the manual and page number.

12  Only thing I expect to hear from you is that this is not

13  in the manual.  This is a fraudulent copy.  Other than

14  that, I don't expect to hear anything.

15          MR. DALTON:  All right.

16          MR. ST. CLAIR:  Okay?

17          MS. GAMBALE:  Uh-huh.

18          MR. ST. CLAIR:  All right.  Go ahead, Mr.

19  Dalton.  And we will count from -- you said from the close

20  of business when?

21          MR. DALTON:  Tuesday because of the holiday.

22          MR. ST. CLAIR:  All right, that's Tuesday, June

1  --

2          MS. GAMBALE:  First.

3          MR. DALTON:  First.

4          MR. ST. CLAIR:  Yeah, all right.  And I've got

5  10 days from then.  All right, go ahead, Mr. Dalton.

6          MR. DALTON:  I would also like the hearing

7  officer to recall what type of student G▮▮▮▮ was before

8  she came to Friendship-Edison.  She was described by Ms.

9  Johnson, and Ms. Opalac, and I think, Mr. Henry as being

10 very withdrawn, fearful even.  And part of that was due to

11 her lack of school success.  We all know now from the

12 testimony of her grandmother why.

13          When she was with DCPS, she didn't get the

14 attention that she was supposed to get.  We have turned

15 that completely around.  Now, I'm not saying that that

16 justifies everything.  But it certainly counts for

17 something.  And the fact that she's made progress in

18 reading and in written expression should not be

19 discounted.

20          The fact that the proposed remedy sounds to some

21 as maybe not quite equal to the lack of services is

22 something to be judged in the future.  She's made a lot of

1  progress.  And they thought that based on that progress,

2  this is about whether it would take.  If they're wrong,

3  we're going to correct it.

4       But -- and again, if there is a disagreement,

5  that's the subject of a future hearing, not this hearing.

6  For all these reasons, I respectfully request a directed

7  finding in our favor.

8       MR. ST. CLAIR:  Ms. Gambale.

9       MS. GAMBALE:  Okay.  Well, first of all, Your

10 Honor, I would call your attention to the fact that --

11      MR. ST. CLAIR:  I want you to pull that

12 microphone to yourself.

13      MS. GAMBALE:  -- that all of the proposed

14 meeting dates, if you look at the letters that are

15 submitted by counsel in his disclosure, there were letters

16 that went to Rachel Rubenstein (phonetic), who was

17 representing this student before I was.  But all --

18      MR. ST. CLAIR:  (inaudible).

19      MS. GAMBALE:  -- all of the -- well, all of the

20 letters that were received came after we filed our hearing

21 request, our initial hearing request.  So they all would

22 be reviewed as subsequent measures that were brought on by

1   the fact that we had actually filed to compel the
2   completion of the evaluations and the meeting which we had
3   met in December.  And in addition, none of the evaluations
4   had been done at that point either.  And so there are two
5   significant factors that you should take into
6   consideration.
7           Then there was a meeting in December.  At the
8   meeting in December, they decided they couldn't revise the
9   IEP because they needed additional evaluations.  So --
10          MR. ST. CLAIR:  And when did you file for due
11  process?
12          MS. GAMBALE:  We filed for due process at the
13  very beginning of February.  Two weeks after that is the
14  first letter that you have in the file that was sent by
15  the school.  At that point, there weren't evaluations that
16  had been completed for G███████.  The evaluations were not
17  completed for several weeks after that.  We just got them
18  right before the date of the 31st.
19          Now, it is clear in terms of the 31st that the
20  parent indicated that she was unavailable and asked them
21  to reschedule, and that she did not want to attend without
22  having somebody present.  Ms. Moody talked to her and sent

1   her a letter proposing alternate dates for a meeting.  I
2   don't see any evidence of bad faith.  I see three dates
3   within a week of the day that was proposed being sent.

4           I see notice being given on the 24th, which is a
5   full week before the meeting.  And so I -- we've made
6   every attempt to work with them.  It just wasn't
7   convenient for the school to get all their other people
8   there on another date.  And so they were going to go
9   forward whether or not the parent felt like she could
10  participate.  And the parent didn't feel like -- well, the
11  representative of the parent didn't feel like she could
12  without having somebody there to go to as a reference.

13          And so I don't see any bad faith.  I think the
14  school is in bad faith by deliberately going forward when
15  they knew the parent was willing to come to a meeting.
16  And I do have an issue -- I do have a significant issue
17  with that.

18          In terms of the other issues that we have here,
19  the evaluations.  Now, I have reviewed the standards for
20  the AAMR and the Vineland.  And one of the things that
21  needs to be noted about these tests, these are subjective
22  evaluations.  And what concerns me is the fact that the

1   person that they have administered the tests to has very

2   little knowledge of G████. This is somebody who, at the

3   most, has known G████ for a few months.

4          MR. ST. CLAIR:  The teacher.

5          MS. GAMBALE:  The teacher, well -- and I don't

6   know that she is a teacher.  It's -- they've referred to

7   her in the evaluation as school staff.

8          MR. ST. CLAIR:  Okay.

9          MS. GAMBALE:  And she is not listed -- if you

10  look through all the report cards, she's not listed as a

11  teacher in any of her report cards.  It's our

12  understanding that she's a school staff, that she was the

13  case manager, and that she has provided some assistance in

14  the classroom just for the last couple of months.  But

15  that -- and I don't know what's happened this week in

16  terms of whether they have her in a class with her now.

17         But she certainly has not been involved with

18  G████'s education or had a chance to observe her or get

19  to know G████ for any real period of time.  And

20  considering the fact that this test was administered a

21  couple of months ago, her knowledge of G████ is not

22  sufficient.  And given the huge impact and the huge

1   difference that we're talking about for this child is

2   significant.

3          First of all, we're talking about -- well,

4   either way, Friendship-Edison either misclassified her to

5   begin with or they are misclassifying her now.  So

6   somewhere along the line, there is a problem.  And the way

7   you're going to program for a student is significantly

8   different.

9          And we have a student -- you know, if she was

10  MR, she should have been further -- she may -- we need to

11  be looking at different things for her.  If she's LD,

12  then, in all likelihood, there is no reason why she

13  shouldn't have been making more significant progress.

14         But you know, given her reported levels, I am

15  concerned about this child.  I am concerned about her IQ

16  scores being as low as they are because they are clearly

17  in the MR range.  I am concerned about -- I'm concerned

18  that if they change the classification or if they don't

19  classify her appropriately, there are services in the

20  community that she'd be entitled to that she won't

21  receive.

22         So if she is MR, she needs to be identified so

1    that she can be hooked up with places like RSA, which

2    their transitional evaluation recommends.  But she can

3    only do that, you know, with the proper classification.

4              Given the significance of this issue, having a

5    thorough test is important there.  And we would like --

6    Ms. Moody's testified that the AAMR -- she's not

7    necessarily saying it doesn't -- it's not -- that there's

8    anything wrong with it but is not as comprehensive as the

9    Vineland.  And given the circumstances, the more

10   comprehensive evaluation that we have, the better, because

11   it looks like there is an issue here.

12             In terms of the evaluations, we don't have a

13   proper adaptive assessment.  We don't have a --

14             MR. ST. CLAIR:  -- Vineland.

15             MS. GAMBALE:  Vineland, uh-huh.  And we don't

16   have -- and the Vineland should be administered to the

17   teacher and the parent.  That can be done.

18             We don't have a vocational assessment.  Mr.

19   Dalton has alleged that he's done a vocational assessment,

20   but I have looked at that assessment.  I would ask you to

21   look at the evaluation he's putting forth as a vocational

22   assessment and make a determination on whether that is

1  sufficient. If this is an MR student or if this is a

2  student that is so significantly behind, we need to be

3  able to program for her future. And we can't do that

4  without the right information.

5        Now, in terms of compensatory education plan,

6  it's not really disputed that she did not receive services

7  for the first half of the year. The way I calculate it,

8  from the start of the time that she started school until

9  the time -- through December, there were 11 weeks that she

10  would have attended school. That means she would have

11  received 220 hours of instructional services. She would

12  have received 11 hours of speech and she would have

13  received 5-1/2 hours of counseling.

14        MR. ST. CLAIR: This is what time period, from

15  September --

16        MS. GAMBALE: From -- well, from the time that

17  she started. She started in October, actually, and

18  through -- through the end of December.

19        MR. ST. CLAIR: October of '03,'02?

20        MS. GAMBALE: There were 11 weeks of school.

21        MR. ST. CLAIR: What?

22        MS. GAMBALE: Through the end of December. You

1  could say December 31st.

2            MR. ST. CLAIR:  Of what year?

3            MS. GAMBALE:  Of 2003.

4            MR. ST. CLAIR:  All right.

5            MS. GAMBALE:  But there were 236 hours and --

6            MR. ST. CLAIR:  I see.

7            MS. GAMBALE:  -- of services.  And --

8            MR. ST. CLAIR:  And you filed for due process on

9  March, right?

10           MS. GAMBALE:  No, we filed February.

11           MR. ST. CLAIR:  February.

12           MS. GAMBALE:  We filed on February 13, 2004,

13  after two months had gone by and they hadn't made any

14  further progress with regards to the evaluations.  The

15  evaluations and the meetings were all done after that.  Or

16  I think there was one that was started beforehand, but

17  most of them were completed after we filed.

18           And -- well, in terms of the IEP we've laid out

19  in our due process hearing request, in our amended

20  request, all of the complaints that we have about this

21  document, it does not meet the standards that are set

22  forth in 300 and 347.  It doesn't specify the frequency

1   and duration of services.

2           And you had asked me about the -- where in the

3   exhibits, they referred to her need for counseling.  First

4   of all, counseling was a service that she had previously

5   received.  But then also in the psychological evaluation

6   that was done in June of 2002 that has actually never been

7   reviewed by the team, they also recommended psychological

8   counseling.  And there has been nothing further to say

9   that she doesn't need it.  And in fact, I don't think it's

10  a dispute that she does need it.  It's just that they

11  didn't specify --

12          MR. ST. CLAIR:  This is a psycho-educational,

13  not a --

14          MS. GAMBALE:  That was a psychological.

15          MR. ST. CLAIR:  It was a clinical?

16          MS. GAMBALE:  There was a psychological that was

17  done in 2002.

18          MR. ST. CLAIR:  Right.  But I'm trying to figure

19  out what type of -- was it a full -- clinical

20  psychological or was it a psycho-educational?

21          MS. GAMBALE:  It was a -- it was -- it just --

22  it terms itself psychological, but it did primarily -- it

1  was more along the lines of the clinical than it was
2  educational.

3          MR. ST. CLAIR:  I'll look at it.

4          MS. GAMBALE:  Okay.  But throughout the
5  evaluations it refer -- all of the evaluations references
6  social history and the others that were just done.  That's
7  not in dispute.  It's just the -- and the IEP even says
8  that she needs it.  So that's not the dispute.  The
9  dispute is it doesn't specify how much.  And so that is,
10 you know, difficult for them to implement a service that
11 they're all saying that she needs, but they don't specify
12 the amount.

13         There is no -- they haven't really provided you
14 a mechanism to evaluate the progress in this document.  In
15 addition to the goals not being measurable, they don't
16 specify how they're going to measure progress.  There
17 wasn't a transition plan.  There wasn't -- we don't feel
18 that there was sufficient instruction, given the
19 significantly -- the fact of how far below she is.

20         And again, there is the concern about the
21 classification.  And also in the psycho-educational that
22 was done, they had recommended that her -- they addressed

1   her vocabulary and that wasn't done as well.  I guess

2   those are the primary issues and those are my primary

3   concerns for this student.  I just want to make sure that

4   she's programmed correctly.

5          And you know, if they've misclassified her for

6   the last 3 years, then she should be compensated for that.

7   And if they're misclassifying her now and not providing

8   her with what she needs, she should be compensated.  I

9   just want to see her get what she needs so that she can

10  succeed in life.

11         MR. ST. CLAIR:  Thank you, Ms. Gambale.  Mr.

12  Dalton.

13         MR. DALTON:  Well, I appreciate Ms. Gambale --

14         MR. ST. CLAIR:  Oh, yes, I do have a question in

15  my mind.  And this is the question I had when we first

16  began in April 1st.  That is on February what you filed

17  your due process request?

18         MS. GAMBALE:  On February 13th.

19         MR. ST. CLAIR:  Yeah, and alleged that certain

20  services were not provided.  And at March 31st,

21  compensatory education was awarded for those services.

22         MR. DALTON:  Right.

1          MR. ST. CLAIR:  And what that means legally.  Go

2    ahead.

3          MR. DALTON:  Now I'm confused.

4          MR. ST. CLAIR:  What is confusing?

5          MR. DALTON:  I don't understand what you're --

6          MR. ST. CLAIR:  Let me just try it again.  I

7    have a question in my mind about the legal significance of

8    an allegation being made on February --

9          MS. GAMBALE:  February 13th.

10         MR. ST. CLAIR:  -- 13th that Friendship-Edison

11   neglected to provide services during the time period -- a

12   specific time period.  And then on March 31st,

13   compensatory education was awarded for those services.

14         MR. DALTON:  Well, it would have legal

15   significance but for the fact that I asked that they be

16   estopped from making that legal argument because of lack

17   of, you know, clean hands that --

18         MR. ST. CLAIR:  An equitable argument.

19         MR. DALTON:  You know, because it's an equitable

20   remedy.

21         MR. ST. CLAIR:  Well, I understand that, but

22   you're talking about the remedy.  But I'm talking of -- as

1   far as prevailing party status.

2           MR. DALTON:  We don't believe that there is any

3   prevailing party status because we would have addressed

4   these issues much earlier had they not, you know,

5   continued to ignore all our requests for evaluations.

6           MR. ST. CLAIR:  No --

7           MR. DALTON:  -- for the IEP meeting.

8           MR. ST. CLAIR:  I'm just going to ask -- I'm

9   talking about the -- for the services not being delivered.

10  That has nothing to do with the evaluations, has nothing

11  to do with the IEP meeting.

12          MR. DALTON:  Procedural -- I mean I just did a

13  brief on Monday for another case, which I'd be happy to --

14          MR. ST. CLAIR:  Can you get that to me --

15          MR. DALTON:  Yeah.

16          MR. ST. CLAIR:  -- on June 1st?

17          MR. DALTON:  Yeah, because I have just a copy of

18  it.  The fact that you have a procedural violation does

19  not, in any way, mean that --

20          MR. ST. CLAIR:  What is the procedural

21  violation?

22          MR. DALTON:  The fact that you didn't comply

1   with the IEP.

2           MR. ST. CLAIR:  Just a minute.

3           MR. DALTON:  What more --

4           MR. ST. CLAIR:  Just a minute.  You mean the IEP

5   that preceded the March 31st IEP?

6           MR. DALTON:  Correct.

7           MR. ST. CLAIR:  Isn't that a denial of FAPE?

8           MR. DALTON:  No, absolutely not.

9           MR. ST. CLAIR:  That's a procedural violation?

10          MR. DALTON:  Every procedural violation is not a

11  denial of FAPE.  You look at the progress --

12          MR. ST. CLAIR:  I understand that.  But not

13  providing the services is a procedural violation?

14          MR. DALTON:  Absolutely.

15          MR. ST. CLAIR:  Well, what is a substantive

16  violation?

17          MR. DALTON:  A substantive -- it can be both.

18  It doesn't have to be either or --

19          MR. ST. CLAIR:  Yeah, well, give me an example

20  of a violation --

21          MR. DALTON:  Well --

22          MR. ST. CLAIR:  -- that's not procedural but

1  that's substantive.

2       MR. DALTON:  Well, I can give you the same

3  violation.  The same violation with lack of progress is

4  substantive, in other words, of the defect of the

5  educational opportunity of the child.

6       MR. ST. CLAIR:  Well, let me -- just wait a

7  minute.  If you provide the service and the child does not

8  make progress, that's a substantive violation.  But if you

9  don't provide the service and the child cannot make

10  progress, that's not a substantive violation.

11       MR. DALTON:  No, it can't -- if the child

12  doesn't make progress, it is a substantive and procedural

13  violation.  But every procedural violation --

14       MR. ST. CLAIR:  I understand that.

15       MR. DALTON:  -- doesn't turn into a substantive

16  violation.

17       MR. ST. CLAIR:  I understand that.  But I -- I

18  understand you to be saying that not providing the

19  services is not a substantive violation?

20       MR. DALTON:  Correct.  It's not complete

21  analysis according to the reports.

22       MR. ST. CLAIR:  I'll be very interested to read

1  your brief.  You have the last word, sir.

2        MR. DALTON:  Many of the things are inaccurate

3  that Ms. Gambale has stated.  First of all, the child

4  never made any progress before the child came to our

5  school, okay.  So the fact that the child's testing showed

6  her MR is pretty much a matter of neglect.  And the fact

7  that she could never show or demonstrate that she was

8  capable of more.  After, you know, 2 years with us, she

9  has shown and demonstrated she is capable of more.

10        And that's naturally going to be reflected in

11  later testing.  Also, neither -- and this was your

12  question.  Not the '02, you asked if the clinical in '04

13  and the psychological in '04 recommended counseling;

14  neither do.  Okay, so you need to look at number 2 and

15  number 7.  So that's inaccurate also.  Again, I go back to

16  the fact that the compensatory -- the number of hours

17  missed is not relevant to your analysis.

18        What's relevant to your analysis is whether or

19  not the parent's attorney, not Ms. Gambale, but the

20  previous attorney, basically ignored all the overtures

21  that were given to cooperate, and to sit down, and meet.

22  Had those been met, we would not be here because we would

 1  have -- or either we would not be here or the analysis
 2  would be different.

 3          And that is with the participation of the parent
 4  and the parent's representative, we could not justify our
 5  proper compensatory plan, okay.  And based on that, you
 6  would then have experts testify, no, this is, no, it
 7  isn't, and make a decision based on that.  That never
 8  happened.  So what we're saying is we're entitled to
 9  finding in our favor because it cannot be said that our
10  plan, ipso facto, is not going to work.

11          MR. ST. CLAIR:  The comp ed plan.

12          MR. DALTON:  Right, that's it.

13          MR. ST. CLAIR:  Ladies and gentlemen, I know you
14  thought we'd never get to this point.  But surprise,
15  surprise, here we are.  I am going to keep the record open
16  until June 1st, 10 days, and then I'll have a decision.
17  Ms. --

18          SPEAKER:  Rabino.

19          MR. ST. CLAIR:  -- Rabino, you are satisfied
20  with your child going to Friendship-Edison?  You just want
21  to -- she didn't ask for --

22          MS. GAMBALE:  Placement is an issue --

1          MR. ST. CLAIR:  I'm sorry.

2          MS. GAMBALE:  Placement was raised in December.

3          MR. ST. CLAIR:  But it wasn't --

4          MS. GAMBALE:  Right now, that's not the issue.

5          MR. ST. CLAIR:  All right.  I was just trying to

6   make sure that my using time and more time was --

7          SPEAKER:  She is (inaudible).

8          MR. ST. CLAIR:  Again, ladies, gentlemen, here

9   we are.  Thank you very much.  I'm going to keep the

10  record open until June 1st and then I'm going to have a

11  decision out a -- well, 10 days later.

12         MS. GAMBALE:  Okay.

13         MR. ST. CLAIR:  The record is closed.  And

14  again, thanks to all.

15         MS. GAMBALE:  Thank you.

16         (Whereupon, the HEARING was adjourned.)

17                    *   *   *   *   *

18