1    because it was the fourth time that the meeting had been

2    scheduled, we went forward.

3         IDEA sets out in its preamble that the

4    regulations are intended to reflect an underlying

5    assumption that parents and schools will come together in

6    a cooperative atmosphere to work out the details of the

7    child's educational plan.  And we feel that evidence on

8    this issue should be heard prior to any other issues

9    because our theory is that the hearing officer should stop

10   any arguments that parent's counsel has raised in view of

11   that testimony.

12        MR. ST. CLAIR:  How is my determination as to

13   the parent not participating going to eliminate the cause

14   of action, so to speak, for not reviewing the IEP as of

15   June 2003?

16        MR. DALTON:  Counsel believes that he would not

17   be acting in a competent manner in representation of his

18   client's rights unless that was done in an in camera

19   examination of counsel.

20        MR. ST. CLAIR:  Well, how -- you mean how the

21   motion --

22        MR. DALTON:  In other words, basically, what the

1    hearing officer is asking me to do is reveal to parent's

2    counsel my theory of the case and strategy of testimony.

3    And therefore, counsel will have an ability to amend

4    whatever preparation she's had for this hearing.  And I

5    don't believe that that's in my client's best interests.

6        MR. ST. CLAIR:  All right.  Let me see if I

7    understand you.  You're asking that I take the issue set

8    out in paragraph 3 of my interim order, and I'm quoting,

9    "Among the possible issues for hearing that will be set

10   for -- at the continuation," the parent's refusal or non-

11   cooperation with the March 31, 2004, MDT meeting will be

12   one.  My decision to place that last in the order of proof

13   as opposed to first is erroneous, is that what you're --

14   that's your motion is that I should hear that first and

15   then direct the --

16       MR. DALTON:  I believe that in the interest of

17   equity that -- and in saving time because I believe that

18   there is compelling evidence based on the preparation I've

19   had with my witnesses of -- that all other issues would be

20   resolved by their testimony.

21       MR. ST. CLAIR:  All right.  That's what -- now

22   that's what I was asking you.  How -- what --

1      MR. DALTON:  But to tell you how it will be

2    resolved would basically require me to make a proffer of

3    their testimony and basically give my opposing counsel

4    advance notice on what that testimony is.

5      MR. ST. CLAIR:  All right.  I'll tell you what

6    I'll do.  What I'll do is interpret your motion as just to

7    -- as a motion to place that issue first.

8      MR. DALTON:  Okay.

9      MR. ST. CLAIR:  I'm going to deny that.  You can

10    state your objection on the record.

11      MR. DALTON:  My objection basically is that

12    reversing this issue causes us to go through the entire

13    case and when this issue would resolve the case.

14      MR. ST. CLAIR:  Well, that's a possibility.  I

15    mean you may be right.  I mean after listening to all of

16    this I may decide you're right.  But I --

17      MR. DALTON:  I understand.

18      MR. ST. CLAIR:  Yeah, but I got to listen, okay.

19      MR. DALTON:  I'm just, you know, making my

20    record.

21      MR. ST. CLAIR:  Okay.  Please, opening

22    statement, sir.  Call the first witness.

1          MR. DALTON:  Counsel reserves opening statement,

2    and go directly to calling --

3          MR. ST. CLAIR:  All right.  You want to bring

4    the telephone here?

5          MR. DALTON:  Yeah, if I can.

6          MR. ST. CLAIR:  Yeah.

7          MR. DALTON:  The last time I was in this room,

8    it didn't stretch.

9          MR. ST. CLAIR:  Okay.

10          MR. DALTON:  So I have to kind of leave it a

11    little bit off the --

12          MR. ST. CLAIR:  Yeah, okay.

13

14    XXX BEGIN 04_29-04

15

16          MS. OPALACK:  Hello?

17          MR. DALTON:  Yes, Nancy, this is Paul Dalton,

18    I'm in the hearing room.

19          MS. OPALACK:  Okay.  Hold on, let me get (off

20    mike).

21          MR. DALTON:  All right.  I'm going to put you on

22    speaker, and you'll be sworn in.  And then I will start

1    with direct, Ms. Gambale will do cross-examination.  And

2    Mr. St. Clair, who's the hearing officer, may have

3    questions for you also.  Can you hear us?

4              MS. OPALACK:  I sure can, can you hear me?

5              MR. DALTON:  Yeah, we're going to try to raise

6    the volume.

7              MR. ST. CLAIR:  Hello?

8              MS. OPALACK:  Hello.

9              MR. ST. CLAIR:  All right.  May I ask with whom

10   I -- my name is Herbert St. Clair, I'm the hearing

11   officer.  May I ask with whom I'm speaking?

12             MS. OPALACK:  Mr. St. Clair, my name is Nancy

13   Opalack.

14             MR. ST. CLAIR:  That's, N-a-n-c-y?

15             MS. OPALACK:  Yes, sir.

16             MR. ST. CLAIR:  And your -- O-p --

17             MR. DALTON:  A-l --

18             MS. OPALACK:  A-l-a-c-k.

19             MR. DALTON:  -- a-c-k.

20             MR. ST. CLAIR:  Yeah, thank you.  And you are --

21             MR. DALTON:  What's your position with

22   Friendship-Edison?

1           MR. ST. CLAIR:  Oh yeah.

2           MS. OPALACK:  My title is cluster lead, I'm in

3    charge of managing the special ed programs for the

4    Friendship-Edison School.

5           MR. DALTON:  Cluster lead?

6           MS. OPALACK:  That's the title.

7           MR. ST. CLAIR:  All right.

8    Whereupon,

9                         NANCY OPALACK

10   was called as a witness and, having been first duly sworn,

11   was examined and testified as follows:

12          MR. ST. CLAIR:  I'm listening.  Mr. Dalton.

13          MR. DALTON:  Ms. Opalack, we're going to go

14   through a series of issues in a specified order as a

15   result of a meeting held prior to the hearing between

16   counsel and the hearing officer.

17          THE WITNESS:  Okay.

18          MR. DALTON:  So I need us to focus on each one

19   of these questions.  If you feel your response would go

20   outside the question but is necessary for the question,

21   please alert us to that fact.

22          THE WITNESS:  Okay.

1           DIRECT EXAMINATION

2           BY MR. DALTON:

3      Q    All right.  Are you familiar with the student

4    G███████ W█████████?

5      A    Yes, I am.

6      Q    And how are you familiar?

7      A    I'm familiar with G██████ W████████, because I

8    oversaw the due process action process while we conducted

9    evaluation.

10     Q    And what does that include?

11     A    That includes letters back and forth to the

12   attorney ensuring that the evaluations were done within

13   timeline, ensuring that the evaluations reached the

14   attorney and the parents, scheduling the meeting on time,

15   working with the school staff to make sure we had

16   everything that we needed to go to the table and determine

17   what's really needed.

18     Q    Okay.  The first issue that the hearing officer

19   Mr. St. Clair would like to have addressed is the issue of

20   the request allegedly made by parents' representative for

21   a vocational assessment can -- do you recall the

22   circumstances around that particular request?

1      A    There was never any request for a vocational

2    evaluation.  It was not in the original letter from

3    attorney Rubinstein.  And it was not on the subsequent and

4    actually irrelevant student evaluation plan developed on

5    December 7.  Oh, I'm sorry, December 4th with Ms. Ward-

6    Ravenell and someone named Munford, Carolyn Munford.

7      Q    And who was Carolyn Munford?

8      A    I'm not sure.  I believe, she's an advocate, I'm

9    not sure who she was representing.  I believe, she was

10   representing Ms. Ward-Ravenell at that meeting.

11     Q    All right.  So really, the first time that there

12   was a request for vocational assessment is in the due

13   process hearing request, is that what your testimony is?

14     A    Yes, it is.

15     Q    Okay.  What was done with regard to transitional

16   services at the IEP meeting, which is a sort of related

17   component of vocational assessment?

18     A    Bryan Smith (phonetic) is the transition

19   specialist at the high school.  At many meetings with

20   G██████, he provides transition services.  He developed a

21   transition plan and that was included in the IEP, the

22   final document.  It was also faxed to the attorney and

1    given also to Ms. Ward-Ravenell.

2        Q    Do you know when it was faxed to the attorney?

3        A    I --

4        Q    -- approximately if you know

5        A    I don't -- I would have to look that up.

6        Q    Okay.

7        A    I believe, it was faxed when clinical was faxed

8    over, but I would have to check.  I don't have it in front

9    of me.

10        Q    All right.  Do the IEP notes reflect the

11    discussion that was held on transitional services?

12        A    I don't believe they do.

13            MR. ST. CLAIR:  Is it March 31st notes?

14            BY MR. DALTON:

15        Q    Okay.  Could you --

16        A    I can explain why if you want me to.

17        Q    Certainly, go ahead.

18        A    The notes don't reflect it, because we felt that

19    the transition services really should be discussed at the

20    time that we talked about placements.  If G██████ continues

21    to stay at the Collegiate Academy, we would certainly want

22    to sit down with her mom and Ms. Ward-Ravenell, because we

1    have a work-study program, brand-new exciting program

2    going in place at collegiate next year.  And the

3    transition plan is very relevant to what that program is

4    going to look like.  So at that time, I think that would

5    be the most appropriate thing -- to talk about transition

6    services.

7         Q    Has the new work-study program been reviewed

8    with G■■■■■?

9         A    No, it has not.

10        Q    Okay.  Why do you feel that program would

11   benefit her?

12        A    The program is designed to -- for 200 general ed

13   and special ed children who may not necessarily be able to

14   or want to go on to college, because collegiate is a

15   college preparatory school.  It's a program that's

16   partnering with four strategic partners, and it's

17   revolving around 4 days of intensive academics.  It is a

18   diploma program.  And the 5th day is a career vocational

19   day where the students will be interning in and training

20   on -- with one of these strategic partners based on their

21   choice of a career especially by senior year.  But again,

22   we didn't want to discuss this without -- we wanted to

1    discuss this at the next step with G████'s parents and

2    with G████.

3        Q    Okay.  And had the parents represented, even the

4    parent been at the IEP meeting, would this have been

5    explained to them?

6        A    Oh, absolutely.  We -- we're meeting with every

7    special ed parent even if the IEP has been completed to

8    discuss this program.  And we're doing it at IEP

9    conferences now.

10       Q    Okay.  The second issue that we wanted to

11   discuss is the issue of the gap between the previous IEP

12   of June 2, 2002 and the meeting that was held in December

13   and then the subsequent meeting that you held in March,

14   could you address that issue?

15       A    I can address the issue by saying that I came

16   into Friendship Schools in January of last year.  The

17   Friendship Schools were a grossly efficient collegiate not

18   in compliance of IDEA and we've spent the last year

19   bringing the programs into compliance.  And honestly, I

20   think it was poor handling of special ed for the first gap

21   period.  I think Wallace Henry could probably address the

22   second gap period --

1      Q    Okay.

2      A    -- better than I can, because I think he

3   conducted the meeting.

4      Q    All right.  Are you aware of any services being

5   provided the student in that gap period, or would Mr.

6   Henry be addressing that --

7      A    Mr. Henry is the better person to address that.

8      Q    Okay.

9      A    I was aware that she had services, we had

10   checked through all the services that Mr. Henry would have

11   to address the specifics of that.

12     Q    Okay.  Now, I want to talk about present level

13   performances and whether or not the student has made

14   progress.

15     A    Okay.

16     Q    Could you compare --

17          MR. ST. CLAIR:  On the 2/3 and the 3/4 IEP?

18          MR. DALTON:  Right.

19          BY MR. DALTON:

20     Q    On -- when -- if you look at the previous IEP --

21          MR. ST. CLAIR:  Which is?  I mean, you have a

22   number on it.

1          MR. DALTON:  Well, I think it's actually --

2          THE WITNESS:  62 --

3          MR. DALTON:  '02 IEP.

4          THE WITNESS:  Right.

5          MR. ST. CLAIR:  (Inaudible) tab where, what's

6    your tab number?

7          MR. DALTON:  Well, hang on, one second.

8          MR. ST. CLAIR:  I'm not --

9          THE WITNESS:  -- I think it's 23.

10         MR. DALTON:  I think it's -- yeah, I think it's

11   just Ms. Gambale's exhibit 23.

12         MR. ST. CLAIR:  I find Mr. Dalton's tab so

13   helpful Ms. Gambale.

14         MS. GAMBALE:  I'll take note of that.

15         MR. ST. CLAIR:  Here it is, 23, is that what you

16   said?

17         MS. GAMBALE:  It should --

18         MR. DALTON:  No, that's the notes, let's see,

19   just --

20         MS. GAMBALE:  It might be in our amended --

21   okay, I have it right here.

22         MS. GAMBALE:  Let me find it for you.

1          MR. ST. CLAIR:  Help the hearing officer??

2          MS. GAMBALE:  Certainly will.

3          MR. ST. CLAIR:  Oh, you have tabs?

4          (Laughter)

5          MR. DALTON:  Give us one second Ms. Opalack,

6    we're looking for this --

7          BY MR. DALTON:

8     Q    Do you have the '02 IEP in front of you?

9     A    Yes, I do.

10         MR. ST. CLAIR:  Okay.

11         MS. GAMBALE:  This is 20 what?

12         MR. ST. CLAIR:  Twenty-six, thank you.

13         THE WITNESS:  Do I -- do you want me to have the

14   goals and objectives in front of me also?

15         MR. DALTON:  No, I just want to look at --

16         MR. ST. CLAIR:  Present levels of performance.

17         MR. DALTON:  Present levels of performance.

18         THE WITNESS:  Third grade math, fourth grade in

19   reading.

20         MR. ST. CLAIR:  Wait a minute, where are you

21   reading from on the IEP?

22         THE WITNESS:  Second page of the -- and those

1    were dated June 23, '01.

2            MR. ST. CLAIR:  Hold on for a minute, Ms.

3    Opalack.

4            THE WITNESS:  I'm not going anywhere.

5            MR. ST. CLAIR:  I'm sorry.

6            THE WITNESS:  I'd like to, but I'm here.

7            MR. ST. CLAIR:  Believe me, Ms. Opalack, we know

8    the feeling.  I'm -- help me out here.

9            MR. DALTON:  Well, I don't see it -- Ms. Gambale

10    --

11            MR. ST. CLAIR:  I don't see it.

12            MS. GAMBALE:  And what's this you're looking

13    for?

14            THE WITNESS:  There's nothing on the page

15    except, math, history, math --

16            MR. DALTON:  Well, we're missing from Ms.

17    Gambale's exhibit, we're missing the entire page.

18            THE WITNESS:  Okay.

19            MR. ST. CLAIR:  We understand that the IEP was

20    drafted by Friendship-Edison.  And really this is -- the

21    appropriateness of the IEP is --

22            THE WITNESS:  More than questionable.

1          MR. DALTON:  Well, what -- the issue is whether
2    or not there were any present level performances, and your
3    testimony is that there are present level performances
4    listed.  Ms. Gambale's copy does not have that.
5          MR. ST. CLAIR:  Does -- do you --
6          MR. DALTON:  Well, our -- no.
7          MR. ST. CLAIR:  Okay.
8          MR. DALTON:  The reason we didn't disclose the
9    document is because we don't disclose duplicate documents.
10          MR. ST. CLAIR:  Oh, okay.
11          MR. DALTON:  And since Ms. Gambale disclosed the
12    document, we presume that Ms. Gambale's copy was a correct
13    copy of the IEP.  I would request that the case be --
14    remain open for us to file a rebuttable copy of the IEP
15    and label that "Friendship-Edison R" for rebuttable '01.
16          MS. GAMBALE:  This is the document that was
17    provided to us from the school and this is what we have of
18    the document.  If there are -- I'm uncomfortable with
19    counsel being allowed to present new documentation that we
20    haven't reviewed, that may not be what we were provided.
21          MR. ST. CLAIR:  Does that mean it's all right?
22          MS. GAMBALE:  Oh, I would object.

1          MR. ST. CLAIR:  Oh, okay.  I'm going to sustain

2     the objection.

3          MR. DALTON:  Well, just for the record, I would

4     like to state that rebuttable evidence is not required to

5     be disclosed.  Counsel's --

6          MR. ST. CLAIR:  I understand that.  Let me just

7     say this, that this -- once you were informed of the

8     allegation of inappropriateness of the IEP, it was

9     incumbent upon Friendship-Edison to disclose the IEP.

10          MR. DALTON:  The document was already disclosed.

11          MR. ST. CLAIR:  No, I said it was incumbent upon

12     -- all right, well, we're going to accept this one.

13     You're saying that's --

14          MR. DALTON:  Well, you know, my --

15          MR. ST. CLAIR:  You can state your objection,

16     but now, let's move on to the next --

17          MR. DALTON:  Let's move on.

18          BY MR. DALTON:

19     Q     The copy that you have, just to preserve our

20     record, Ms. Opalack, does have present levels of

21     performance, correct?

22     A     It has levels of performance that are dated

1    2001.

2        Q    Okay, and what were those levels of performance?

3        A    3.0 in math calculations and 4.0 under both

4    reading sections.

5        Q    Okay.  And when you went to do the March 31 IEP,

6    which is our exhibit 16, what did you list as present

7    levels of performance?

8        A    Oh, okay.  Wait a minute, let me look.  I'm just

9    looking at the Woodcock reviews to do that.  And I don't -

10   - and let me get the IEP.  I'm sorry.

11           MR. ST. CLAIR:  Now, we're looking at the

12   3/31/04 IEP, right?

13           MR. DALTON:  That's correct.

14           THE WITNESS:  Math calculation, 2.9; math

15   reasoning, 2.7; reading comprehension, 5.2; reading basic

16   4.5; written expression, 6.7.

17           BY MR. DALTON:

18       Q    All right.  So from the previous IEP to the

19   March 31st IEP, what progress, if any, did the student

20   have?

21       A    If we -- looking at these kind of performance

22   levels and the Woodcock-Johnson that breaks it down even

1    more, about a year's growth in word attack, word, letter

2    identification and more than a year's growth in what we

3    call "reading fluency," which would be reflected in the

4    reading comprehension grade.  And passage comprehension is

5    more than a year's growth also.

6        Q    And what about written --

7        A    Word attack went up to 7.5 grade level on the

8    Woodcock-Johnson.

9        Q    Okay, and what about written expression?

10       A    Written expression is at 6.7.  And I'm looking

11   for this.  I don't have that on the Woodcock printout that

12   I have in front of me.

13       Q    Okay, all right.  So it's safe to say that you

14   made little or no progress in math, is that correct?

15       A    Correct.  It's not redressed, yes.

16       Q    All right.  And what did you do at that IEP to

17   address that issue?

18       A    We felt very strongly that -- well, she's

19   diagnosed with a math disability, and that we had -- I

20   felt that the MDT -- I felt very strongly and the --

21   obviously, the MDT felt very strongly that we had not

22   adequately addressed the math disability, and that --

1    wanted to provide 30 hours of comp ed and tutorial by a

2    special ed teacher to make up the time that we felt that

3    she had missed.  And to figure out strategies we could use

4    next year to boost her scores.  We felt that 30 hours

5    would give us time to look at strategies that would work

6    as well as show some significant progress.

7        Q    And with regard to reading, why wasn't there any

8    comp ed awarded for reading?

9        A    G█████ was placed in a reading resource class,

10   in December.  And the reading resource class is based on a

11   program called, "language to literacy," and it's -- I

12   wanted to say it's a Linda Mood Bell based program and

13   incorporates a lot of Linda Mood Bell strategies, that

14   it's very scripted.

15           And the kids or the students are very responsive

16   to it.  And she's made extraordinary progress.  And even -

17   - as of her report card yesterday, has a B in reading and

18   is still continuing to show growth.  So we felt that she

19   was on the right track with reading.

20       Q    All right.  And what was -- was there any change

21   in classification of her disability from the '02 IEP to

22   the '04 IEP?

1       A    Yes, she's clearly not mentally retarded; she's

2    learning disabled.

3       Q    Okay, and in part, was that decision made

4    because of the Vineland done?

5       A    It was made, because the Vineland was done, and

6    because we were seeing continuing growth in classes with

7    her.  But the Vineland, of course, is the final say.

8       Q    Right, and what would -- what are some of the

9    factors that you would attribute to the growth in the

10   classroom that G█████'s has exhibited?

11      A    Well, I think that that's a question for Kelly

12   Johnson, her case manager, but it was reported to the team

13   at the meeting that once G█████ went into resource classes

14   and began to see that she was making progress.  G█████ has

15   just grown leaps and bounds both socially and now

16   academically.  Her report card, which has not been

17   officially released yet, is terrific.  And the teacher has

18   reported that she's just coming alive.

19           She just seems to be doing a complete

20   turnaround.  You -- I -- may I say something that doesn't

21   -- that's peripheral to what you're asking me.

22      Q    Sure, go ahead.

1      A    What are you laughing for?  I just wanted to say

2    that the evaluators -- G██████'s very resistant to having

3    any evaluations done.  It takes the evaluators a long time

4    to talk her into it and she was extremely resistant to the

5    evaluator that determined her mentally retarded.

6            And I, of course, wasn't involved at that time,

7    but from what I can see of it, she -- I don't think it was

8    an accurate finding at that time of her potential.

9      Q    Did that delay the process, do you know, of

10   getting the IEP completed?

11     A    The delay for the process was in '03 -- were in

12   '02 -- I don't have that in front of me, because at that

13   time it was my understanding they wanted to have more

14   testing done, because G██████ had been so resistant, they

15   reviewed as an accurate thing.

16     Q    Okay.  And wasn't it also several months' period

17   of time where G██████ had left the school?

18     A    Yes, she apparently enrolled in Oxon Hill.  She

19   left in August and came back, I believe, in October,

20   November of that year -- of that school year.

21     Q    And that would've been '02 or '03?

22     A    Yes, it was -- I think it's actually '03.

1        Q    Okay.  Alrighty.  The other -- the final issue

2    that we've been asked to address -- and I believe, you're

3    probably the person that has the most information on this,

4    is the attempts that were made to have an IEP with the

5    parent and counsel, and the fact that after three

6    unsuccessful attempts and a confirmation of a fourth

7    attempt and then change in that confirmation, you went

8    forward with the IEP, is that correct?

9        A    Yes, it is.

10       Q    All right.  Would you please outline in detail

11   for the hearing officer, that entire scenario?

12       A    Okay.  We -- because I have a long history of

13   being an advocate, I feel very strongly that the parent or

14   the parent's representative should be at meetings.  So

15   this was a tough decision for me to make.  We were under

16   timeline constraints.  And again, we're very committed to

17   compliance, but this case began on a funky note, because

18   the request for evaluations came in on October 9th by

19   attorney Rubinstein.

20           Attached to that request were a release in

21   information belonging to a student we had never heard of.

22   It was not -- somebody had made a mistake at the office

1    level.  Despite a number of phone calls, either there was

2    no belief that they had made that mistake -- I finally

3    faxed everything back.  But it wasn't until November 25th

4    that we got all -- Ms. Williams' release and verification

5    that Ms. Rubinstein was representing her.

6          So we viewed the November 25th as the timeline,

7    but I was pressed to get this done, because the requests

8    were actually made on October 9th.  So November 25th,

9    again, the timeline -- there -- we struggled with

10   residency issues, because on December -- on November 25th,

11   we went ahead to begin the evaluations that were listed in

12   the original letter.

13         On December 24th, Ms. Ward-Ravenell came in and

14   signed a permission to evaluate with, I guess, her

15   advocate, and then residency issues became a problem,

16   because G████ does live in Maryland with her grandmother.

17   And so we went back and forth on that.  In the meantime,

18   we decided to move forward, because no matter where G████

19   ended up, we -- I felt very strongly that Friendship owed

20   her a really good evaluation package.

21         I tried -- on February 24th, I sent a letter to

22   Ms. Rubinstein on February 24th offering the dates of

1    March 16th, 17th and 18th.  I heard nothing back, I --

2              MR. ST. CLAIR:  Wait, wait, wait -- just a

3    minute --

4              BY MR. DALTON:

5        Q    Wait, wait -- one second, Nancy.

6        A    Okay.

7        Q    I think the hearing officer --

8              ST. CLAIR:  -- wants to see the letter.

9              MR. DALTON:  -- wants to see the letter --

10             MR. ST. CLAIR:  2/24, February 24 --

11             THE WITNESS:  Dated February 24th.

12             MR. ST. CLAIR:  Where is that letter?

13             MR. DALTON:  Twelve.

14             MR. ST. CLAIR:  Hold on for a minute, Ms.

15   Opalack.

16             THE WITNESS:  I'm here.

17             MR. ST. CLAIR:  February 12.

18             MR. DALTON:  Yeah, it's -- actually you have a

19   March 5th date on this, but --

20             THE WITNESS: I'm looking at the February 24th --

21             MR. DALTON:  Oh, I'm sorry, I'm -- I got to go

22   back.  I've got the wrong one.  Yeah, there it is.  I've

1    got it now, go ahead.

2            MR. ST. CLAIR:  Just a minute, just a minute,

3    give me -- Ms. Opalack, give the hearing officer a chance

4    to read the letter.

5            THE WITNESS:  Okay.

6            MR. ST. CLAIR:  Okay, Mr. Dalton.

7            BY MR. DALTON:

8       Q    What was the purpose of this letter?

9       A    Purpose of this letter was to try to establish

10   three dates, or to establish a -- you know, to provide

11   three dates and to establish a time that we could convene

12   and also to request -- at that time, we were still

13   struggling with the residency issue.  I received -- do you

14   want me to go on, Paul?

15      Q    Yes, go on.

16      A    Okay.  I received a response on February 25th.

17   It was about the legal issue, and Ms. Rubinstein states

18   that Ms. Ravenell does not claim for a -- on her tax

19   returns, wanted to know more about the testing that I had

20   sent out on December 19th to her office, and called her

21   and told her that a notice of intent to eval -- listing

22   what the evaluations were.

```
1              Then yeah, I told her I needed to hear about a
2    confirmation date, never heard back from her, wrote her
3    another letter on March 5th, offered the dates of March
4    23rd, 24th, 25th --
5         Q   One moment please.  Let the hearing officer read
6    this one, this is exhibit --
7         A   Okay.
8              MR. DALTON:  Exhibit 13.
9              MR. ST. CLAIR:  March 14 -- dated March 14th.
10   She said March 5th, didn't she?
11             THE WITNESS:  Dated March 5th.
12             MR. DALTON:  Yeah, that's 14, you need 14.
13             MR. ST. CLAIR:  Oh.
14             MR. DALTON:  That's 15.  Go back.  All right.
15   Whoops.
16             MR. ST. CLAIR:  This is 12, this is what she's
17   talking about -- 13, right?
18             MR. DALTON:  Yes, yes, yes.
19             THE WITNESS:  And --
20             MR. DALTON:  Let the hearing officer -- excuse
21   me Ms. Opalack, let the hearing officer read this letter.
22   He'll indicate when he's ready and then we can begin.
```

1          THE WITNESS:  The letter's dated March 5th,

2    Paul.

3          MR. DALTON:  Yes, I know.

4          MR. ST. CLAIR:  Yeah, I know, I have --

5          THE WITNESS:  Oh, okay, okay.

6          MR. DALTON:  Yeah.

7          MR. ST. CLAIR:  Go ahead, Mr. Dalton.

8          BY MR. DALTON:

9      Q    All right, what was the purpose of this letter?

10     A    Again, to get three dates and to send over the

11   evaluations and to inform the attorney that we are going

12   to do a little bit more.  We wanted to be sure we were

13   right about the change in identification.

14          And I had also asked the social worker who did

15   the social history to please meet with G███████, because the

16   social history -- in the social history, Ms. Ward-Ravenell

17   and Ms. Williams both say that G██████'s living in the city

18   with Ms. Williams.  But that wasn't true, and I just

19   wanted to make sure that the social history reflected

20   G██████'s input, which of course is that she's living with

21   Ms. Ravenell in Maryland.  So I -- on March 14th, I sent

22   another letter --

1      Q    Now, stop, stop, stop.

2      A    -- now saying, okay we're going to meet March

3   24th at 10:00 o'clock and I believe I enclosed with that,

4   the independent social history.

5      Q    All right.  Stop, just a second, that's exhibit

6   14 --

7      A    Okay.

8      Q    -- let the hearing officer read that.

9           MR. ST. CLAIR:  Okay.

10          BY MR. DALTON:

11     Q    All right.  What did you do as a result of this

12  letter?

13     A    Didn't get a response.  So on -- I got

14  frustrated.  On March 22nd which I believe is a Sunday, I

15  don't have my calendar in front of me, I called Ms.

16  Williams direct, which I'm sure is not good, but I did and

17  I told her that we really wanted to go to the table, I --

18  I've not heard anything from the attorney or an advocate

19  if one existed and that we wanted to schedule the meeting

20  for, I believe, it's March 31st, and would she be

21  available to come.  And she said she couldn't, but she's

22  sure Ms. Ward-Ravenell would, she would call her and I

1    spoke with -- subsequent to that, I spoke with Ms. Ward-

2    Ravenell on March 23rd, she said she would come.

3           I mailed her all the records so that she could

4    read them before the meeting.  On March -- let me look at

5    my notes here -- on March 22nd, when I tried for Ms.

6    Rubinstein, I was told that Ms. Gambale was in charge of

7    the case.  I think, I talked to Ms. Gambale, I don't have

8    my phone log in front of me.  Sent a letter saying that we

9    were confirming this meeting, that I had confirmed it with

10   Ms. Williams and Ms. Ravenell.

11          I received via Wallace Henry, a note or a letter

12   -- a short letter on March 23rd from Michelle Moody who, I

13   guess, was the -- the advocate in the case, saying that

14   she couldn't make the meeting on March 30th, that it was

15   inconvenient for the parents.  I called Ms. Moody and told

16   her that the meeting was not March 30th, but March 31st.

17          Ms. Moody said, "Oh fine, we can make that."  I

18   confirmed.  Gave final confirmation to all the people

19   involved; there's a lot of people involved in this

20   meeting; all the people involved.  On the following day,

21   March 25th, I got a late call from Ms. Moody saying that

22   she had made a mistake, she couldn't make it, and it

1    wasn't convenient for the parents.

2          I told her -- at that point -- called back at

3    that point and told her that we unfortunately were going

4    to go forward with the meeting, that it was the fourth

5    attempt.  On March 29th, I received a communication from

6    Michelle Moody saying that the -- that we shouldn't move

7    forward without the parent being present and that the

8    parent would not come, because she wanted to review the

9    reports and she didn't have the necessary evaluations to

10   review.

11         And I called to try to inform her that not only

12   were all the evaluations on file at her office, but Ms.

13   Ward-Ravenell who was still going to represent Ms.

14   Williams at the meeting had copies of everything also.  So

15   I -- we went ahead with the meeting, I just was not going

16   to care for all these people, one more time.

17       Q    All right.  And at the meeting basically, in

18   sort of an overview fashion, would you please review what

19   was discussed and decided?

20       A    In an overview fashion, okay.  Prior to the

21   meeting, both Kelly Johnson and I did talk to Ms. Ward-

22   Ravenell by the way.  And Ms. Ward-Ravenell was very

1    apologetic to both of us.  She understood what we were

2    trying to do, but had been instructed by her attorney not

3    to attend the meeting, and that was -- it was clear in

4    that she was not going to come based on what her attorney

5    was telling her.

6        Q    Listen, I want to back you up on that.  Is this

7    knowledge that you have directly or is this knowledge that

8    you got from Ms. Kelly?

9        A    No, Ms. Ward -- I talked to Ms. Ward-Ravenell

10   too and told her that I felt badly, but everybody was

11   scheduled to go, we were not going to cancel, we hoped she

12   changed her mind.  And she told me that she couldn't, that

13   the attorney had told her she could not attend.

14       Q    And at that time she was represented by Ms.

15   Gambale?

16       A    I assume so, yeah -- this -- yes, yes, yes Ms.

17   Gambale took over from Ms. Rubinstein.

18       Q    Okay.  Did she offer any explanation as to why

19   she was instructed not to attend the IEP meeting?

20       A    I did not ask.

21       Q    Okay.  All right.  Well, go ahead and talk about

22   the discussion with regard to, you know, what progress

1    G██████ had made, what progress she hadn't made and why you

2    decided to formulate this comp ed plan?

3         A    Okay, we had -- we had -- all of us were very

4    excited by the way at both Friendship and in (inaudible) -

5    -

6              (Tape interruption)

7         A    -- about the test results, because we felt that

8    -- a lot of us had felt that G██████ was not eligible, was

9    mentally retarded, just from seeing the progress that she

10   was making.  So we were excited about the test results.

11   The test results indicated that she is learning disabled

12   with a disability in math areas.  Former testing placing

13   her in the deficient range was not accurate.  That testing

14   placed her in the average range.

15             The speech and language therapist was especially

16   excited about coming to the meeting -- and he and the

17   person -- the speech and language person and the school

18   that had been monitoring her was excited, because it was

19   evident that her scores were commensurate now with her new

20   IQ points that she would be exited from speech and

21   language, which was very good news.

22             The teachers reported in -- reattached those

1    notes to the IEP, because at some point we wanted the

2    parents to know the teachers felt that G▇▇▇'s progress

3    was really terrific too.  There were no significant

4    clinical issues from the -- from issues that can be

5    addressed in counseling.  We did not create counseling

6    notes, because we wanted the parent and G▇▇▇ to be

7    involved in developing what those goals were.

8         G▇▇▇ has a lot of conflicts with her parents,

9    with her mom, that was clear.  And we just wanted

10   everybody to sit down to -- at the table together so that

11   G▇▇▇ had some say in what the counseling issues that

12   were going to be covered would be.

13        We felt, based on the reports of her teachers in

14   classes requiring reading and writing and based on Ms.

15   Logan's (phonetic) evaluation of how far she's come in the

16   reading resource class, that we didn't need to address

17   that, and -- with comp ed, but that we will continue that

18   with goals and objectives.

19        We felt again that we had not done very -- a

20   very good job with addressing a math disability, which of

21   course we hadn't before this time.  And that before the

22   end of the school year, we wanted to provide comp ed to

1   see if we could get her back on track and in preparation

2   for her next school year.

3          And that's -- that was how the meeting ended and

4   that's how the meeting closed.  Ms. Johnson, Kelly Johnson

5   handled the IEP portion of the meeting.

6       Q    All right.  And with regard to 30 hours --

7   what's special about 30, why couldn't it have been 20 or

8   40?

9       A    We felt we could give 30 between now if the

10  parents had signed, that we could've done 30 hours between

11  now and the end of the school year.

12          MR. ST. CLAIR:  Okay.

13          THE WITNESS:  We didn't want to ask G██████ to

14  come in at the summer time.  We didn't know her --

15  whether she was working or not.  And we felt we could

16  address that during the school year intensively.  And we

17  could do it Saturday mornings with a special ed teacher.

18  And 30 hours seemed -- the team seemed to feel that 30

19  hours, again, was enough to determine what compensatory

20  strategies we could work with, and to help show some

21  increase in her academic performance.

22      Q    What would be done at the end of that 30-hour

1    period?

2        A    Post testing -- we have obviously -- testing

3    now, we would have done some post testing and some notes

4    that could be passed on to the special ed teacher for this

5    coming school year as (inaudible) at work.

6        Q    And what if you determined that additional comp

7    ed was needed?

8        A    We would move forward with it, we continue it,

9    if not this summer into -- we would make this available

10   for the next school year.

11       Q    Okay.

12       A    We wouldn't have decided that, because we're

13   putting a math lab in the new program for next year and

14   would want to see her -- how she gets through her math

15   class and comp ed could've been built into that.

16       Q    Okay.  Do you believe that as a result of the

17   evaluations done and the meeting held on March 31st that

18   G█████ has been comprehensively evaluated and that the IEP

19   is appropriate for her?

20       A    Yes, I do.

21       Q    Okay.

22       A    Yes, I do.

1       Q    Is there anything that --

2       A    No, the -- and I think the results are accurate.

3       Q    Okay, and -- is there anything you want to add

4    that you didn't speak to as a basis for why you make --

5    you have those opinions?

6       A    I think that covers it.

7       Q    Okay.  You may have questions from Ms. Gambale

8    and Mr. St. Clair.

9       A    Okay.

10           MR. ST. CLAIR:  Cross-examination Ms. Gambale?

11           MS. GAMBALE:  Yes.

12           CROSS-EXAMINATION

13           BY MS. GAMBALE:

14      Q    The first thing is, you sent a request for a

15   meeting on February 24th?

16      A    I'm sorry, I didn't hear you?

17      Q    You stated that you sent a request for a meeting

18   on February 24th?

19      A    On February 24th, I sent a letter proposing the

20   dates March 16th, 17th, and 18th.

21      Q    And did you receive a response from Ms. Moody?

22      A    No, I did not.

1           MR. ST. CLAIR:  This is addressed to Ms.

2      Rubinstein.

3           BY MS. GAMBALE:

4      Q    You said that -- and you sent the letter to Ms.

5      Rubinstein -- on March 29th, did you receive a letter from

6      Ms. Moody?

7      A    On March 29th --

8      Q    -- Exhibit number 30.

9      A    No, I did not.

10          MR. ST. CLAIR:  Just a minute.

11          MR. DALTON:  One second.  I believe --

12          MR. ST. CLAIR:  It's your exhibit what?

13          MS. GAMBALE:  It's our exhibit number 30.  Or --

14     it should be, actually it should be --

15          MR. ST. CLAIR:  Try this?

16          MS. GAMBALE:  No, this is -- it's 31, I'm so

17     sorry.

18          MR. ST. CLAIR:  Oh.  Wait a minute.

19          MR. DALTON:  And -- well, mine's over here.

20          MR. ST. CLAIR:  This is too much --

21          (Tape interruption)

22          MS. GAMBALE:  March 31st, I'm sorry.  I'm

1   referring to the March 31st.

2           MR. DALTON:  What exhibit number is it?

3           MS. GAMBALE:  It's exhibit number 31 and it's

4   dated March 29th.

5           MR. DALTON:  Okay, well, hold on one second,

6   because I -- my tabs don't go that far.  I would ask that

7   this be read to Ms. Opalack, because she doesn't have the

8   benefit of reading this.  And I believe, that Ms. Opalack

9   actually touched on this issue in her direct examination?

10          MR. ST. CLAIR:  Ms. Opalack?

11          THE WITNESS:  Yes, sir.

12          MR. ST. CLAIR:  I'm going to read this letter to

13  you.

14          THE WITNESS:  Okay.

15          MR. ST. CLAIR:  This is on the letterhead of

16  James E. Brown and Associates, it's dated March 29, 2004?

17          THE WITNESS:  Oh, I have something dated March

18  29th.  I'm sorry, I thought you said February 29th, I --

19  I'm corrected, I have that.

20          MR. DALTON:  Okay.

21          THE WITNESS:  I have the March -- I'm sorry, I

22  thought you said February 29th.

1          MR. ST. CLAIR:  All right.  This is the letter
2     from Michelle Moody?
3          THE WITNESS:  The -- I have a letter from
4     Michelle Moody dated March 29th.
5          MR. ST. CLAIR:  Okay.
6          THE WITNESS:  I misunderstood.  I thought you
7     were saying February 29th.  I don't have anything from
8     March -- February.
9          MR. ST. CLAIR:  All right.  Ms. Gambale.
10          MS. GAMBALE:  And then --
11          MR. ST. CLAIR:  You just want to know if she has
12     it?
13          BY MS. GAMBALE:
14     Q    February 24th, you made a request for a meeting
15     stating that all evaluations were completed?
16     A    No, I said the evaluations would be completed by
17     that Friday and sent to her within a week, which they
18     were.
19     Q    As of February 24th, the psycho-educational had
20     not been done, is that correct?
21     A    Part of it had, the entire thing had not.  You
22     can only test G████ in little bits and pieces.

1      Q      The speech and language evaluation had not been

2  done?

3      A      No.

4      Q      The clinical evaluation had not been done?

5      A      No.

6      Q      The clinical -- as of March 5th, the evaluations

7  have not been completed?

8      A      The evals were attached with the March 5th

9  letter, yes, they were.

10     Q      Well, the clinical evaluation is dated March

11  15th?

12     A      That's right.  We went back and did additional

13  testing.  But we did -- in the testing that was attached

14  on March 5th, the clinical psychologist Dr. Sparrow called

15  me and said, "I did a preliminary screening and there are

16  no emotional issues here."  But I told her that she needed

17  to address it when she went back to do additional testing

18  on the cognitive part of it and she did.  But I did not

19  feel that she -- that there were clinical issues that

20  warranted further investigation.

21     Q      Well, on March -- the evaluation was not

22  completed though.  The evaluation is dated March 15th.

1              MR. DALTON:  Objection.

2              THE WITNESS:  Well, the evaluations --

3              MR. ST. CLAIR:  -- overruled.

4              THE WITNESS:  -- that were requested, except for

5     the clinical -- although there's a notation that there

6     were no clinical issues, I believe, in the first psycho-

7     ed, were sent over on March 5th.

8              MR. ST. CLAIR:  I think I understand.  Move on

9     to the next issue.

10             MS. GAMBALE:  Okay.

11             BY MS. GAMBALE:

12     Q    And the vocational evaluation also has -- a

13     vocational evaluation has also not been completed?

14     A    You didn't request one.

15     Q    The letter that was sent on October 9th, it

16     included -- the language of that letter was --

17             MR. ST. CLAIR:  Just a minute, what's the

18     number?

19             MR. DALTON:  What's the exhibit number?

20             MS. GAMBALE:  Okay, well in terms of the

21     vocational?

22             MR. ST. CLAIR:  No, the letter --

1          MR. DALTON:  No, the letter of October the 9th.

2    That's what you -- I'm sorry.

3          MR. ST. CLAIR:  Thank you, sir --

4          THE WITNESS:  You can show me where it says

5    vocational, I'll --

6          MR. ST. CLAIR:  Just hold on for -- Ms. Opalack,

7    we're waiting for Ms. Gambale to reference the letter.

8    And we'll --

9          MS. GAMBALE:  I'm not sure the letter is in our

10   disclosure packet.  I do have a copy of the letter if we

11   need to submit it, in terms of rebuttal evidence we will.

12         MR. ST. CLAIR:  You --

13         THE WITNESS:  I have it in front of me.

14         BY MS. GAMBALE:

15   Q     You have a copy of the October letter in front

16   of you?

17   A     Yes, I do.

18         MR. ST. CLAIR:  Would you read it?

19         THE WITNESS:  The comp -- oh, the entire letter

20   or the part where -- which requests evaluation?

21         MR. ST. CLAIR:  If it's not too much, the entire

22   letter.

1          THE WITNESS:  "On behalf of my client, Ms. Wanda

2    Williams, I hereby request that the student G█████

3    W████████ is comprehensively reevaluated for special ed

4    services, pursuant to the implementing regulations of IDEA

5    blah-blah-blah.

6          A comprehensive reevaluation of the student

7    would include, but is not limited to: 1) psycho-

8    educational evaluation, 2) speech and language evaluation,

9    3) social history, 4) hearing and vision, 5) clinical, 6)

10   formal classroom observation.

11         The parent further requests information

12   regarding where an independent reevaluation may be

13   obtained in deference to the District of Columbia Public

14   Schools' efforts to conduct the reevaluations.  The parent

15   will wait 60 days to ascertain the school's intentions

16   regarding the evaluation.  Please be advised that the 60-

17   day timeline should take into account any earlier request

18   made by the parent teacher IEP team.  If we do not hear

19   from you at the end of the 60-day timeline, the parent

20   will take the appropriate steps to -- to secure

21   independent evaluations funded by DCPS.

22         Finally, I request the proper notice of all

1    proposed tests, observations, reevaluations be provided to

2    me pursuant to whatever 300 505.  I may be reached at to

3    schedule the reevaluation, thank you for your prompt

4    attention.  A general authorization release form signed by

5    the parent is attached.  Please call me if you have any

6    questions regarding this (inaudible) legal assistant."

7              BY MS. GAMBALE:

8         Q    The exact language of the letter states to

9    include, but not limited to the evaluations listed.  So

10   this was not an exhausted list of evaluations the parent

11   was seeking?

12        A    That's fine.

13        Q    The letter states that the evaluations were

14   supposed to be comprehensive.  Reevaluations -- is that

15   correct?

16        A    Sure.  It says a comprehensive reevaluation of

17   the student.

18        Q    And G████ is an eleventh grade student; G████

19   is in the eleventh grade?

20        A    Are you asking me that or are you saying --

21        Q    I'm asking you that.  Is ████ in the eleventh

22   grade?

```
 1        A    Yes, she is.

 2        Q    And is she scheduled to graduate -- will she

 3   graduate next year?

 4        A    That's not a question that I can answer.  You'd

 5   have to ask her case manager or Wallace Henry.

 6        Q    Now, have you conducted any of the evaluations

 7   for G█████?

 8        A    Have I conducted any of the evaluations?

 9        Q    Uh-huh.

10        A    I'm not the -- no, I didn't do any of the

11   evaluations.

12        Q    Are you qualified to administer any of the

13   evaluations --

14        A    No, I'm not.

15        Q    Did you participate in the December 2003 meeting

16   for G█████?

17        A    No, I did not.

18        Q    Did you participate in a meeting for -- in

19   October 2003 for G█████?

20        A    No, I did not.

21        Q    And you did talk to Ms. Ward-Ravenell about the

22   meeting on the 31st?
```

```
1        A    Yes, I did.

2        Q    And Ms. Ward asked you to reschedule the

3   meeting?

4        A    No, she did not.

5        Q    Ms. Ward-Ravenell asked you to reschedule to a

6   different date?

7        A    No, she did not.

8        Q    She did not?

9        A    No, she did not.  I scheduled the meeting with

10  Ms. Wanda Williams pending Ms. Ward-Ravenell's

11  availability to be there, because Ms. Williams said Ms.

12  Ward -Ravenell would represent her, because she had to

13  work.

14            And so I said fine, I would like to do it on the

15  31st.  And that's the meeting date that was confirmed the

16  -- on that Monday after -- I think it's March 23rd.

17       Q    So the parent indicated that Ms. Ward-Ravenell

18  would be the person that would attend on her behalf?

19       A    Yes, she did.

20       Q    And did you ever speak to Ms. Ward-Ravenell?

21       A    Yes, I did.

22       Q    About this meeting?
```

1        A    Yes, I did, on Monday the -- I think it's -- I

2    spoke with Ms. Williams on Sunday -- I don't have my

3    calendar in front of me.  I believe, that was the 22nd and

4    I spoke with Ms. Ward-Ravenell on the 23rd and sent her

5    all the records in -- I spoke with her 2 days later, she

6    confirmed she had received all the records --

7        Q    So what you're saying is Ms. Williams asked you

8    to schedule the meeting at Ms. Ward-Ravenell's

9    convenience?

10       A    No, Ms. Williams said the 22nd -- I'm sorry, the

11   31st sounded good, but it would only work if Ms. Ward-

12   Ravenell could attend.

13       Q    Okay.

14       A    Ms. Ward-Ravenell confirmed she could attend on

15   the following Monday.

16       Q    And you're saying that Ms. Ward-Ravenell did not

17   ask you to reschedule that meeting?

18       A    No, she did not.

19       Q    And you're saying that you did not receive any

20   correspondence from Ms. Moody asking you to reschedule

21   that meeting?

22       A    I received correspondence on March 29th.  I

 1    received correspondence from Ms. Moody on March -- I think
 2    it's the 23rd, now I can't find it.
 3                        (end of Tape)
 4           MR. ST. CLAIR:  Okay.  And now we are back on
 5    the tape.  I'd like to go back.  There was a question, did
 6    you receive on the 29th of March the letter which we
 7    already have discussed, which was exhibit 31, of -- and
 8    that's the one that was --
 9           MR. DALTON:  31 for whom?
10           MR. ST. CLAIR:  For --
11           THE WITNESS:  -- letter.  There is one -- she
12    sent me one, I believe it's March 24th, and right now -- I
13    just had it, and I can't find it.
14           MR. ST. CLAIR:  Which exhibit is that?
15           MS. GAMBALE:  It's -- I believe it is labeled
16    "R" -- I believe --
17           THE WITNESS:  I've got March 23rd letter from
18    Linda Moody.
19           MS. GAMBALE:  It could be the 30th.
20           MR. ST. CLAIR:  I'm looking at -- is this the
21    one that has one paragraph?
22           THE WITNESS:  Yes, and it says they can't make

1    the meeting on the 30th.

2         MR. ST. CLAIR:  All right.  Let me see.  Right.

3         THE WITNESS:  I called her and said that there

4    was a mistake, that the meeting had been scheduled for the

5    31st.  And Ms. Moody said fine, we can make the 31st.  I

6    then confirmed that date for sure with all the clinicians

7    who were standing by waiting for the final confirmation.

8    Ms. Moody called me on the 25th saying she had made a

9    mistake, they couldn't make the 31st.

10        MS. GAMBALE:  There were three alternate dates

11   that were proposed in that letter.

12        THE WITNESS:  Which one?

13        MS. GAMBALE:  In the letter on the 23rd.  Were

14   you aware of those dates?

15        MR. DALTON:  What document are you referring to?

16        MS. GAMBALE:  I'm referring to the March 23rd

17   letter.

18        MR. ST. CLAIR:  It's the parent's document 30.

19   March -- April 4th, April 6th, and April 8th.

20        THE WITNESS:  Right.

21        BY MS. GAMBALE:

22        Q    Did you attempt to schedule a meeting on any of