1     those dates or --

2          A     No, because I called Ms. Moody back and said

3     it's not the 30th, it's the 31st, and that was the end of

4     the discussion.  She said fine, we can make that.

5          Q     And so nothing was scheduled for the 4th, the

6     6th, or the 8th?

7          A     No --

8                MR. DALTON:  Objection.  She is --

9                MS. GAMBALE:  I just am trying to establish

10    that.

11               THE WITNESS:  She said 31st was acceptable.

12               MR. ST. CLAIR:  I know that.  I know.  All

13    right.  I mean Ms. Opalack is quite clear.

14               MR. DALTON:  Okay.

15               THE WITNESS:  Thank you.

16               BY MS. GAMBALE:

17          Q     Now, in terms of the student's IEP, in Math you

18    indicated that she had regressed from 2002.

19          A     I've not indicated she had regressed as -- I'm

20    sorry, I'm having a hard time hearing you.

21          Q     Well, are you -- well, you are not qualified to

22    administer any of the evaluations for the student,

1    including the educational?

2        A    No, I'm not.

3        Q    What is your educational background?

4        A    I'm Bachelor of Arts in English and Education.

5    I'm certified to teach secondary education.

6        Q    Okay.  And do you have any education relating to

7    special education specifically?

8        A    I am sorry.  I -- I'm having a real hard time

9    hearing.

10       Q    Do you have any qualifications related to

11   special education specifically?

12       A    Well, I've run the largest special ed advocacy

13   organization for 10 years in Washington, D.C. -- yes.

14       Q    Do you have any training or education in terms -

15       A    Lots of training on special ed, but no degrees.

16       Q    Okay.

17            MS. GAMBALE:  Let's see.  I have no further

18   questions for this witness.

19            MR. ST. CLAIR:  Redirect, Mr. Dalton?

20            REDIRECT EXAMINATION

21            BY MR. DALTON:

22       Q    Ms. Opalack, those 10 years when you ran the

1    largest advocacy program, approximately how many students

2    did you represent?

3         A    Actually, we added it up; 1,300 families.

4         Q    1,300 families?  And of those 1,300 families,

5    how many went to a hearing?

6         A    All of them.

7         Q    And how many -- all of them?  And how -- and of

8    those 1,300, how many did you successfully place?

9         A    Oh god, 96 percent, 97 percent.

10        Q    Okay.  I think that qualifies you.

11             MR. DALTON:  No further questions.

12             MS. GAMBALE:  Qualifies her for what?  Is Mr.

13   Dalton --

14             MR. ST. CLAIR:  I think -- Ms. Opalack --

15             THE WITNESS:  Yes, sir.

16             MR. ST. CLAIR:  When he asked you how many went

17   to a hearing -- that is what you said, "hearing."

18             THE WITNESS:  Uh-huh.

19             MR. ST. CLAIR:  Did you mean you -- when you

20   were at the advocacy group, you represented people in

21   1,300 hearings?

22             THE WITNESS:  No.  I -- my educational advocacy

1    firm was not like other -- the ones --

2            MR. ST. CLAIR:  Oh, you're talking about -- the

3    firm did that.

4            THE WITNESS:  No, I personally was the

5    educational advocate for probably in 10 years, 800 --

6            MR. ST. CLAIR:  Fine.  I understand now.  Okay.

7            THE WITNESS:  And G██████ has worked for our

8    firm.

9            MR. ST. CLAIR:  Yes, you answered the question.

10           THE WITNESS:  Thank you.

11           MR. DALTON:  I have nothing further.

12           MR. ST. CLAIR:  Recross, Ms. Gambale?

13           MS. GAMBALE:  I have no further questions.

14           MR. ST. CLAIR:  Ms. Opalack, I have a couple of

15   questions.

16           THE WITNESS:  Yes, sir.

17           MR. ST. CLAIR:  Now, G█████'s disability

18   classification was changed from MR to LD.

19           THE WITNESS:  Correct.

20           MR. ST. CLAIR:  The change was made at the March

21   31st meeting.

22           THE WITNESS:  Yes, it was.

1          MR. ST. CLAIR:  All right.  Now, the MR was

2     incorrect.

3          THE WITNESS:  Yes, sir.

4          MR. ST. CLAIR:  When was the MR designation

5     disability coding established?

6          THE WITNESS:  I believe at the -- well, I

7     believe it's six -- that's a question for Mr. Henry, but I

8     believe it was established at the meeting that was held in

9     June of '02.

10         MR. ST. CLAIR:  And that meeting was held at

11    Friendship-Edison?

12         THE WITNESS:  Yes, it was.

13         MR. ST. CLAIR:  Okay.  I want to ask you some

14    questions about the timeline.  You said something about

15    the evaluation timeline.  What timeline?

16         THE WITNESS:  120 days.

17         MR. ST. CLAIR:  How did you come up with that?

18         THE WITNESS:  Our charter schools follow the

19    120-day timeline that public schools follow.  We try to do

20    evaluations within the first 60 days.

21         MR. ST. CLAIR:  So -- let me see if I

22    understand.  When you -- can you be a little more clear as

1    to whether it's the 60 days for evaluation or 120 days for

2    elevation.

3         THE WITNESS:  Well, we -- no.  We try to do 60

4    days for evaluation.  The timeline that charter schools

5    are -- have to abide by are the same that the school

6    system abides by.  Its -- the council will -- or the

7    council interpretation of 120 days, we've put a 60-day

8    mark for evaluations.

9         And when we began to provide services to charter

10   schools, we tried to impress upon our charter schools that

11   evaluation should be done in 60 days.  I don't know -- I

12   believe the council law has changed and there is no

13   timeline for when anything has to be done, but again, we

14   try to get evaluations done within 60 days.

15        MR. ST. CLAIR:  All right.  Let me ask you this,

16   now.

17        THE WITNESS:  Sure.

18        MR. ST. CLAIR:  When did you count the 60 days?

19   When did you -- what was the -- when did you begin to

20   count the 60-day term?

21        THE WITNESS:  November 26th.

22        MR. ST. CLAIR:  And why was that?

1          THE WITNESS:  Because on November 26th we got

2     all the documentation faxed to collegiate that said Ms.

3     Rubinstein (phonetic) was in fact representing Ms.

4     Williams.

5          MR. ST. CLAIR:  Let me see if I understand.

6          THE WITNESS:  Okay.

7          MR. ST. CLAIR:  Who requested the evaluations?

8     Did miss --

9          THE WITNESS:  Ms. Rubinstein did --

10          MR. ST. CLAIR:  All right.

11          THE WITNESS:  -- in her October 9th letter.

12          MR. ST. CLAIR:  Okay.  And the parent

13     authorization was in the letter.  But what was wrong with

14     the letter?

15          THE WITNESS:  The letter was fine.  The parent -

16     - what was attached to it was the authorization for

17     another student.

18          MR. ST. CLAIR:  Oh, oh.  I understand.  You got

19     the authorizations straight on November 25th?

20          THE WITNESS:  Correct.

21          MR. ST. CLAIR:  And so you counted this -- you

22     count the 60-day timeline then?

1           THE WITNESS:  Yes, sir.

2           MR. ST. CLAIR:  And 60-day --

3           THE WITNESS:  We -- yeah, our clinicians will

4    not -- will follow it with testing unless they've got a

5    parent's signature or some kind of authorization that they

6    are supposed to move forward with it.  And I had called --

7           MR. ST. CLAIR:  So --

8           THE WITNESS:  -- Ms. Williams and had not gotten

9    a response several times.  And I had left numerous

10   messages for Harry Romero (phonetic) and Ms. Rubinstein.

11   But it took till November 25th --

12          MR. ST. CLAIR:  Okay.

13          THE WITNESS:  -- for them to send us the correct

14   authorization.

15          MR. ST. CLAIR:  All right.  And 60 days from

16   that would have been roughly January 25th?  Christmas?

17          THE WITNESS:  Yes.  But we -- again, because of

18   the Christmas holidays, we kind of moved into February and

19   March.

20          MR. ST. CLAIR:  Okay.  Redirect, sir?

21          MR. DALTON:  No, I have no redirect.

22          MR. ST. CLAIR:  Re-cross, Ms. Gambale?

1          MS. GAMBALE:  No.

2          MR. ST. CLAIR:  Okay.  Next witness, please.

3          MR. DALTON:  Thank you, Ms. Opalack.

4          THE WITNESS:  Am I done?

5          MR. DALTON:  Yes.

6          THE WITNESS:  Okay.  Thank you.

7          MR. DALTON:  All right.

8          (Witness excused)

1              MR. ST. CLAIR:  Next witness --

2              MR. DALTON:  Sir, next one -- this is Kelly

3     Johnson.

4              MR. ST. CLAIR:  Well, who is Mr. Johnson?  What

5     is he going to testify to?

6              MR. DALTON:  No, Kelly -- female.

7              MR. ST. CLAIR:  Oh, I'm sorry.  K-e-l-l-i?

8              MR. DALTON:  K-e-l-l-y.

9              MR. ST. CLAIR:  Oh, "y."

10             MS. GAMBALE:  Either, you've got either --

11             MR. ST. CLAIR:  Okay, either.

12             MR. DALTON:  Where's my -- what's --

13             SPEAKER:  396-5500, extension 1502.

14             MR. ST. CLAIR:  What's Mr. Kelly going to

15    testify to?

16             MR. DALTON:  Ms. Kelly.

17             MR. ST. CLAIR:  Ms. Kelly, excuse me.

18             MR. DALTON:  120 --

19             SPEAKER:  1502.

20             MR. ST. CLAIR:  Hold it for a moment.

21             MR. DALTON:  I'll get her on --

22             MR. ST. CLAIR:  No, before you get her on, what

1    is she going to testify to?

2            MR. DALTON:  The fact that the parent was

3    instructed not to --

4            MR. ST. CLAIR:  Okay.

5            MR. DALTON:  Yeah, Ms. Kelly Johnson?  Is this

6    Ms. Johnson?

7            (No audible response)

8            MR. DALTON:  Okay, this is Paul Dalton.  I have

9    Mr. St. Clair, the hearing officer here, and Ms. Gambale

10   who is the parent's attorney.  I'll be asking questions

11   first.  He will swear you in.  Ms. Gambale will cross-

12   examine you, and Mr. St. Clair may also independently ask

13   questions.

14           MS. JOHNSON:  Okay.  I'll just go ahead and (off

15   mike).

16           MR. DALTON:  Yes.  Okay.  All right.

17           MR. ST. CLAIR:  Can we settle on the correct

18   spelling?  Is it K-e-l-l-y?

19         ' MR. DALTON:  Yes.

20           MR. ST. CLAIR:  Johnson?

21           MR. DALTON:  Yes.  J-o-h --

22           MR. ST. CLAIR:  I believe it's not -- I can

1    handle this.

2              MR. DALTON:  She's just having some students

3    exit.

4              MR. ST. CLAIR:  Ms. Johnson is?

5              MR. DALTON:  G███████'s special ed teacher.

6              MR. ST. CLAIR:  Okay.

7              MR. DALTON:  Yes.  Now, I want to start with you

8    first.  Yes.  Are you ready?  All right.  I'm going to put

9    you on speaker.  Can you hear us?

10             MS. JOHNSON:  Yes, I can.

11             MR. ST. CLAIR:  Okay.  Ms. Johnson?

12             MS. JOHNSON:  Yes.

13             MR. ST. CLAIR:  My name is Herbert St. Clair,

14   I'm the hearing officer.

15             MS. JOHNSON:  Okay.

16             MR. ST. CLAIR:  In addition to myself and Mr.

17   Dalton in the hearing room are Mr. Henry Wallace, whom you

18   know.

19             MS. JOHNSON:  Uh-huh.

20             MR. ST. CLAIR:  Mr. Wallace Henry III, Ms.

21   Michelle Moody who is G███████'s advocate, and Ms. Ward

22   Rabino who is G███████'s grandmother, and G███████'s attorney,

1    Ms. Gambale.

2            MS. JOHNSON:  Okay.

3            MR. ST. CLAIR:  All right.

4    Whereupon,

5                        KELLY JOHNSON

6    was called as a witness and, having been first duly sworn,

7    was examined and testified as follows:

8            MR. ST. CLAIR:  All right.  Mr. Dalton?

9            DIRECT EXAMINATION

10           BY MR. DALTON:

11       Q   Yes.  Would you please state your name and

12   position at Friendship-Edison for the record?

13       A   Yes.  I'm a special education inclusion case

14   manager.

15       Q   And -- for Friendship-Edison Schools?

16       A   I'm sorry?

17       Q   For Friendship-Edison Schools?

18       A   Yes.

19       Q   All right.  And how is it that you know G████

20   W███████?

21       A   I'm her case manager and inclusion teacher.

22       Q   Okay.  Did you have any discussions with Ms.

1     Ward Rabino regarding her attendance at the March 31st IEP

2     -- proposed IEP meeting?

3          A    Yes.

4          Q    And what was the nature of those discussions?

5          A    I asked Ms. Rabino if she was going to attend

6     the March IEP meeting and she said that she was advised

7     not to attend the meeting.

8          Q    What -- March of -- was it March 31, 2004?

9          A    No, it was the one prior to that.  It was the

10    day before the meeting.

11         Q    Okay.  But the meeting was scheduled for March

12    31st --

13         A    Yes.

14         Q    -- 2004.  Your discussion took place on March

15    30, 2004.

16         A    Yes.

17         Q    And what was -- since we are backing up, would

18    you the repeat what Ms. Ward Rabino told you with regard -

19    -

20         A    I asked Ms. Ward Rabino if she would be

21    attending the meeting and she said that her -- she was

22    advised not to attend the meeting.  And we could give her

1    a call back later once we concluded the meeting on the

2    31st.

3         Q    And --

4         A    And that she wouldn't be there.

5              MR. ST. CLAIR:  Ms. Johnson?

6              THE WITNESS:  Yes.

7              MR. ST. CLAIR:  This is Herbert St. Clair.

8              THE WITNESS:  Yes.

9              MR. ST. CLAIR:  The dates are very important.

10             THE WITNESS:  Okay.

11             MR. ST. CLAIR:  The date of the meeting is

12   important.  And the date that you spoke with Ms. Ward

13   Rabino is important.

14             THE WITNESS:  Okay.

15             MR. ST. CLAIR:  So I want you to answer Mr.

16   Dalton's questions -- I'm going to ask him to repeat it.

17   But I want you to answer it again.  But this time, I want

18   you to be very careful about the dates.

19             THE WITNESS:  Okay.

20             MR. ST. CLAIR:  When you talked to Ms. Ward

21   Rabino, when you understood the meeting was scheduled to

22   take place, and whether or not the meeting had been

1    rescheduled or misunderstood, all right?

2            THE WITNESS:  Okay.

3            MR. ST. CLAIR:  Go ahead, Mr. Dalton.

4            BY MR. DALTON:

5        Q    All right.  Ms. Johnson, what was the date that

6    you spoke to Ms. Ward Rabino?

7        A    It was -- it was Tuesday, March 29th because --

8    hello?

9        Q    Yes.

10       A    It was Tuesday, March 29th.  Wait a minute.

11       Q    Do you have a calendar in front of you?

12       A    Yes.  I'm sorry.  It was Tuesday, March 30th.

13   Now I have a calendar in front of me.  Because the meeting

14   was scheduled for Wednesday.  The meeting was on March

15   31st, a Wednesday.

16       Q    Of 2000 --

17       A    And four.

18       Q    All right.  So this pre -- past, just past

19   month, Tuesday, March 30th was the day that you spoke with

20   Ms. Ward Rabino?

21       A    Yes.

22       Q    Do you recall the approximate time?

1      A      G⬛⬛ was in the office with me, so it had to

2    be during -- I want to say 2:00 p.m. -- between 1:30 and

3    2:00 p.m.  It was during the first block class when miss -

4    - when I am usually see G⬛⬛ for Mr. Roberts' (phonetic)

5    class.  She was down in the office with me.

6      Q      Okay.  And your testimony is that she was

7    advised not to attend the --

8             MR. ST. CLAIR:  Just -- I'm going to tell her --

9    just -- Ms. Johnson, just tell -- just recount the

10   conversation as accurately as you can.

11            THE WITNESS:  When I spoke with Ms. Ward Rabino

12   I asked her if she was going to be attending the meeting

13   on the next day, which was Wednesday.  She said that she

14   was advised by the lawyer and the advocate not to attend

15   the meeting.

16            MR. ST. CLAIR:  Are you -- is your -- I want to

17   make sure that I am clear.  Are you saying by both the

18   attorney and the advocate?

19            THE WITNESS:  She mentioned both the names in

20   the context of the conversation.  At one point she said

21   advocate and at another point she said attorney.

22            MR. ST. CLAIR:  And did she identify who the

1    advocate and attorney were?

2                THE WITNESS:  No, she did not.

3                MR. ST. CLAIR:  All right.

4                BY MR. DALTON:

5        Q    Now, with regard to the meeting that was held in

6    December, did you attend that meeting?

7        A    No, I did not.

8        Q    All right.  Were you -- when did you --

9                MR. ST. CLAIR:  What meeting was that again?

10                MR. DALTON:  December 2003.

11                THE WITNESS:  I was not employed with

12    Friendship-Edison in December.

13                BY MR. DALTON:

14        Q    All right.  When did you become employed with

15    Friendship-Edison?

16        A    January the 3rd -- I think January the 3rd of

17    2004.

18        Q    All right.  And when did you start seeing

19    Gloria?

20        A    I started seeing G██████ at the end of January.

21        Q    And how -- what do you do with G██████?

22        A    I do -- most of the time I am in the classroom

1    with her assisting her with her class instructions.  I

2    also assist her -- I probably -- sometimes we do pullout

3    services like for instance, if she has a (inaudible) she

4    gets extended time.  Or she has a test she uses that

5    extended time with me.  I modify her assignments.

6         Several things.  Sometimes I give her assistant

7    reading if she needs assistant reading.  Those are the

8    services I provide for her.

9         Q    Did you attend the March 21st 2004 IEP meeting?

10        A    Yes, I did.

11        Q    Did you make any written comments with regard to

12   that meeting?

13        A    Yes, I did.

14        Q    And do you have those comments in front of you?

15        A    No, I do not.

16        Q    Okay.  Do you recall the sum and substance of

17   those comments?

18        A    Yes.  During that time, I spoke about my -- when

19   I first encountered G███████, she wasn't really receptive to

20   me providing services with her.  She also wasn't receptive

21   to going to the reading resource class.  I had several

22   discussions with her grandmother regarding her going to

1    the class.  Eventually, in time, I also put in my report

2    that G███████ and I have developed a working relationship.

3            Therefore, she agreed to go into Ms. Bobin's

4    (phonetic) class, the reading resource class.  And then

5    she agreed to allow me to come into the classroom and

6    assist her a little more.  First, she wouldn't even let me

7    to come near her.  After that was done, her grades had

8    improved tremendously since I've been assisting her with

9    that.  Also she wasn't very receptive to people when they

10   came in for testing.

11           I specifically remember Dr. Sparrows (phonetic)

12   wanted the clinical (inaudible) were instituted.  She

13   wasn't receptive in the beginning, but then after some

14   conversation with some other members in the office and

15   myself she decided that she would go ahead and do that.

16   So her whole attitude and approach was quite changed.  And

17   that's what I recall putting in the March 31st IEP notes.

18       Q    Do you recall any of the discussions centering

19   around the decision to award compensatory ed -- education

20   to G██████?

21       A    No, I do not recall that conversation.

22       Q    Okay.  Do you feel that G██████ has made

1    educational progress this year?

2        A    Yes, I feel she has made tremendous progress

3    within the last 3 months.

4        Q    All right.  And that is due primarily to what?

5        A    I think it is due primarily to her advocating

6    for herself in more of a positive way, also being aware

7    that the support services that are provided by the special

8    Edison department are not to hinder her, to help her.  So

9    she's been a lot more receptive to coming down here asking

10    for assistance and also allowing us to come into the

11    classroom and help her.

12        So I think that's quite a tremendous --

13    tremendous gains.  Also realizing that she needed to, you

14    know, try to get -- testing services and try to get these

15    services so we could figure out exactly where she.  She is

16    also done that, so now she is in the reading -- out of --

17    basically, next year she will be out of the reading

18    resource class, because now we know that she doesn't need

19    to be in a class that functions that low, because she has

20    been making so many gains.

21        Q    Has she expressed how she feels about these

22    gains?

1      A    Yes.  She is extremely happy that she's done so
2   well in school.  And on occasion she gets frustrated by --
3   I think she still gets frustrated, but I think the
4   difference is that she is handling those frustrations
5   differently.  She is coming in -- and like I said, she is
6   seeking out the necessary people in order to make sure
7   that it's taken care of appropriately, versus before where
8   it may have become a verbal confrontation or her walking
9   out of the classroom or something of that nature.
10     Q    What is her attitude, if you know, with regard
11  to next school year?
12     A    I think right now she is extremely concerned
13  about not being able to -- I'm sorry, the phone rang,
14  excuse me.  I think she is extremely concerned about -- if
15  she is going to graduate on time.  I think that that's the
16  number one issue that she is having right now.  Am I going
17  to graduate, am I going to be able to do this with my
18  class.  Also, what her classes are going to look like.
19         She's always like, well, what electives am I
20  going to take, am I still going to be able to be with my
21  English teacher, am I still going to have this.  So --
22  just so many questions about what's going on.  I think she

1    is nervous about the approaching year.

2        Q    Could those issues be addressed at a IEP

3    meeting?

4        A    I'm sorry, can you repeat that?

5        Q    Could those issues be addressed at an IEP

6    meeting?

7        A    Yes, they can.

8        Q    Okay.

9        A    They could be addressed at an IEP meeting.

10       Q    All right.

11            MR. DALTON:  I have no further questions.  Ms.

12   Gambale may have questions.

13            MR. ST. CLAIR:  Ms. Gambale.

14            CROSS EXAMINATION

15            BY MS. GAMBALE:

16       Q    When did you start working with Friendship-

17   Edison?

18       A    I got my hire letter first, I think, January

19   3rd.  But classes started the 5th of January.

20       Q    So you started working with them January 5th?

21       A    Right.

22       Q    And --

```
1       A    That's when I actually reported to work, yes.

2       Q    Okay.  And so you were employed there when the

3   December meeting took place?

4       A    No, I was not.

5            MR. ST. CLAIR:  Certainly -- is there a

6   significance to the December 2003 meeting --

7            THE WITNESS:  Hello?

8            MR. ST. CLAIR:  -- other than that it took place

9   -- is it a counsel attorney to --

10           THE WITNESS:  I'm sorry, I can't hear you.

11           MR. DALTON:  Ms. Johnson, we are having an

12   internal discussion which --

13           THE WITNESS:  Oh, okay.

14           MR. DALTON:  -- does not affect you and when we

15   are through we'll get back to you.

16           THE WITNESS:  Okay.

17           MR. ST. CLAIR:  I'm going to put you on hold,

18   Ms. Johnson.

19           THE WITNESS:  Okay.

20           MR. ST. CLAIR:  What is the significance of the

21   January 2003 meeting?

22           MS. GAMBALE:  What is its significance?
```

1               MR. ST. CLAIR:  Uh-huh.

2               MS. GAMBALE:  Well, there is quite a lot of

3       significance to the January -- to that meeting.  In

4       particular, the team at that point discussed the fact that

5       she wasn't receiving services for the -- from the start of

6       the school year.  At that time, they agreed to implement

7       the June '02 IEP and provide her the services that were

8       contained therein --

9               MR. DALTON:  I --

10              MS. GAMBALE:  -- which hasn't been done, but a

11      lot went on.  But again, that's -- I would reserve to

12      comment on that.

13              MR. ST. CLAIR:  Is that the only significance

14      you attested that the team agreed to implement the

15      services of the expert IEP --

16              MS. GAMBALE:  Well, they also -- well, they -- a

17      lot occurred at that meeting.  The team agreed that they

18      hadn't provided the services to her, they agreed that they

19      were going to reevaluate and that they would wait to

20      revise the IEP until after the reevaluations were

21      completed.  They agreed that they would, until such time,

22      implement the June '02 IEP.

1           The parents -- the concerns about the lack of

2    services that had been provided were addressed.  I believe

3    also the fact that their child was not going to graduate

4    on schedule was addressed.  A lot took place at that

5    meeting.

6           MR. ST. CLAIR:  So far -- everything you said so

7    far about that meeting has been addressed in these other

8    issues.  That's why I'm asking you --

9           MS. GAMBALE:  Has been addressed in these other

10   issues?

11          MR. ST. CLAIR:  Yeah --

12          MS. GAMBALE:  No --

13          MR. DALTON:  Just wait a minute -- that the IEP

14   from the 2002 - 2003 -- I haven't heard anything about the

15   services being Mr. Wallace' --

16          MR. WALLACE:  Yeah.

17          MR. ST. CLAIR:  Okay.  Good, good.  Excuse me,

18   do you want to --

19          MR. DALTON:  Well -- and the only other point I

20   wanted to make for the record is that the characterization

21   by Ms. Gambale, I believe, is inaccurate and that will be

22   addressed by Mr. Wallace.

1          MR. ST. CLAIR:  All right.  Okay.  I'm going to

2     put --

3          MR. DALTON:  Speaker?

4          MR. ST. CLAIR:  Yeah.  Hello, Ms. Johnson?

5          THE WITNESS:  Yes.

6          MR. ST. CLAIR:  All right.  Thank you for your

7     indulgence.

8          THE WITNESS:  That's fine.

9          MR. ST. CLAIR:  Go ahead, Ms. Gambale.

10         BY MS. GAMBALE:

11     Q    Do you provide direct services to G█████?

12     A    Yes.

13     Q    So you provide instructional services to G█████?

14     A    Yes.

15     Q    And is she in -- what kind of studying is she in

16     with you?

17     A    She is in an inclusion setting with me.  So she

18     -- there's a -- the general ed teacher and then myself.

19     Q    And how long has she been in the inclusion

20     setting with you?

21     A    Since -- well, they interchanging way -- I don't

22     have a specific date.

1      Q    And how often -- how much time do you spend with

2    her?

3      A    Let me see, I spend two different blocks with

4    her for an average of about 10 hours or more a week.

5      Q    Okay.

6           MS. GAMBALE:  I have no further questions for

7    this witness.

8           MR. DALTON:  I have a little bit.

9           REDIRECT EXAMINATION

10          BY MR. DALTON:

11     Q    Ms. Johnson, do you -- does G████ also have

12   resource classes?

13     A    Yes, she does.

14     Q    And a resource class is a special ed class, is

15   that not correct?

16     A    Yes, it is.

17     Q    And how much resource does she get a week --

18     A    She has three to four resource classes which

19   were about 7.5 hours each for each one of them.

20     Q    Okay.

21     A    Oh, I'm sorry.  Wait a minute, she sees mister -

22   - Ms. Walkins (phonetic), I mean Ms. Whiting (phonetic) on

1   two different days, that's totally 5 hours there and then

2   7.5 hours of reading resource.

3      Q    So altogether it's a little over 20.

4      A    Right.

5      Q    Okay.

6           MR. DALTON:  All right, I have no further

7   questions.

8           MR. ST. CLAIR:  Recross, Ms. Gambale?

9           RE-CROSS EXAMINATION

10          BY MS. GAMBALE:

11     Q    How much time is she spending in your class

12  right now?

13     A    I'm sorry?

14     Q    It's my understanding that she's been pulled

15  from some of her courses.

16     A    She is going to be pulled at the end of this

17  year out of the reading resource, which I don't see her

18  in.  The reading resource class is a special education

19  course -- class for reading.

20          MR. ST. CLAIR:  Why is she going to be pulled?

21          THE WITNESS:  Because her test scores and her

22  performance in that class had indicated that she will be

1    doing -- she'll be able to be okay in her regular English

2    classes with inclusion instruction from me.

3         BY MS. GAMBALE:

4         Q    So her educational scores indicate that she's

5    reading between a fourth and a fifth grade level.

6         A    Yes.  In that class -- generally the students in

7    that class are reading anywhere from -- we have some

8    students here who read from kindergarten up until -- till

9    approximately regularly is in some higher.  But generally,

10   the kids in my class read on the second to third grade

11   level.  And when G███████ entered that classroom, her scores

12   at that time indicated that that's where she needed to be.

13        However, from her performance in there, she has

14   done -- made significant gains and progress.  So the only

15   real thing -- concern we have now is her comprehension

16   skills, which I think we'll be able to provide instruction

17   for that for her general education classroom, but this

18   isn't from an inclusion teacher.

19        Q    Now, over what time period did she make

20   significant gains --

21        A    I'm sorry, can't hear you.  Say it again?

22        Q    A month there as to what timeframe that she made

1    these significant gains that you're referring to?

2         A    From her performance up in the classroom, she --

3    also from her performance while she's in her English

4    class, she's probably in Ms. Walton's English class, and I

5    have seen where she's gone, she's become more comfortable

6    and have initiated lessons.  She currently has a beta

7    score in Mr. Walton's class.  She's done very well in her

8    papers.

9         With the assistance of Ms. Walton and I, she has

10   -- her sentence structure is getting much better.  She's

11   started to use context clues when she is reading --

12   different things like that.  Like I said, I think her

13   weakness right now is her comprehension skills which we

14   could -- I think we'll be able to work on slow, working in

15   Ms. Walton's class with inclusion.

16        Q    And she's right now in the 11th grade?

17        A    Yes, she is.

18        Q    Were you aware that she failed all of her

19   classes in June of 2003?

20        A    Yes.

21        Q    And you --

22             MS. GAMBALE:  I have no further questions.

1          MR. ST. CLAIR:  Ms. Johnson?

2          THE WITNESS:  Yes.

3          MR. ST. CLAIR:  Thank you very much.  Wait --

4          MR. DALTON:  Ms. Johnson, is Ms. Wilkinson

5    there?

6          THE WITNESS:  Yes, she is.

7          MR. DALTON:  Would you put her on, please?

8          THE WITNESS:  Yes, hold on.

9          (Witness excused)

1       MR. ST. CLAIR:  W-i-l-k-i-n-s-o-n.  First name?

2       MR. DALTON:  Beth.  B-e-t-h.

3       MS. WILKINSON:  Hello?

4       MR. DALTON:  Yes, Ms. Wilkinson?

5       MS. WILKINSON:  Yes, good afternoon.

6       MR. DALTON:  This is Paul Dalton.  I have Mr.

7   St. Clair, who's the hearing officer in the room, and I

8   have Ms. Gambale who is the attorney for the parent.

9       MS. WILKINSON:  Okay.

10      MR. DALTON:  And Mr. St. Clair will swear you

11  in, I'll be asking some questions, Ms. Gambale will be

12  asking some questions, and Mr. St. Clair may ask you some

13  questions.

14      MS. WILKINSON:  Okay.

15  Whereupon,

16                      BETH WILKINSON

17  was called as a witness and, having been first duly sworn,

18  was examined and testified as follows:

19      DIRECT EXAMINATION

20      BY MR. DALTON:

21      Q    Please state your name and position with

22  Friendship-Edison.

1    A    My name is Beth Wilkinson, I'm speech-language

2    pathologist here with Friendship-Edison.

3    Q    And how is it that you know G███████ W████████?

4    A    She is a special education student.

5    Q    Okay.  Do you have any personal involvement with

6    G██████?

7    A    Yes.

8    Q    And what is that involvement?

9    A    She received speech and language services here

10   at the school.

11   Q    Okay.  And did you attend the March 31, 2004 IEP

12   meeting?

13   A    Yes.

14   Q    And what happened as a result of that meeting

15   with regard to speech and language?

16   A    We absented her from speech and language seeing

17   that she no longer qualified for services.

18   Q    And what was the basis for that determination?

19   A    One of the bases was her test results, her

20   current assessment results, but also in just talking with

21   the team and seeing her and observing her in the classroom

22   and consulting with the teachers in the team.

1       Q    So in addition to the testing, you also with her

2    teachers and you have your own personal experiences with

3    her in the classroom as a basis in that this was a team

4    decision, is that correct?

5       A    That's correct.  Even outside the classroom, but

6    yes, that's correct.

7       Q    Okay.

8            MR. DALTON:  I have no further questions.

9            THE WITNESS:  Okay.

10           MR. ST. CLAIR:  Cross-examination, Ms. Gambale.

11           CROSS-EXAMINATION

12           BY MS. GAMBALE:

13      Q    I have -- were you the person who did the speech

14   and language evaluation?

15      A    No, ma'am.

16           MS. GAMBALE:  I have no questions for this

17   witness.

18           MR. DALTON:  Thank you, Ms. Wilkinson.

19           MS. WILKINSON:  Okay, thank you.

20           (Witness excused)

1           MR. DALTON:  Counsel requests a short break.

2           MR. ST. CLAIR:  What time is it?

3           MR. DALTON:  It's 10 to 1:00.

4           MR. ST. CLAIR:  How much long a break do you

5       think we should take?

6           MR. DALTON:  Well, I just -- I need a personal

7       break.

8           MR. ST. CLAIR:  Oh, okay.

9           MR. DALTON:  Five minutes.

10          MR. ST. CLAIR:  Five minutes?  Okay, a 5-minute

11      recess.

12              (Recess)

13          MR. ST. CLAIR:  All right.  We're back on the

14      record now.  Mr. Dalton, you --

15          MR. DALTON:  I just wanted to indicate that I

16      represent another charter school who has a meeting with

17      Tom Loffmann (phonetic) who is the Chairman of the D.C.

18      Public Charter School Board.  And his counsel and a number

19      -- about eight people, so it would be virtually impossible

20      for me to reschedule that meeting due to Mr. Loffmann's

21      schedule.

22              And since this proceeding started at 11:00, we

1    anticipated that a 3:00 o'clock meeting would be all

2    right.  That hasn't turned out to be the case, and I

3    wanted to let counsel know ahead of time so that counsel

4    could decide whether to continue this hearing at this

5    point or after Mr. Wallace's testimony, or what is your

6    preference.

7             MS. GAMBALE:  My preference would be for you to

8    call Mr. Wallace since you have him here, and then I guess

9    we'll need to schedule a date when we can continue with

10   our -- put on our case.

11            MR. ST. CLAIR:  All right.

12            MR. DALTON:  That's fine

13            MR. ST. CLAIR:  Okay.  You want to call your

14   next witness, Mr. Dalton?

15            MR. DALTON:  Yes.  Wallace Henry, please.

16   Whereupon,

17                        HENRY WALLACE

18   was called as a witness and, having been first duly sworn,

19   was examined and testified as follows:

20            MR. ST. CLAIR:  I'm going to ask you to direct

21   that microphone --

22            THE WITNESS:  Okay.

1          MR. ST. CLAIR:  I'm listing this to Dalton.

2          DIRECT EXAMINATION

3          BY MR. DALTON:

4     Q    Yes.  Mr. Henry, please state your full name and

5     position at Edison-Friendship, please

6     A    My name is Wallace Henry III, and I'm director

7     of special education for Friendship Edison Collegiate

8     Academy.

9     Q    And in that capacity, are you familiar with the

10    student G█████ W████████?

11    A    Yes, I am.

12    Q    And how are you familiar with her?

13    A    I supervise her educational program.

14    Q    All right.  Are you familiar with the June 2,

15    2002 IEP?

16    A    Yes, I am.

17    Q    All right.  And subsequent to the June 2, 2002,

18    would you relate to the hearing officer and counsel what

19    meetings took place with regard to the student?

20    A    I began at the high school in April of 2002.

21    And when I arrived after viewing the records, I saw that

22    G█████ had been evaluated in the fall of 2001 by a Dr.

1    Kim. It was November 18, 2001.  And we were not satisfied

2    with the quality of the report, and so we requested that

3    she be reevaluated.  And she was reevaluated by Dr.

4    Quentin Graham on 5, 6 and finished up on 6/02 -- 6/02.

5         Q    All right.  And as a result of those

6    evaluations, did you hold a IEP meeting in June of 2002?

7         A    Yes, we did.

8         Q    And as a result of the team's review of those

9    evaluations, did you come to the conclusion as to the

10   disability category for the student?

11        A    Yes, we did.

12        Q    And what was that disability category?

13        A    Mental retardation.

14        Q    And that was based on what?

15        A    Based on her IQ scores and her Vineland scores.

16        Q    And what were here IQ and Vineland scores?

17        A    Her full-scale IQ --

18             MR. ST. CLAIR:  Did Dr. Graham recommend (off

19   mike) disability qualification --

20             THE WITNESS:  Yes, he did.  He recommended and

21   the team agreed with the recommendation.  Her full-scale

22   IQ at that time was 53, performance was 54, and verbal IQ

1    was 59.

2              BY MR. DALTON:

3         Q    And those scores indicate a profound range.  Is

4    that correct?

5         A    Yes.

6              MR. ST. CLAIR:  Found mental retardation?

7              THE WITNESS:  Retardation, yes.

8              MR. ST. CLAIR:  Go ahead.

9              BY MR. DALTON:

10        Q    All right.  Did Dr. Graham qualify the results

11   in any way to suggest that these scores may have been

12   lower than the student's actual IEP or did he feel that

13   given the particular testing that occurred at that time,

14   that they were accurate?

15        A    As I recall, he presented them as being accurate

16   for her performance.

17        Q    All right.  And what happened subsequent, then,

18   to the June 2, 2002 IEP?

19        A    The IEP was implemented as written.

20        Q    Did there come a time when G█████ left the

21   school system?

22        A    Yes.

1      Q    And when did she leave?

2      A    She left in August of 2003.

3      Q    Okay.  So she was there -- this was done in June

4    of 2002, so she was there for 2002-2003, and then she left

5    in August of 2003?

6      A    Yes.

7      Q    And when did she come back?

8      A    She returned, I believe, on October 2003.

9      Q    So she was gone for approximately two months?

10     A    Almost -- yeah, 2 months.

11     Q    Okay.  And then when she came back, what

12   happened?

13     A    When she came back, we received a request for

14   records on October the 9th and --

15     Q    From Ms. Rubinstein?

16     A    From Ms. Rubinstein.

17     Q    All right.  I think those issues have been

18   addressed adequately by other witnesses.  What I'd like to

19   focus on is why did you have a meeting in December?

20     A    We had a meeting in December to --

21          MR. ST. CLAIR:  2003?

22          THE WITNESS:  2003, which is December 4, 2003,

```
1    to continue her present IEP since it had lapsed.  And we
2    at that time were looking at reviewing her evaluations.
3              BY MR. DALTON:
4         Q    All right.  During that period of lapseness, was
5    she nevertheless receiving services?
6         A    Services continued.
7         Q    Okay.  And how do you know that?
8         A    I monitor the service hours for all the
9    students.
10        Q    Okay.  Including this student?
11        A    Yes.
12        Q    All right.  Now, were you present at the March
13   31, 2004 IEP?
14        A    Yes, I was.
15        Q    All right.  And do you recall any of the
16   discussion with regard to what type of compensatory
17   services should be offered for this lapse?
18        A    Yes.  I believe 30 hours was recommended and
19   offered at that time.
20        Q    All right.  And is the normal procedure to do
21   both pre- and post-testing after those -- after any award
22   of a specific number of hours?
```

1        A    Yes.

2        Q    And will post-testing be done when those hours

3    are completed?

4        A    Yes, it will be.

5        Q    And will another IEP meeting be held to discuss

6    whether additional compensatory ed is required?

7        A    Yes.

8        Q    If the parent and -- or the parent's

9    representative had been at that IEP meeting, would the IEP

10   team have considered input from the parent and/or advocate

11   with regard to all the possible issues of compensatory ed

12   including subject area and hours?

13       A    Definitely.

14       Q    And those inputs were not available because the

15   individuals were not available.  Isn't that correct?

16       A    That's correct.

17       Q    Okay.

18            MR. DALTON:  I have no further questions for

19   this witness.

20            MR. ST. CLAIR:  Ms. Gambale.

21            CROSS-EXAMINATION

22            BY MS. GAMBALE:

1      Q    First of all, who normally sends out the

2  invitation letters for meetings?

3      A    The invitation letters will either go out from

4  the case manager or myself or on occasion, our cluster

5  lead.

6      Q    And there was not an invitation letter that was

7  sent out for a meeting on the 31st?

8      A    If I recall correctly, there was an extension.

9  If it was not indirectly stated in an invitation letter,

10  it was stated in a letter offering that date as a possible

11  meeting date.

12      Q    Relying on the documents that have been

13  submitted into evidence, have you had a chance to review

14  those documents?

15      A    Yes, I have.

16      Q    Is the invitation -- is there -- well, I guess

17  the hearing officer can review the documents and answer

18  that question for himself.  What is your educational

19  background?

20      A    I have a master's in special education.

21      Q    Originally -- is there a difference between the

22  way they would program for a learning disabled student and

1    a mentally retarded student?

2        A    There is.

3        Q    And can you outline what the differences would

4    be?

5        A    For a mentally retarded student depending on how

6    adapt -- how they adapt their skills or they may receive

7    more life skill training there -- the approach to

8    instruction will be more rote learning, I think, on their

9    ability to retain the information.  And as a learning

10   disabled student depending on the area of learning

11   disability will kind of dictate how the instruction is

12   carried out.

13       Q    Okay.  And what a mentally student -- what kind

14   of progress would you normally see with a mentally

15   retarded student?

16       A    That's going to depend upon the student.

17       Q    Is it true that they would plateau at some point

18   -- confirm to their skill?

19       A    Some students have.

20       Q    Would a learning disabled student be able to

21   make more progress?

22            MR. DALTON:  Objection.  I think these questions

1    are all really way too general and not specific to this

2    particular case at all.

3         MR. ST. CLAIR:  Just a minute.  Mr. Henry has a

4    master's degree in special education, right?

5         MS. GAMBALE:  Uh-huh.

6         MR. ST. CLAIR:  I'm going to --

7         MR. DALTON:  Just for the record, I'm not

8    objecting -- I believe he's highly qualified to answer the

9    question.  The question is just not relevant to this case.

10         MR. ST. CLAIR:  Rephrase your question.  Make it

11   relevant to G█████.

12         MS. GAMBALE:  Okay.

13         BY MS. GAMBALE:

14   Q    Well, first of all, G█████'s classification

15   changed from MR to learning disabled.  As an MR student --

16   well, as an LD student, would G█████ have been expected to

17   make -- what kind of progress would G█████ have been

18   expected to make?

19   A    All students are expected to make progress

20   regardless of the disability category.

21   Q    In terms of grade level, would she be -- in

22   terms -- I'm not quite sure how to phrase the question

1    without making it more general.  Well, let me move on from

2    there.  The compensatory education plan that was drafted

3    in March of 2004 --

4        A    Yes.

5        Q    -- that was not a comprehensive plan?

6            MR. DALTON:  Objection to the form of the

7    question.  I don't understand the question being asked of

8    the witness.

9            MR. ST. CLAIR:  Was that the final judgment --

10    was that the final agreement on compensatory education for

11    all past and now?  (Inaudible) Ms. Gambale?

12            MS. GAMBALE:  That's fine.

13            THE WITNESS:  That was the package that was

14    proposed at that date.

15            MR. ST. CLAIR:  As the final settlement?

16            THE WITNESS:  Yes.

17            BY MS. GAMBALE:

18        Q    And there was no IEP that existed between June

19    of 2002 and March of 2004?

20        A    There was no IEP that was updated, but the

21    program still continues according to the 2002 IEP.

22        Q    Okay.

1           MS. GAMBALE:  I have no further questions.

2           MR. ST. CLAIR:  Redirect?

3           MR. DALTON:  No redirect.

4           MR. ST. CLAIR:  Mr. Henry, on this -- the

5    meeting that took place in December 2003, what's the date?

6           THE WITNESS:  2004?

7           MR. ST. CLAIR:  No.

8           THE WITNESS:  2003?  I'm sorry.

9           MR. ST. CLAIR:  What's the date on that?

10          THE WITNESS:  12/4.

11          MR. ST. CLAIR:  December 4?

12          THE WITNESS:  '03.

13          MR. ST. CLAIR:  Ma'am, do I have a copy of a

14   meeting note anywhere?

15          MS. GAMBALE:  yes.

16          MR. ST. CLAIR:  Where is it?

17          MS. GAMBALE:  There is the meeting notes that

18   are in our exhibit, and they should be labeled number 21

19   and 22.

20          MR. ST. CLAIR:  Here we go.  All right, 21 --

21   okay.

22          MS. GAMBALE:  And then 22 is the -- that's the

```
1    addendum --

2           MR. ST. CLAIR:  Okay, let me see.  All right,

3    now let me see if I understand -- now, at the -- all

4    right, now the -- where do I see the plan offered for --

5           MR. DALTON:  It is in the middle.

6           MR. ST. CLAIR:  It says develop a test --

7    student evaluation plan for -- to continue service in her

8    current IEP with the change in services deliver 15 hours

9    in special ed resource, 5 hours inclusion -- where does it

10   say "comp ed"?

11          THE WITNESS:  That was not discussed at the

12   12/4/03 --

13          MR. ST. CLAIR:  Oh, I'm sorry, I asked you for

14   the --

15          MS. GAMBALE:  Oh, I'm sorry.  I thought you were

16   asking for --

17          MR. ST. CLAIR:  No, this is what the --

18          MR. DALTON:  That is what you asked for --

19          MR. ST. CLAIR:  Yeah, 12/4.

20          MR. DALTON:  That's not the --

21          MS. GAMBALE:  He was there at that meeting.

22          MR. DALTON:  -- 12/31 meeting that the comp ed
```

1   is -- was discussed.

2         MR. ST. CLAIR:  Oh.  Oh, I mistook, now I

3   understand.  Okay.  I'm still trying to --

4         MR. DALTON:  I can recount Ms. Opalack's

5   testimony with regard to this, if that helps or --

6         MR. ST. CLAIR:  According to -- let me see.  All

7   right, now -- well, wait a minute, Ms. Gambale -- one of

8   her complaints is that services were not provided to

9   G████.  Related services were not provided to G█████ from

10  September '03 to December '03, right?

11        MS. GAMBALE:  During the first semester that she

12  was at --

13        MR. ST. CLAIR:  Just dates -- did I get the

14  dates correct?

15        MS. GAMBALE:  Yes.

16        MR. ST. CLAIR:  Fine.  That wasn't discussed

17  here?

18        THE WITNESS:  No, it was not discussed there.

19        MR. ST. CLAIR:  And that was first discussed in

20  this meeting in --

21        THE WITNESS:  March 31st.

22        MR. ST. CLAIR:  Let me ask you this.  What was